No. 23-5611

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

FRIENDS OF GEORGE'S, INC.,

*Plaintiff-Appellee,*

**v.**

STEVEN J. MULROY,

*Defendant-Appellant.*

On Appeal From The United States District Court
for the Western District of Tennessee
2:23-cv-02163 (Parker, T.)

---

## BRIEF OF APPELLEE'S FRIENDS OF GEORGE'S, INC.

---

Brice M. Timmons, #029582
Melissa J. Stewart, #040638
Craig A. Edington, #038205
Donati Law, PLLC
1545 Union Ave.
Memphis, TN 38104
(901) 278-1004 (Office)
(901) 278-3111 (Fax)
brice@donatilaw.com
melissa@donatilaw.com

i

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to 6th Cir. R. 26.1, Plaintiff-Appellee Friends of George's, Inc. makes the following disclosure:

Plaintiff-Appellee Friends of George's, Inc. is a 501(c)3 nonprofit organization. It is not a publicly owned corporation, nor is it owned by any parent corporation with financial interest in the outcome of this case.

# TABLE OF CONTENTS

STATEMENT OF ISSUES ........................................................................ ix

STATEMENT OF THE CASE.................................................................1

SUMMARY OF THE ARGUMENT ......................................................5

ARGUMENT .........................................................................................8

   I.   Organizational Standing .................................................................8

     A.   FOG is Substantially Likely to Engage in Conduct Consistent with Its Purpose...............................................................................................9

     B.  FOG's Future Conduct is Arguably Proscribed by the AEA.....................11

     C.  FOG Faces a Credible Threat of Enforcement............................................12

           1. The AEA is designed to make prosecution easier and more likely. ...................................................................................13

           2. District Attorney Mulroy has refused to disavow enforcement of the AEA. ...................................................................................17

   II.  Narrowing Constructions.................................................................19

      A.  The Definition of "Harmful to Minors."...............................................19

      B.  The Location Clause ........................................................................25

      C.  *Mens rea* Requirement.......................................................................27

   III. The AEA is Facially Invalid.........................................................31

      A.  Strict Scrutiny Applies to the AEA.......................................................31

           1. The AEA is a content-based, viewpoint discriminatory regulation of protected speech. ...................................................................................31

      2.  The AEA was enacted for an impermissible purpose ....................36

  B.  The AEA Fails Under Strict Scrutiny .....................................................39

      1.  The State has a compelling interest in protecting children from indecent content. ............................................................................40

      2.  The AEA is not narrowly tailored...................................................41

  C.  The AEA is Unconstitutionally Vague. .................................................43

  D.  The AEA is Unconstitutionally Overbroad...........................................50

IV. Scope of Relief ..............................................................................................51

CONCLUSION .......................................................................................................53

# TABLE OF AUTHORITIES

## Cases

*Samantar v. Yousuf*, 560 U.S. 305 (2010) ................................................................35

*ACLU v. Mukasey*, 534 F.3d 181 (3rd Cir. 2008) ...................................... 22, 23, 47

*Ashcroft v. ACLU*, 535 U.S. 564 (2002) ......................................................... 31, 44

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) ......................................................... passim

*Blount Pride, Inc., et al. v. Ryan K. Desmond, et al.*, No. 3:23-cv-00316 (E.D. Tenn. 2023) .....................................................................................................17

*Broadrick v. Okla.*, 413 U.S. 601 (1973) ........................................... 39, 51, 52

*Carey v. Brown*, 447 U.S. 455 (1980) ..................................................................34

*City of Austin v. Reagan Nat'l Adver. of Austin, LLC.*, 142 S. Ct. 1464 (2022) .....31

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ...............................................8

*Crawford v. United States Department of Treasury*, 868 F.3d 438 (6th Cir. 2017) .8, 12

*Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.3d 520 (Tenn. 1993) .. passim

*Elonis v. United States*, 575 U.S. 723 (2015) .......................................................27

*Entm't Prods., Inc. v. Shelby County*, 588 F.3d 372 (6th Cir. 2009)............... 26, 35

*Eubanks v. Wilkinson*, 937 F.2d 1118 (6th Cir. 1991).............................................30

*FCC v. Fox Tv Stations, Inc.*, 567 U.S. 239 (2012).................................................49

*Fischer v. Thomas*, 52 F.4th 303 (6th Cir. 2022) ................................................12

*Ginsberg v. New York*, 390 U.S. 629 (1968) .................................................. 41, 48

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ..............................................43

*Greater Cincinnati Coal. For the Homeless v. Cincinnati*, 56 F.3d 710 (6th Cir. 1995). ....................................................................................................9

*Hamling v. United States*, 418 U.S. 87 (1974) ......................................29

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)...........................9

*L.W. v. Skrmetti*, 73 F.4[th] 408 (6th Cir. 2023)..........................................51

*Libertarian Party of Ohio v. Husted*, 751 F.3d 403 (6th Cir. 2014).......................49

*Los Angeles Police Dept. v. United Reporting Publishing Corp.*, 528 U.S. 32 (1999) ................................................................................................v, 50

*McKay v. Federspiel*, 823 F.3d 862 (6th Cir. 2016)................................12

*Miller v. California*, 413 U.S. 15 (1973) .................................... 19, 43, 44

*MX Grp., Inc. v. Covington*, 293 F.3d 326 (6th Cir. 2002).........................8

*New Hampshire Right to Life PAC v. Gardner*, 99 F.3d 8 (1st Cir. 1996) .............14

*New York v. Ferber*, 458 U.S. 747 (1982) ...............................................29

*Nixon v. United States*, 506 U.S. 224 (1993)...........................................37

*Police Dep't of Chicago v. Mosley*, 408 U.S. 92 (1972) ........................52

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ................................ 33, 40

*Ramsey v. Town of Oliver Springs*, 998 S.W.2d 207 (Tenn. 1999)........................18

*Rappa v. New Castle County*, 18 F.3d 1043 (3rd Cir. 1994)...................52

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) .......................... 31, 32, 36

*Reno v. ACLU*, 521 U.S. 844, 875 (1997) .......................... 24, 40, 41, 49

*Rhodes v. Brigano*, 90 F.3d 803 (6th Cir. 1996).....................................20

*Smith v. California*, 361 U.S. 147 (1959) ...............................................29

*St. Paul Area Chamber of Commerce v. Gaertner*, 439 F.3d 481 (8th Cir. 2006)..14

*Staples v. United States*, 511 U.S. 600 (1994) .........................................................27

*Steffel v. Thompson*, 415 U.S. 452 (1974). ................................................................8

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ...........................................8

*Triplett Grille v. City of Akron*, 40 F.3d 129, 136 (6th Cir. 1994) .........................26

*United States ex rel. Felten v. William Beaumont Hosp.*, 993 F.3d 434 (6th Cir. 2021) .....................................................................................................................35

*United States v. Balint*, 258 U.S. 250 (1922) ...........................................................27

*United States v. Parks*, 583 F.3d 923 (6th Cir. 2009) ..............................................27

*United States v. Playboy Entm't Group*, 529 U.S. 803 (2000) ......................... 39, 42

*United States v. Stevens*, 559 U.S. 460 (2010) ................................................. 49, 50

*United States v. Williams*, 553 U.S. 285 (2008) .......................................................50

*Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021 (6th Cir. 2022) ........................................................................................................ 15, 17, 18

*Virginia v. American Booksellers Ass'n*, 484 U.S 383 (1988). ........................ 30, 42

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) .................................. 36, 37, 40

*Warth v. Seldin*, 422 U.S. 490 (1975). ......................................................................8

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 449 (2008)..........50

*Zielasko v. Ohio*, 873 F.2d 957 (6th Cir. 1989) .......................................................18

**Statutes**

Tenn. Code Ann. § 39-11-301 ...................................................................... 28, 29, 30

Tenn. Code Ann. § 39-17-901 ........................................................................ 2, 32, 44

Tenn. Code Ann. § 39-17-911 ............................................................................ 15, 16

Tenn. Code Ann. § 39-17-914 ...................................................................................20

Tenn. Code Ann. § 39-17-914 ................................................... 19, 20, 26

Tenn. Code Ann. § 7-51-1102 ....................................................35

Tenn. Code Ann. § 7-51-1401 ..................................................1, 34

Tenn. Code Ann. § 7-51-1407 ............................................. passim

Tenn. Code Ann. § 8-7-103 ......................................................18

# STATEMENT OF ISSUES

1.  Whether the district court correctly determined that Friends of George's has standing to bring a facial challenge to Tennessee's Adult Entertainment Act

2.  Whether the district court correctly determined that the Adult Entertainment Act is a non-content neutral restriction on speech that fails to satisfy strict scrutiny

3.  Whether the district court correctly determined that the Adult Entertainment Act is both vague and overbroad in violation of the First and Fourteenth Amendments

4.  Whether the district court properly enjoined the Shelby County District Attorney from enforcing the statute in his jurisdiction.

# STATEMENT OF THE CASE

Friends of George's is a theater organization whose mission is to "provide a space outside of bars and clubs where people can enjoy" drag shows and through such performances to "raise money for LGBTQ non-profits." Findings of Fact and Conclusions of Law, R. 91 at PageID 1399. Part of FOG's mission is to provide venues for non-adults to enjoy drag performances outside of stigmatized and age-restricted venues. *Id.* at 1400. FOG includes sexual themes and inuendo in its performances but attempts to keep them in the "PG-13 area." *Id.* FOG's members write all of their own material and produce, direct, and perform in their shows. *Id.* Almost all of Plaintiff's performances are in Shelby County, Tennessee's Evergreen Theater and do not have age restrictions. *Id.*

The AEA was passed in response to a family-friendly drag show in Jackson, Tennessee. Findings of Fact and Conclusions of Law, R.91 at PageID 1404. The AEA amends T.C.A. § 7-51-1401 *et. seq.* Before the AEA, this section of Title 7 was a zoning law that regulated the location, hours, and operations of adult-oriented businesses, such as strip clubs. The statute contained only misdemeanor penalties and regulated only commercial businesses. In a stark departure from the original text and purpose of § 7-51-1401 *et seq.* – regulating the location of sexually oriented businesses in municipalities – the AEA criminalizes the expressive conduct of performers themselves.

1

The AEA amended an existing zoning law regarding strip clubs and similar adult-oriented businesses to include the following prohibition:

**(1) It is an offense for a person to perform adult cabaret entertainment:**

> **(A) On public property; or**

> **(B) In a location where the adult cabaret entertainment could be viewed by a person who is not an adult.**

T.C.A. § 7-51-1407(c)(1). A first offense is a Class A misdemeanor, and a subsequent offense is a Class E felony, punishable by up to six (6) years in prison. *Id.* "Adult cabaret entertainment" is a term newly created by the AEA and not previously part of the statute. It is defined in § 7-51-1401:

**(2) "Adult cabaret entertainment":**

> **(A) Means adult-oriented performances that are harmful to minors, as that term is defined in § 39-17-901, and that feature topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers; and**

> **(B) Includes a single performance or multiple performances by an entertainer.**

Finally, the AEA borrows its definition of "harmful to minors" from Tennessee's existing laws governing the display of pornography in stores, T.C.A § 39-17-901:

**(6) "Harmful to minors" means that quality of any description or representation, in whatever form, of nudity, sexual excitement, sexual conduct, excess violence or sadomasochistic abuse when the matter or performance:**

**(A)** Would be found by the average person applying contemporary community standards to appeal predominantly to the prurient, shameful or morbid interests of minors;

**(B)** Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for minors; and

**(C)** Taken as whole lacks serious literary, artistic, political or scientific values for minors[.]

The Act expressly criminalizes performances by "male and female impersonators" that are "harmful to minors," incorporating by reference a definition of "harmful to minors" that would include even descriptions or representations of "actual or simulated sexual act or sexual contact, an actual or simulated normal or perverted sexual act, or a lewd exhibition of the genitals or post-pubescent female breast . . . in a manner patently offensive with respect to minors" and that "lack serious artistic value with respect to minors." While Plaintiff does not perform actual sexual acts, whether lewd, perverted or otherwise, in its shows, its shows often include descriptions and representations of sexual conduct that likely violate the AEA.

With less than a week before the AEA was set to take effect and fearing criminal charges due to uncertainty about what specific conduct the Act prohibits, Friends of George's filed suit in the Western District of Tennessee on March 27, 2023, challenging the constitutionality of the AEA under the First Amendment and

seeking a temporary restraining order to prevent Defendants from enforcing the statute while the matter was litigated. Compl. R. 1; Pl.'s Mot. For TRO, R. 7.

Five (5) days later, FOG brought a separate suit against Shelby County District Attorney General Steven J. Mulroy in his official and individual capacities in the Western District of Tennessee, which was consolidated with the initial suit. Notice of Consolidation, R. 32; R. 32-1. The Parties submitted briefs, and the district court held a hearing in both cases on March 30, 2023. The following day, and one day before the AEA was to take effect, the district court granted FOG's motions for a Temporary Restraining Order as to all Defendants. Order Granting TRO, R. 26. On April 5, 2023, the district court held a status conference during which all parties consented to consolidate the cases and extend the Temporary Restraining Order until May 24, 2023. Order Extending TRO, R. 31. The district court also consolidated the preliminary injunction hearing with the trial on the merits. A few weeks later, FOG moved to dismiss all Defendants other than District Attorney General Steven J. Mulroy, which the Court granted. Order Granting Mot. to Dismiss, R. 60. The Court held a consolidated preliminary injunction hearing and trial on the merits on May 22-23, 2023. On June 2, 2023, the district court entered its Findings of Fact and Conclusions of Law. Findings, R. 91.

Based on the evidence at trial and an analysis of the AEA, the Court found that FOG had Article III standing to bring suit because it credibly feared enforcement

of the AEA. *Id.* at 1407. The district court further ruled that because Plaintiff under the relaxed rules of prudential standing in First Amendment cases, FOG had standing to assert the interests of third parties. *Id.* The Court ruled that the AEA was facially unconstitutional under the First Amendment and that it was passed for an impermissible purpose. *Id.* at 1459-60. The court dismissed the District Attorney in his individual capacity and entered declaratory relief ruling the AEA unconstitutional in violation of the First and Fourteenth Amendments. The court also permanently enjoined District Attorney General Mulroy, in his official capacity, from enforcing the Act in his jurisdiction, Shelby County, Tennessee. *Id.*

## SUMMARY OF THE ARGUMENT

The district court correctly determined that FOG had Article III standing to challenge the AEA's constitutionality. At trial, FOG established a substantial probability of engaging in conduct that is arguably affected with a constitutional interest but proscribed by the AEA. FOG also established a credible threat of enforcement in two ways. First, District Attorney Mulroy has refused to disavow enforcement of the AEA; second, the AEA makes prosecution easier and more likely, because it targets specific performers for enforcement and is without scienter requirement or affirmative defenses.

The district court correctly rejected the three narrowing constructions put forth by the State. The State asks this Court to read, "minor" to mean "reasonable

17-year-old minor;" to read "in a location where the adult cabaret entertainment could be viewed by a person who is not an adult" to mean "anywhere adult entertainment could *permissibly* be viewed by a person who is not an adult;" and to read into the text of the AEA a *mens rea* requirement where none exists. The district court was correct when it found that the State's arguments amounted to redrafting the AEA, which is beyond the scope of a federal court's authority.

The district court correctly determined that the AEA is a content-based, viewpoint discriminatory restriction on protected speech. Alternatively, the district court correctly determined that the AEA was adopted by the legislature for an impermissible purpose – because lawmakers disagreed with the message certain speakers sought to convey. The AEA is therefore presumptively unconstitutional and must be reviewed under strict scrutiny.

The AEA cannot survive strict scrutiny. It contains no affirmative defenses or exceptions and no *mens rea* requirement. Nor has the State proffered any evidence that the alternatives proposed by FOG would be a less effective means of achieving the State's purported goal of protecting children from sexually explicit content. Nor has the State explained why Tennessee's existing criminal statutes regulating obscenity are insufficient.

The AEA is unconstitutionally vague. The Act relies on the community standards of the judicial district in which the performance occurs, effectively

creating thirty-one different definitions of the prohibited conduct. It also applies to all minors under the age of 18, requiring performers to know both the precise community standard of the district and the precise ages of any minors in the audience. There is no way for ordinary persons to know what precisely is prohibited; nor does the AEA provide explicit standards for law enforcement who seek to enforce the Act.

The AEA is overbroad, sweeping up large swaths of protected speech. It is not limited to businesses or commercial transactions, but applies anywhere a minor "could" view a performance. It reaches even into the private homes of Tennesseans. And because the AEA applies to all minors under the age of 18, performers are forced to tailor their content to the youngest possible audience in order to comply with the law.

Finally, the State's proposed remedies are improper. FOG has standing to challenge the public-property provision of the AEA, so the district court acted properly when it enjoined its enforcement. Additionally, under the relaxed prudential standing requirements in First Amendment facial challenges, any enforcement of the law is forbidden. Severing the entertainers clause would exacerbate, rather than remedy, the many constitutional maladies of the AEA.

## ARGUMENT

### I. Organizational Standing

Although a plaintiff in federal court must have Article III standing, a plaintiff need not "first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). To have standing in the pre-enforcement context, a plaintiff need only show "a substantial probability that the plaintiff actually will engage in conduct that is arguably affected with a constitutional interest," and "a certain threat of prosecution if the plaintiff does indeed engage in that conduct." *Crawford v. United States Department of Treasury*, 868 F.3d 438, 454-55 (6th Cir. 2017) (combining standards from *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014), *Warth v. Seldin*, 422 U.S. 490, 498 (1975), and *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013)).

The district court ruled that FOG is an organization, and while the AEA targets individual performers rather than businesses or organizations, FOG has standing because the organization itself "has suffered a palpable injury as result of the defendants' actions." *MX Grp., Inc. v. Covington*, 293 F.3d 326, 332-22 (6th Cir. 2002).[1] To demonstrate organizational standing, FOG must show that its "ability to

---

[1] As noted above, Plaintiff also argued that FOG itself could face criminal penalties under Tennessee's Criminal Facilitation and Corporate Criminal Liability statutes, Tenn. Code Ann. 39-11-403 & 404.

further its goals has been perceptively impaired so as to constitute far more than simply a setback to the organization's abstract social interests." *Greater Cincinnati Coal. For the Homeless v. Cincinnati*, 56 F.3d 710 (6th Cir. 1995) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

### A. FOG is Substantially Likely to Engage in Conduct Consistent with Its Purpose

At trial, the district court heard evidence on FOG's mission and performances. Ms. Rodley, a member of FOG, testified that FOG is a "drag-centric theatre group" that puts on three productions each year. FOG's mission has two main objectives: to raise money for local LGBTQ non-profit organizations, and to provide a space for drag outside of bars and nightclubs.[2] Tr. of Consolidated Hr'g, R. No. 81 at PageID 1064.

FOG played videos of its past productions. The first production, "The Tea with Sister Myotis," features four individual "female impersonators." The sketch includes verbal descriptions of sexual acts, including masturbation and intercourse. In the second video, "Paradise by Dashboard Light," performers silhouetted behind a translucent curtain made gestures intended to portray "ultimate sex acts." The district court found that "the conduct of performers in this production could be

---

[2] *See also,* Friends of George's, Inc. website, https://www.friendsofgeorges.org/about/ ("We also recognized the LGBTQ community's growing need for events and activities outside of bars and nightclubs . . .")

interpreted by a law enforcement officer as violating the AEA." Findings, R. 91 at PageID 1400.

Ms. Rodley also testified about other FOG past productions. The first production was from FOG's April 2023 production, "Drag Rocks." Ms. Rodley testified that the performance featured a Rod Stewart impersonator who was "wearing tight, tight black pants and he is . . . wearing a penis that is over exaggerated so the audience can see it's there." Tr. of Consolidated Hearing, R. 81 at PageID 1074. Ms. Rodley also testified about a skit entitled "Dick in a Box," which "involved two people presenting gift packages where their penises would be . . . penis is in a box, it's got tissue around it." These performances are arguably proscribed under § 39-17-901's prohibition on the "depiction of male genitals in a discernibly turgid state. Findings, R. 91 at PageID 1419. Ms. Rodley testified that all of these productions were performed at a local theater venue with no restrictions on the age of the audience. Tr. of Consolidated Hearing, R. 81 at PageID 1074.

The district court found Ms. Rodley's testimony to be credible. Findings, R. 91 at PageID 1421. The court concluded that these performances "are typical of Plaintiff's productions since 2011," and that FOG intends "beyond a substantial probability" to continue writing and producing drag-centric shows of this kind, and that FOG intends to keep its productions open to all ages. *Id.* To comply with the AEA, FOG would have to censor the material it writes and produces, or else strictly

enforce age restrictions on its future shows. The AEA thus directly impedes FOG's mission to bring drag out of traditionally age-restricted venues like bars and nightclubs.

### B. FOG's Future Conduct is Arguably Proscribed by the AEA.

The State argues that FOG's performances, as described above, are not arguably covered by the AEA, because the AEA restricts only performances that contain "nudity, sexual excitement, sexual conduct, excess violence, or sadomasochistic abuse" that are "harmful to minors" under an adapted *Miller* standard. Appellant Br. at 18. This is misleading. The AEA's definition of "harmful to minors" reaches beyond actual nudity, sexual excitement, etc. and includes "that quality of any *description or representation, in whatever form*" of the enumerated content. T.C.A. § 39-17-901 (emphasis added). The district court found that FOG's shows are "performances that both described and represented sexual content that is arguably constitutionally protected." Findings, R. 91 at PageID 1422.

The State also argues that the Tennessee Supreme Court's narrowing construction to the AEA's "harmful to minors" standard in *Davis-Kidd Booksellers, Inc. v. McWherter* is controlling in this case and that, under that construction, FOG's productions are not arguably covered by the AEA. In particular, the State argues that under that narrowing construction, FOG must prove that its productions "lack serious literary, artistic, political, or scientific value *for a reasonable 17-year-old-*

*minor*." Appellant Br. at 30. (Citing *Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.3d 520 (Tenn. 1993). This argument fundamentally misunderstands the Tennessee Supreme Court's holding in that case, as will be fully discussed in the merits below. But regardless, this issue is irrelevant for purposes of standing. FOG need only demonstrate that its conduct is "arguably proscribed" by the statute; it need not prove conclusively that its conduct is proscribed under the State's preferred reading of the statute. *see Crawford*, 868 F.3d at 454-55. The State's argument would require FOG to win on the merits of its claim before it has standing to bring suit.

### C. FOG Faces a Credible Threat of Enforcement

FOG has also demonstrated an imminent threat of enforcement. When determining whether a Plaintiff faces a threat of enforcement, this Court has "highlighted four commonly recurring factors to consider: (1) Does the relevant prosecuting entity have a prior history of enforcing the challenged provisions against the plaintiffs or others? (2) Has that entity sent warning letters to the plaintiffs regarding their conduct? (3) Does the challenged regulatory regime make enforcement easier or more likely? And (4) Did the prosecuting entity refuse to disavow enforcement of the challenged provisions against the plaintiffs?" *Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022) (quoting *McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016)). The *McKay* factors are not "a laundry list; [plaintiffs]

don't have to satisfy all the factors" to have standing. *Fischer*, 52 F.4th at 307. In this case, the third and fourth considerations settle the matter in FOG's favor.

### 1. The AEA is designed to make prosecution easier and more likely.

The AEA makes enforcement easier or more likely in three ways. First, the law prohibits "adult cabaret entertainment," which is defined as "performances that are harmful to minors, as that term is defined in Tenn. Code Ann. § 39-17-901, and that feature topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers[.]" There are two possible ways to read this definition. Under one reading, "adult cabaret entertainment" must be harmful to minors *and must also* include one of the enumerated performers. Read another way, "adult cabaret entertainment" includes performances that are harmful to minors, and also, *separately,* includes performances which feature the enumerated performers. Under either reading, FOG is targeted by the law. FOG is a drag-centric theatre troupe; all of its shows feature "male or female impersonators." The former reading invites law enforcement to surveille FOG's performances for content an officer might believe is "harmful to minors." Under the latter interpretation, FOG need do nothing more salacious than feature a man in a ballgown in order to run afoul of the AEA.

Second, the AEA is easier to enforce because it lacks a scienter requirement. The State argues that this Court should read a scienter requirement into the law. For

reasons explained below, this argument is atextual. Tennessee's catch-all *mens rea* statute is found in Tenn. Code Ann. § 39-11-301:

> If the definition of an offense ***within this title*** does not plainly dispense with a mental element, intent, knowledge or recklessness suffices to establish the culpable mental state.

(emphasis added). Despite the fact that the AEA carries felony penalties, the legislature placed the statute in Title 7, rather than in Title 39 with the rest of Tennessee's criminal code. Thus, § 39-11-301 does not apply to laws in Title 7, rendering the AEA a strict liability statute with felony penalties. The State can successfully prosecute violations of the AEA without proving that a performer had any knowledge of either the material or the age of the audience. The lack of *mens rea* makes the AEA easier to enforce and captures more conduct, including instances when a performer does not even know that a minor is or "could be" present.

Finally, the AEA is a recently-enacted law. At least two other circuits have found that this fact weighs in favor of a credible threat of prosecution. *See St. Paul Area Chamber of Commerce v. Gaertner*, 439 F.3d 481, 486 (8th Cir. 2006) ("When dealing with pre-enforcement challenges to recently enacted (or at least non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence.") (quoting *New Hampshire Right to Life PAC v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996)).

These cases are consistent with this Court's holding in *Universal Life Church Monastery Storehouse v. Nabors*. At issue in that case was a 2019 Tennessee statute which prohibited persons who received online ordinations to become ministers from performing marriage services. 35 F.4th 1021, 1025 (6th Cir. 2022). Defendants in that case argued that no future prosecution was imminent because "there has never been a ULC minister prosecuted in the past for violating" the law. *Id.* at 1035. The state defendants also argued that "ULC solemnization was *already* illegal before 2019 – with the amendment just making the proscription clearer[.]" *Id.* This Court rejected the state's arguments for several reasons. First, the district court enjoined enforcement of the statute "almost as soon as the law went into effect," so "the fact that no one has been prosecuted under the amendment is unsurprising." *Id*. Second, even if ULC solemnization was already illegal before 2019, "by making the proscription so much clearer in 2019, the legislature may have emboldened prosecutors in a way that they were not before the amendment." *Id*.

The State makes nearly identical arguments in this case, first arguing that "FOG sued before the Act even went into effect, so it cannot establish a history of prior enforcement." App. Br. at PageID 33. The State asserts that this Court should consider the lack of prosecution under T.C.A. § 39-17-911(b), which the State claims "includes the same prohibition" as the AEA. This is inaccurate. § 39-17-911(b) contains both a "knowing" scienter requirement and an affirmative defense to

prosecution for the consent of the minor's parent or legal guardian, and carries only misdemeanor penalties. The AEA contains no scienter requirement, no affirmative defenses or exceptions, and carries felony penalties. The AEA also targets specific, enumerated performers (topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers), whereas § 39-17-911(b) applies to any "motion picture, show, or other presentation" and does not discriminate based on the identity of the performer.

Additionally, § 39-17-911(b) regulates commercial activity – the sale of admission tickets or passes – where the AEA targets the performers themselves. Consider the following hypothetical: a restaurant hosts a drag show that would violate the AEA if minors were present. The owner of the restaurant decides to limit admission to persons 18 years of age and older. A parent chooses to bring their 17-year-old minor to the show. Since the minor is accompanied by their parent, the owner knowingly allows the minor to watch the show, because § 39-17-911(b) permits the admission of minors with parental consent. Under Tennessee law, the owner of the restaurant has done nothing wrong. But the *performers* of the show could still be prosecuted, because the AEA is without scienter or affirmative defenses.

The legislature has "emboldened prosecutors in a way that they were not before the amendment" beyond mere hypotheticals. *Universal Life Church,* 35 F.4th

at 1035. On August 29, 2023, Blount County District Attorney Ryan Desmond sent a 3-page letter to Blount Pride, Inc., threatening enforcement of the AEA at Blount Pride's upcoming annual Pride festival. Letter from Desmond, ECF 1-3, *Blount Pride, Inc., et al. v. Ryan K. Desmond, et al.*, No. 3:23-cv-00316 (E.D. Tenn. 2023). The letter was sent nearly three months after a federal judge had declared the AEA unconstitutional. DA Desmond alleged that Blount Pride's social media posts, which featured a number of performers in drag, gave him reason to believe the performances might violate the AEA. None of the social media posts included sexual content of any kind; the DA's belief was based entirely on g-rated photos of drag performers. *See* Blount Pride Promotional Materials, ECF 1-4, *Blount Pride, Inc., et al. v. Ryan K. Desmond, et al.*, No. 3:23-cv-00316 (E.D. Tenn. 2023). DA Desmond also addressed the letter to three different heads of local law enforcement, effectively empowering and encouraging police to target Blount Pride and the drag artists who were scheduled to perform. No District Attorney had ever previously threatened to enforce Tennessee's existing obscenity laws against Blount Pride. DA Desmond was newly empowered to target Blount Pride and drag performers because of the AEA.

Absent compelling evidence to the contrary, this Court should presume that FOG faces a similar threat of imminent enforcement.

### 2. District Attorney Mulroy has refused to disavow enforcement of the AEA.

District Attorney Mulroy "has both a 'constitutional and statutory obligation

to prosecute offenses committed in [Shelby] County.'" *Universal Life Church*, 35 F.4th at 1035 (quoting *Ramsey v. Town of Oliver Springs*, 998 S.W.2d 207, 208 (Tenn. 1999)); *see also* TCA § 8-7-103(1) ("each district attorney general . . . [s]hall prosecute in the courts of the district all violations of the state criminal statutes[.]"). FOG intends to continue to write and produce material consistent with the performances in the record, which the district court found to be "typical of Plaintiff's productions since 2011." Findings, R. 91 at PageID 1401. By engaging in this speech in a non-age restricted venue, FOG "would be subject to the real and immediate (not merely conjectural or hypothetical) harm of criminal penalty." *Universal Life Church*, 35 F.4th at 1035 (quoting *Zielasko v. Ohio*, 873 F.2d 957, 959 (6th Cir. 1989)).

DA Mulroy has never "provided clear assurances that [he] will *not* prosecute" FOG. *Id.* (emphasis original). To the contrary, he has unequivocally stated that he "intends to enforce all State of Tennessee laws that fall within his prosecutorial jurisdiction, including the felony and misdemeanor crimes recently codified at Tenn. Code Ann. § 7-51-1407." Pretrial Order, R. 69 at PageID 955; Mulroy FAQ, R. 41-3 at PageID 727. So this factor is also satisfied.

Article III standing requires a certain *threat* of prosecution under the AEA; a plaintiff need not prove that prosecution is certain. FOG has met that burden here.

## II. <u>Narrowing Constructions</u>

In its opening brief, the State proposes three (3) major narrowing constructions it believes the Court should adopt in this case. The State's arguments, both as to standing and the merits, substantially rely on this Court's adoption of all three narrowing constructions. Those narrowing constructions are incompatible with the plain meaning of the statute. Even if the State's narrowing constructions were adopted, FOG would still have standing and the AEA would still be unconstitutional.

### A. The Definition of "Harmful to Minors."

The AEA regulates "adult cabaret entertainment," which is defined in part as a performance that is "harmful to minors" as that term is defined in Tenn. Code Ann. § 39-17-901. The definition of "harmful to minors" includes a modified version of the three-prong *Miller* test for obscenity, adapted for minors. *See generally, Miller v. California*, 413 U.S. 15 (1973). The third prong requires that the performance, "taken as a whole, lacks serious literary, artistic, political, or scientific value *for minors*." T.C.A. § 39-17-901 (emphasis added). The addition of the term "for minors" moves this statute beyond the realm of obscenity and into a content-based restriction on speech. *ACLU v. Mukasey,* 534 F.3d 181, 191 (3rd Cir, 2008) (applying strict scrutiny to a statute with substantially similar definitions). In *Davis-Kidd Booksellers, Inc. v. McWherter*, the *Tennessee Supreme* Court considered the definition of "harmful to minors" in the context of a T.C.A. § 39-17-914(a), a statute

which regulates the display of sexually explicit materials such as books, magazines, and videos. 866 S.W.2d 520 (Tenn. 1993). Invoking the doctrine of constitutional avoidance, the Tennessee Supreme Court narrowly construed the display statute to be "only applicable to those materials which lack serious literary, artistic, political, or scientific value for a reasonable 17-year-old minor." *Id.* at 528.

The State asserts that the *Davis-Kidd* construction controls here, because "federal courts are 'bound by the state court's interpretation of its criminal laws.'" App. Br. at 30 (quoting *Rhodes v. Brigano*, 90 F.3d 803, 806 (6th Cir. 1996)). According to the State, because the definition of "harmful to minors" at issue in *Davis-Kidd* is the same statutory language used in the AEA, "the text of § 39-17-901 must have the same meaning here as it did in *Davis-Kidd*." App. Br. at 30.

But the court in *Davis-Kidd* did not consider the definition of "harmful to minors" in isolation or in the context of a statute criminalizing live performances. At issue was Tenn. Code Ann. § 39-17-914 ("display statute"), which "made it a criminal offense for 'a person to display for sale or rental a visual depiction, including a video cassette tape or film, or a written representation, including a book, magazine or pamphlet, which contains material *harmful to minors* anywhere minors are lawfully admitted.'" *Davis-Kidd*, 866 S.W.3d at 522 (quoting T.C.A. § 39-17-914)). The court held that "the *display statute* applies only to those materials which lack serious literary, artistic, political, or scientific value for a reasonable 17-year-

old minor." *Davis-Kidd*, 866 S.W.2d at 528 (emphasis added.).

The display statute was also "readily susceptible" to such a narrowing construction. *Id.* at 526. The display statute included a number of affirmative defenses and informed retailers of exactly where and how explicit materials could be displayed. The court applied a single narrowing construction that, in the court's view, prevented the statute from running afoul of the First Amendment.

The State's argument would transform the Tennessee Supreme Court's holding to reach far beyond a display statute and would extend it to cover anything the State wishes to append to the definition of "harmful to minors," regardless of context. Nothing in the *Davis-Kidd* opinion even suggests that the Court's reasoning extended beyond the narrow issue of how to sell pornographic materials in a retail setting to which minors were lawfully admitted. In fact, the *Davis-Kidd* Court explicitly reserved consideration in other contexts. *Id.* at 532 ("[W]e do not deem it necessary in this case to further define the boundaries of freedom of expression under the Tennessee Constitution. We prefer, as the court of last resort, to interpret Article I, § 19 of the Tennessee Constitution on a case by case basis as issues arise.") The Tennessee Supreme Court has never considered a statute remotely similar to the AEA, and this Court should not so broadly construe a holding that was explicitly limited to its facts.

The *Davis-Kidd* case also predates a number of key First Amendment cases

that render it obsolete. In *Ashcroft v. ACLU*, 542 U.S. 656 (2004) ("*Ashcroft II*"), the Government appealed a preliminary injunction barring the implementation of the Child Online Protection Act (COPA). The Supreme Court affirmed the Third Circuit's holding that COPA was not narrowly tailored. *Id.* at 673. On remand, the Third Circuit applied a detailed overbreadth analysis to COPA's definition of "harmful to minors," and found the definition both overbroad and not narrowly tailored. *ACLU v. Mukasey*, 534 F.3d 181, 189-192 (3rd Cir. 2008). The definition of "harmful to minors" used in COPA is as follows:

> Any communication, picture, image, graphic image file, article, recording, writing, or other matter of any kind that is obscene or that—
>
> "(A) the average person, applying contemporary community standards, would find, taking the material as a whole and with respect to minors, is designed to appeal to, or is designed to pander to, the prurient interest;
>
> "(B) depicts, describes, or represents, in a manner patently offensive with respect to minors, an actual or simulated sexual act or sexual contact, an actual or simulated normal or perverted sexual act, or a lewd exhibition of the genitals or post-pubescent female breast; and
>
> "(C) taken as a whole, lacks serious literary, artistic, political, or scientific value for minors." § 231(e)(6).

"Minor[s]" were defined in COPA as "any person under 17 years of age." § 231(e)(7); *Ashcroft II*, 542 U.S. at 661-62. Compare this to the definitions employed by the Adult Entertainment Act:

> (6) "Harmful to minors" means that quality of any description or representation, in whatever form, of nudity, sexual excitement, sexual conduct, excess violence or sadomasochistic abuse when the matter or

22

performance:

(A)  Would be found by the average person applying contemporary community standards to appeal predominantly to the prurient, shameful or morbid interests of minors;

(B)  Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for minors; and

(C)  Taken as whole lacks serious literary, artistic, political or scientific values for minors;

Tenn. Code Ann. § 39-17-901.

These definitions are substantially similar, and so the Third Circuit's analysis is highly instructive. The *Mukasey* court held that COPA was overbroad in part because of its definition of "minor," which included any person under the age of 17. The court held that "COPA's definition of 'minors' renders the statute overinclusive because it broadens the reach of material that is harmful to minors under the statute to encompass a vast array of speech that is clearly protected for adults – and indeed, may not be obscene as to older minors." *Mukasey,* 534 F.3d at 206 (internal quotations omitted). This definition of "minor" means the statute "applies in a literal sense to an infant, a five-year old, or a person just shy of age seventeen." *Id.* at 191. The Third Circuit held that this would result in "great uncertainty in deciding what minor could be exposed" to published materials. *Id.* The court expressly rejected the Government's reasoning that COPA should be read to apply "only to normal, older adolescents." *Id.* Rather, COPA required that all content be tailored to the needs of

the most impressionable children, effectively limiting it to "that which would be suitable for the sandbox." *Reno v. ACLU*, 521 U.S. 844, 875 (1997).

The AEA defines "minor" as "any person under the age of 18, rendering the Act even broader than COPA. Here, as in *Mukasey*, there is nothing in the text of the AEA to limit the phrase "harmful to minors" to include performances only harmful to "reasonable, seventeen-year-old minors." *See Id.* at 193.

The AEA is not readily susceptible to a narrowing construction. The statute "provides no guidance whatever for limiting its coverage." *Reno v. ACLU*, 521 U.S. 844, 885 (1997). Nothing in the text, the legislative history, or any other source of legislative intent "identified a clear line that this Court could draw." *Id.* In fact, the legislative history indicates that the legislature sought to protect *young* children from sexual conduct. Legisl. Tr., R. 35-1 at PageID 549 (Senator Massey stating that lewd performances are "not appropriate for young kids.").

Even if this Court were to adopt the State's argument and limit the "harmful to minors" standard to "reasonable 17-year-old minors," the AEA would violate the First Amendment. This is evident from the fact that the State asks this Court to adopt not one, not two, but *three* different "narrowing constructions," essentially asking the federal courts to take on the role of the Tennessee legislature. The Supreme Court has "stricken legislation when the construction supplied by the state court failed to cure" the constitutional maladies. The *Davis-Kidd* holding was limited to the display

statute, and its analysis is likely incompatible with modern First Amendment precedent. Even if this Court were to retrofit portions of that holding to the AEA, such a construction would not rescue it from facial invalidity. This Court should, for the same reasons, decline to certify the question to the Tennessee Supreme Court, as that Court has consistently held that it "cannot, under the guise of judicial interpretation of the statute, in effect rewrite the law and thus substitute [the court's] own policy preferences for the Legislature's." and reject the State's flawed reasoning. *Calaway ex rel. Calaway v. Schucker*, 193 S.W.3d 509, 517 (Tenn. 2005).

## B. The Location Clause

The AEA prohibits adult cabaret entertainment "in a location where the adult cabaret entertainment could be viewed by a person who is not an adult." T.C.A. § 7-51-1407((c)(B). Ignoring the text, the State argues that "the statute is more naturally read to only apply to a location where the adult cabaret entertainment could *permissibly* be viewed by a person who is not an adult." App. Br. at 51. This reading is, as the district court noted, "completely unmoored from the text." Findings, R. 91 at PageID 1407. As the district court correctly explained, because the statute unambiguously applies anywhere the performance "*could* be viewed by a person who is not an adult," it applies "virtually anywhere, because minors *could* theoretically sneak into locations where they are not permitted to be." *Id.* at PageID 1450.

Contrary to the State's suggestion, there is nothing "natural" about reading the statute to mean that it is limited to locations where the entertainment can "permissibly be viewed" by children. App. Br. 34. The AEA's location clause contains no such limiting language or affirmative defenses. When the Tennessee General Assembly wants to limit the location clause in an obscenity statute, it does so. For example, the display regulation statute at issue in *Davis-Kidd* applies only to locations where "minors are *lawfully* admitted." T.C.A. § 39-17-914 (emphasis added). The legislature did not include any similar limitation in the AEA, and it would "be improper for this Court to *supply* limiting language . . . in order to preserve [a law's] constitutionality." *Entm't Prods., Inc. v. Shelby County*, 588 F.3d 372, 388 (6th Cir. 2009) (quoting *Triplett Grille v. City of Akron*, 40 F.3d 129, 136 (6th Cir. 1994)).

In any case, the State's construction of the location clause does little to narrow its scope. The display statute in *Davis-Kidd* regulated commercial establishments that may choose to check identification at the door to ensure that no minors are admitted. The AEA does not regulate businesses; it criminalizes the speech and expression of individual performers whether or not they are performing for pay. A minor is "lawfully admitted" in their own home, the homes of friends and family, and any number of other places that are not commercial establishments. The State's reading of the location clause does not preclude enforcement of the AEA in these

spaces.

### C. *Mens rea* Requirement

Finally, the State asks this Court to read a scienter requirement into the text where none exists. The State provides two justifications for this reading of the AEA. First, the State argues that the Court should "presume there is a *mens rea* requirement in the statute," absent any indication that the legislature intended otherwise. App. Br. at 67 (quoting *Staples v. United States*, 511 U.S. 600, 605-19 (1994); *Elonis v. United States*, 575 U.S. 723, 734 (2015)).

First, *Staples* and *Elonis* stand for the proposition that courts presume a *mens rea* requirement in *federal* criminal statutes. *See Staples*, 511 U.S. at 605 ("Thus, we have long recognized that determining the mental state required for commission of a federal crime requires 'construction of the statute and . . . inference of the intent of Congress.") (quoting *United States v. Balint*, 258 U.S. 250, 253 (1922); *see also Elonis*, 575 U.S. at 734 (applying the presumption of *mens rea* to a federal statute; *United States v. Parks*, 583 F.3d 923, 926 (6th Cir. 2009) (applying the presumption of *mens rea* to a federal statute). Again, the State asks this Court to do the job of the Tennessee legislature and rewrite a state criminal statute. This Court should decline to take on the role of legislator-of-last-resort.

Nonetheless, should this Court choose to apply such a presumption to the AEA, the presumption is rebutted by the evidence in the record. The district court

found that there was evidence that the legislature intended to lower the *mens rea* requirement to criminalize more conduct, because it drew language from a case that considered a textual scienter requirement yet excluded it from the AEA anyway. Findings, R. 91 at PageID 1439-40. The State points to nothing in the record suggests that the legislature intended to include such a requirement.

The legislature chose to place the AEA in Title 7 of the Tennessee Code, rather than in Title 39 where one would typically find a criminal offense. It would have been simpler to place the AEA in Title 39 with the rest of Tennessee's obscenity laws, especially since the AEA cross-references definitions from Title 39. As noted above, this choice places the AEA beyond the reach of Tennessee's catch-all *mens rea* statute, § 39-11-301, which provides that:

> (b) A culpable mental state is required *within this title* unless the definition of an offense plainly dispenses with a mental element.
>
> (c) If the definition of an offense *within this title* does not plainly dispense with a mental element, intent, knowledge, or recklessness suffices to establish the culpable mental state.

(emphasis added). By situating the AEA outside of Title 39, the General Assembly placed the AEA beyond the reach of § 39-11-301 and the default scienter requirements applicable to the Tennessee criminal code. Had the legislature intended to include a scienter requirement in the AEA, it would have included one in the text of the law or placed the AEA with the rest of Tennessee's criminal code. It did neither; it therefore created a strict liability offense.

28

Second, the State asserts that "the Tennessee Supreme Court has inferred scienter for all 'criminal statutes regulating obscenity.'" App. Br. at 67 (quoting *Davis-Kidd*, 866 S.W. 2d at 528). The State again misstates the court's holding in *Davis-Kidd*. The Tennessee Supreme Court noted the constitutional mandate that criminal obscenity statutes require the State to "establish that the defendant had knowledge of the contents and character of the materials displayed or sold." *Davis-Kidd*, 866 S.W.2d at 528. (citing *New York v. Ferber*, 458 U.S. 747, 765-66 (1982); *Hamling v. United States*, 418 U.S. 87, 123 (1974)). In the absence of such a *mens rea* requirement, obscenity statutes fail constitutional muster. *See Smith v. California*, 361 U.S. 147 (1959) (striking down an ordinance criminalizing the possession of obscene books, because the statute did not require proof that a person had knowledge of the content of the book).

The Tennessee Supreme Court then noted that Tennessee's display statute meets this requirement because "the State must prove that the bookseller had knowledge of the contents and character of the material displayed or sold to establish a violation." *Davis-Kidd*, 866 S.W.2d at 528. The Court did not *sua sponte* impose a *mens rea* requirement without a legal basis to do so. The Court explicitly stated that it imputed such a scienter requirement because "Tenn. Code Ann. § 39-11-301(c) supplies that requirement." *Id.*

The Tennessee Supreme Court did not read a knowledge requirement into all

criminal obscenity laws; it did not even read a knowledge requirement into the display statute at issue in *Davis-Kidd*. The court did not need to, because the display statute is located in Title 39 and thus subject to § 39-11-301(c). Here, the legislature failed to include a scienter requirement in the text of the AEA, and then intentionally placed the statute in Title 7, where Tenn. Code Ann. § 39-11-301(c)'s default *mens rea* provision does not apply. The State's interpretation of the AEA is, once more, contrary to both the text of the statute and any other indication of legislative intent.

***

The State asks this Court to adopt three different narrowing constructions, any one of which amounts to "rewriting the statute to conform it to constitutional requirements." *Virginia v. American Booksellers Ass'n*, 484 U.S 383, 397 (1988). This Court has previously held that "a federal court has very limited powers in construing state statutes or municipal ordinances," and that federal courts "cannot find the statute or ordinance constitutional on the basis of a limiting construction supplied by it rather than a state court." *Eubanks v. Wilkinson*, 937 F.2d 1118, 1126 (6th Cir. 1991) (internal quotation marks omitted). Nothing in either the text of the AEA or its history suggests that "the [Tennessee] legislature would have chosen this limiting language." *Id*. This Court should decline to redraft the AEA and reject the State's proposed constructions.

## III.    The AEA is Facially Invalid

### A.  Strict Scrutiny Applies to the AEA

#### 1.  The AEA is a content-based, viewpoint discriminatory regulation of protected speech.

"As a general matter, the First Amendment means that the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) ("*Ashcroft I*"). Content-based regulations on speech are therefore "presumptively unconstitutional," and must survive strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). A law is content-based when it "'targets speech based on its communicative content' – that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin v. Reagan Nat'l Adver. of Austin, LLC.*, 142 S. Ct. 1464, 1471 (2022) (quoting *Reed*, 576 U.S. 155,163 (2015)).  Facially content-based laws are subject to strict scrutiny, "regardless of the government's benign motive" or "content-neutral justification." *Id.* at 165. "Government discrimination among viewpoints – or the regulation of speech based on the specific motivating ideology or the opinion or perspective of the speaker – is a more blatant and egregious form of content discrimination." *Reed*, 576 U.S. at 169. The district court correctly determined that the AEA is a content-based regulation. Findings, R. 91 at PageID 1431. At trial, the State agreed that the AEA "does reference content in the statute" but denied that the statute is viewpoint-discriminatory or subject to strict

31

scrutiny. Tr. of Consolidated Hr'g, R. 81 at PageID 1193.

The AEA creates criminal penalties for performers of "adult cabaret entertainment:"

> "Adult cabaret entertainment" means adult oriented performances that are harmful to minors, as that term is defined in § 39-17-901, and that feature topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers;

Tenn. Code Ann. § 7-51-1407. The definition of "harmful to minors" is lifted from Tennessee's criminal code definitions of obscenity and reads in part, "Harmful to minors means that quality of any description or representation, in whatever form, of nudity, sexual excitement, sexual conduct, excess violence or sadomasochistic abuse . . ." T.C.A § 39-17-901(6). The AEA plainly "defin[es] the regulated speech by particular subject matter." *Reed*, 576 U.S. at 163.

The AEA is not only a content-based regulation; it is also viewpoint-based. "Adult cabaret entertainment" means "adult oriented performances that are harmful to minors" as defined by § 39-17-901(6), and that feature topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers." There are two possible readings of this definition—both of them are viewpoint discriminatory.

The first reading requires that a performance is **both** 1) harmful to minors **and** 2) includes a performer of the type listed. Under this reading, the content of a performance could be "harmful to minors" without violating the law, as long as the

performer is not a topless dancer, go-go dancer, exotic dancer, stripper, male or female impersonator, etc. Under this reading, whether or not speech violates the Act is entirely dependent on the identity of the speaker.

Alternatively, the definition can be read to mean that adult oriented performances are 1) performances that are harmful to minors and **separately**, 2) performances that feature the enumerated entertainers. While this reading is inclusive of anyone who performs material that meets the "harmful to minors" standard, it penalizes performances by the specified performers *regardless of whether their conduct is harmful to minors.* For example, the Act prohibits a drag performer wearing a crop top and mini skirt from dancing where minors might see it, but does not prohibit a Tennessee Titans cheerleader wearing an identical outfit from performing the exact same dance in front of children.

Either reading violates the First Amendment. In *R.A.V. v. City of St. Paul*, the Supreme Court considered a city ordinance which prohibited the display of a symbol which "arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender." 505 U.S. 377, 380 (1992). The Court held that "the ordinance is facially unconstitutional in that it prohibits otherwise permitted speech solely on the basis of the subjects the speech addresses." *Id.* at 382. And while some categories of speech, such as obscenity, defamation or fighting words, may be regulated in compliance with the First Amendment, those categories of speech may not "be made

the vehicles for content discrimination unrelated to their distinctively prescribable content." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 383-84 (1992). A state might choose to prohibit only obscenity "which involves the most lascivious displays of sexual activity. But it may not prohibit, for example, only that obscenity which includes offensive *political* messages." *Id. see also Carey v. Brown*, 447 U.S. 455, 463 (1980) (Striking down an Illinois statute which banned picketing in residential areas, but made an exception for labor disputes).

The State contends that the AEA is viewpoint neutral. This argument is pointless, because even if the AEA were merely a content-based, viewpoint neutral regulation of speech, it would still have to survive strict scrutiny, and (as explained below) it does not. In any event, the State's viewpoint neutrality arguments are also meritless. In the State's view, the AEA "lists types of performers that might engage in sexual speech 'harmful to minors'" and then includes a catchall – "or similar entertainers" – which includes anyone who engages in a performance that is "harmful to minors," regardless of viewpoint. App. Br. at 59. The State reads the list to be merely illustrative. The State's argument falls apart in light of the statutory context.

Before the enactment of the AEA, TCA § 7-51-1401 was a zoning statute which regulated "adult-oriented establishments" at the municipal level – it was Tennessee's default strip club law and applied only where a municipality had not

adopted its own ordinance governing such establishments. Section 7-51-1401 contains a number of definitions which long predate the AEA, including "Adult cabaret," which means "a cabaret that features topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers." This list of performers is not "merely illustrative," because "adult cabaret" is defined *exclusively* by the featured performers. Nothing about the content of the performance is included. It would be bizarre to rest the definition of "adult cabaret" entirely on this list of performers and render an identical list superfluous for the very next defined term in § 7-51-1401 – "adult cabaret entertainment."

Where lawmakers wanted to make a list of performers illustrative, they did so. For example, T.C.A. § 7-51-1102 contains a more specific definition of "Adult cabaret," which reads in part, "Adult cabaret *includes* a commercial establishment that features entertainment of an erotic nature, *including* exotic dancers, strippers, male or female impersonators, or similar entertainers[.]" (emphasis added). In *Entm't Prods., Inc. v. Shelby County*, this Court found that the specified performers in § 7-51-1102 are "merely examples." 588 U.S. at 395. That holding is consistent with traditional canons of construction as applied by this Court and the Supreme Court. *See United States ex rel. Felten v. William Beaumont Hosp.*, 993 F.3d 428, 434 (6th Cir. 2021) ("The use of 'shall include . . .' demonstrates that the list of remedies is not exhaustive."); *see also, Samantar v. Yousuf*, 560 U.S. 305, 317

(2010) ("It is true that the use of the word 'include' can signal that the list that follows is meant to be illustrative rather than exhaustive.").

The State asks this Court to define "Adult cabaret entertainment" as "adult oriented performances that are harmful to minors . . . which includes performances that feature topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers[.]" But the text does not say, "includes;" it says, "and that feature." Thus, the presence of a performer in one of these categories in the performance is an element of the crime itself.

The text of the AEA, plainly read, restricts protected speech of a particular subject matter, and from a particular set of people. The prohibited conduct cannot be defined without referencing both the content of the speech and the perspective of the speaker. It is both a content-based restriction and viewpoint discrimination. T.C.A. § 7-51-1407 is thus presumptively unconstitutional and can only survive if it satisfies strict scrutiny.

## 2. The AEA was enacted for an impermissible purpose.

"Because strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based, a court must evaluate each question before it concludes that the law is content neutral and thus subject to a lower level of scrutiny." *Reed v. Town of Gilbert*, 576 U.S. at 167 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). If the Court finds that the

AEA is facially content-neutral, but that "an impermissible purpose or justification" underpins the law, then the law is still subject to strict scrutiny. Both the text and the legislative history of the AEA support the district court's conclusion that the AEA was adopted by the government "because of disagreement with the message [the speech] conveys." *Ward*, 491 U.S. at 791.

The text of the AEA is the "best indicator of intent," and the text indicates that legislators adopted the AEA for an impermissible purpose. *Nixon v. United States*, 506 U.S. 224, 232 (1993). First, the AEA is facially viewpoint discriminatory, targeting speech from specific speakers. And in a radical departure from the statutory scheme of Title 7, the AEA criminalizes the individual performer, rather than regulating business operators or parents who enable a minor to view adult cabaret entertainment.

Second, as discussed above, the AEA's lack of scienter requirement and inapplicability of Tennessee's default *mens rea* statute makes the AEA a strict liability crime. The legislature cross-referenced existing obscenity statutes, all of which contain a scienter requirement, yet chose not to include one in the AEA. The Tennessee General Assembly also declined to include any affirmative defenses in the AEA, another drastic departure from the rest of Tennessee's obscenity statutes. While perhaps not dispositive, this is evidence that the legislature sought to chill

speech by criminalizing more conduct and making the law easier to enforce against the targeted performers.

The legislative history supports this conclusion and demonstrates the significant shift that the AEA introduces to the regulatory scheme of Title 7, from zoning laws regulating brick-and-mortar business to the criminalization of a class of performers. Senator Johnson, the Senate sponsor of the bill, specifically assured lawmakers that only performers, and not commercial businesses, would be targeted by this law. Legisl. Tr., R. 35-1 at PageID 519.

Second, the legislative history supports the conclusion that the AEA was adopted to target a particular viewpoint because lawmakers disagreed with the message the speech conveys. While FOG does not assert that the AEA targets *only* drag performers, one cannot escape the mountain of evidence in the legislative transcript that lawmakers were primarily concerned with "male or female impersonators." In the legislative debates, three specific examples of conduct lawmakers considered "harmful to minors" were performances by "male or female impersonators." *See Id.* at PageID 93 (Discussing a video of a drag show in Knox County, Tennessee); *Id.* at PageID 22 (Discussing a video of a drag show at Tennessee Tech); *Id.* at PageID 57 (Discussing videos of drag performances at Tennessee Tech University and Murfreesboro). Representative Todd, the AEA's House sponsor, explained that was "asked to come up with legislation" in response

to a family-friendly drag show in his district. *Id.* at PageID 76. He had not seen the drag show, and he never once mentioned any sexual content that would be harmful to children. The 100 pages of legislative transcript includes at least twenty-nine references to "drag" and eleven references to "male or female impersonator." Legislators objected to the inclusion of "male or female impersonator" in the AEA, and the General Assembly chose to retain that language in the final version of the Act. *See Id.* at PageID 75 (Rep. Hardaway objecting to the inclusion of "male or female impersonators" in the AEA).

The First Amendment requires that restrictions on speech "must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society." *Broadrick v. Okla.*, 413 U.S. 601, 611-12 (1973). "The text of the AEA is not narrowly drawn, and the legislative history does not demonstrate a considered legislative judgment." Findings, R. 91 at PageID 1443. For these reasons, the district court concluded that the AEA was adopted for an impermissible purpose. This Court should affirm.

## B. The AEA Fails Under Strict Scrutiny

"The discussion above leads to one conclusion: the Court must apply strict scrutiny to the AEA." Findings, R. 91 at PageID 1449. Content-based prohibitions "have the constant potential to be a repressive force in the lives and thoughts of a free people." *Ashcroft II*, 542 U.S. at 660. Such restrictions on speech are

"presumptively invalid, and the Government bears the burden to rebut that presumption." *United States v. Playboy Entm't Group*, 529 U.S. 803, 817 (2000) (internal citations omitted). To survive strict scrutiny, the State must prove that the AEA is "narrowly tailored to serve compelling state interests." *R.A.V.*, 505 U.S. at 395. The Court should ask whether the AEA is "the least restrictive means among available, effective alternatives." *Ashcroft II*, 542 U.S. at 666.

### 1. The State has a compelling interest in protecting children from indecent content.

FOG does not dispute that the State has a compelling interest in "protecting the physical and psychological well-being of minors, which extended to shielding them from indecent messages that are not obscene by adult standards." *Reno*, 521 U.S. at 879. However, the State does *not* have a compelling interest in protecting children from indecent content only from certain speakers. *see Ward*, 491 U.S. at 791. (finding an impermissible purpose when the government regulates speech because of disagreement with the message the speech conveys). Whether the Court interprets the AEA to prohibit performances from the enumerated performers regardless of the content or interprets the AEA to require a performance be both "harmful to minors," and *also* include one of the enumerated performers, the AEA fails on the first prong of the strict scrutiny analysis. A performance is either harmful to a child, or it is not. The identity of the speaker is irrelevant.

## 2. The AEA is not narrowly tailored.

A statute that "effectively suppresses a large amount of speech that adults have a constitutional right to receive and to address to one another" is unconstitutional, "if less restrictive alternatives would be at least as effective in achieving" the State's compelling interest. *Reno*, 521 U.S. at 874. FOG proposed several, less restrictive alternatives, and "the burden is on the Government to prove that the proposed alternatives will not be as effective as the challenged statute." *Ashcroft II*, 542 U.S. at 665.

First, the AEA contains no affirmative defenses, not even a defense of parental consent. The State argues that it has it has an "independent interest in the well-being of its youth." App. Br. at 66 (quoting *Ginsberg v. New York*, 390 U.S. 629, 640 (1968)). In 3 important ways, the statute upheld in *Ginsberg* was narrower than the AEA. First, the New York state law at issue in *Ginsburg*, which criminalized the sale of indecent magazines to children under the age of 17, "expressly recognize[d] the parental role in assessing sex-related material," and the statute did not "bar parents who so desire from purchasing the magazines for their children." *Id.* at 639. Second, "the New York statute applied only to commercial transactions, whereas the [AEA] contains no such limitation." *Reno*, 521 U.S. at 865. And third, "the New York statute defined a minor as a person under the age of 17, whereas the [AEA], in applying to all those under 18 years, includes an additional year of those nearest

majority." *Id.* These distinctions were fatal to the CDA in *Reno*. *Id.* at 865. *see also, Ashcroft II*, 542 U.S. at 670 ("By enacting programs to promote the use of filtering software, Congress could give parents [the ability to monitor what their child sees on the internet] without subjecting protected speech to severe penalties."). The AEA must suffer the same fate.

It is not enough for the State to show that the AEA effectively protects children. Nor is the burden on FOG "to introduce, or offer to introduce, evidence that [its] proposed alternatives are more effective. The Government has the burden to show they are less so." *Ashcroft II*, 542 U.S. at 669.

At trial, the State offered no evidence of the need for and efficacy of the AEA, let alone why the least restrictive means of protecting children required targeting individual performers regardless of their mental culpability, overriding the authority of parents, and drafting language that intrudes not merely into public spaces, but even into private homes. The Court "should not presume parents, given full information, will fail to act." *Playboy Entm't Grp.*, 529 U.S. at 824. Nor has the State offered proof that a scienter requirement or less expansive location clause would diminish the efficacy of the AEA, instead arguing that the Court should functionally "rewrite [the AEA] to conform it to constitutional requirements." *American Booksellers*, 484 U.S. at 397. This statute is "not narrowly tailored if that requirement has any meaning at all." *Reno*, 521 U.S. at 879. The AEA fails to pass

strict scrutiny.

## C. The AEA is Unconstitutionally Vague.

Overly vague laws are unconstitutional for three reasons. First, due process requires that a law provide "persons of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108-9 (1972). Second, the law must provide "explicit standards" to law enforcement officials, judges, and juries so as to avoid "arbitrary and discriminatory application." *Id.* Third, a vague statute can "inhibit the exercise" of First Amendment freedoms and may cause speakers to "steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." *Id.* The AEA fails on all three counts.

The Act criminalizes adult-oriented performances that are "harmful to minors," which is defined in part by a version of the obscenity test established by the Supreme Court in *Miller v. California*, 43 U.S. 15, 24 (1973). The AEA adapts the *Miller* test to make it specific to minors:

> (A) Would be found by the average person applying contemporary community standards to appeal predominantly to the prurient, shameful or morbid interests *of minors*;
>
> (B) Is patently offensive to prevailing standards in the *adult* community as a whole *with respect to what is suitable for minors*; and
>
> (C) Taken as whole lacks serious literary, artistic, political or scientific values *for minors*[.]

43

(emphasis added).

This is not the *Miller* test for obscenity and therefore does not regulate obscenity. It regulates something more. The first two prongs of the *Miller* test rely on "contemporary community standards." Precisely which contemporary community's standard applies varies. In *Miller*, the Court held that a jury instruction which defined "community standards" as the state-wide standards of California was not unconstitutional. *Miller*, 43 U.S. at 24. The Supreme Court in *Ashcroft I* held that community standards need not be defined by reference to a precise geographic area and that "absent geographic specification, a juror applying community standards will inevitably draw upon personal knowledge of the community or vicinage from which he comes." 535 U.S. 564, 576 (2002)

But the Supreme Court's decision in *Ashcroft I* was "quite limited," holding only that the law's "reliance on community standards to identify 'material that is harmful to minors' does not *by itself* render the statute substantially overbroad for purposes of the First Amendment." *Id.* at 585 (emphasis original). Tennessee's definition of "community," by contrast, does not rely on either state-wide or nation-wide standards. Nor does it leave the juror to "draw on his personal knowledge." *Id.* Instead, § 39-17-901 defines the word "community" as, "the judicial district, as defined in § 16-2-506, in which a violation is alleged to have occurred." Tennessee has created thirty-one (31) judicial districts, which means that the AEA has thirty-

one (31) unique, imprecise, and likely conflicting definitions of what is "harmful to minors." Viewed in conjunction with the rest of the statute, this definition of "community" renders the law vague – even if 31 separate definitions of "harmful to minors" is insufficient to do so on its own.

Plaintiffs are aware of no similar definition of "community" that has survived First Amendment scrutiny. The Tennessee Supreme Court in *Davis-Kidd Booksellers v. McWherter*, 866 S.W.2d 520, addressed whether this balkanized definition of community violated the Commerce Clause where the state sought to regulate the open display of pornographic and overly violent books, videotapes, magazines, and other commercially available media deemed "harmful to minors" anywhere minors are lawfully admitted. T.C.A. § 39-17-914. The court held that the statute's prohibition on materials that portrayed "excess violence" violated the First Amendment and declined to pass on hypothetical challenges to other types of content, preferring to await future as-applied challenges. *Id.* at 531. Such challenges have not come in the intervening three decades.

The display statute in *Davis-Kidd* also regulates commercial businesses, whereas the AEA regulates the speech of individual citizens, many of whom move in and out of various judicial districts on a daily basis. Performers of all kinds, including drag performers, often travel around Tennessee to perform in different venues and at different events. A brick-and-mortar bookstore of the type regulated

by the display statute has little cause to worry about violating the community standards of a judicial district other than the one in which it is located, but a performer from Memphis booked to perform shows in Nashville, Knoxville, and Bristol would likely find themselves facing radically different definitions of "harmful to minors."

Additionally, the statute in *Davis-Kidd* provides extremely specific standards and affirmative defenses that narrowed the scope of the restrictions:

**Tenn. Code Ann. § 39-17-914**

>**(b)** The state has the burden of proving that the material is displayed. Material is not considered displayed under this section if:
>
>>**(1)** The material is:
>>>**(A)** Placed in "binder racks" that cover the lower two thirds (⅔) of the material and the viewable one third (⅓) is not harmful to minors;
>>>
>>>**(B)** Located at a height of not less than five and one-half feet (5½′) from the floor; and
>>>
>>>**(C)** Reasonable steps are taken to prevent minors from perusing the material;
>>
>>**(2)** The material is sealed, and, if it contains material on its cover that is harmful to minors, it must also be opaquely wrapped;
>>
>>**(3)** The material is placed out of sight underneath the counter; or
>>
>>**(4)** The material is located so that the material is not open to view by minors and is located in an area restricted to adults;
>>
>>**(5)** Unless its cover contains material which is harmful to minors, a video cassette tape or film is not considered displayed if it is in a form

that cannot be viewed without electrical or mechanical equipment and the equipment is not being used to produce a visual depiction; or

**(6)** In a situation if the minor is accompanied by the minor's parent or guardian, unless the area is restricted to adults as provided for in subdivision (b)(4).

If a business is unclear about the precise community standard for what is "harmful to minors" in its district, it may at least be certain about precisely how and where potentially prohibited materials must be displayed in order to abide by the law. More importantly, law enforcement officers have clear guidance to follow when they are enforcing the law. The AEA provides no such clarity.

The "harmful to minors" standard is problematic in a second, independent way it: it applies to all minors under the age of 18. On remand from *Ashcroft I*, the Third Circuit found that the definition of "harmful to minors" in COPA – which is nearly identical to the one in the AEA – was unconstitutionally vague because it applies in a literal sense to an infant, a five-year old, or a person just shy of age seventeen." *Mukasey*, 534 F.3d at 181, *cert denied*, 555 U.S. 1137 (3d Cir. 2009). In order to avoid violating the AEA, a performer would need to know the precise age of any minor in the audience and would need to know what the community standards consider suitable for minors of that age in the specific judicial district where the performance is taking place.

The State objects on two grounds. First the State argues that the Supreme Court's holding in *Ginsberg* settles the matter, because a pre-*Miller* definition of

"harmful to minors" was upheld. App. Br. at 39. As a preliminary matter, the definition in *Ginsburg* is not the same as the definition at issue here. This argument again ignores the context of that case. The New York state statute at issue in *Ginsberg* prohibited the sale of certain explicit content to minors, such as "girlie" magazines. *Ginsberg*, 390 U.S. at 632. That statute contained a "knowingly" *mens rea* requirement both as to the explicit content and the age of the minor. The law also provided an affirmative defense for "an honest mistake" where "the defendant made a reasonable bona fide attempt to ascertain the true age of such a minor" and it respected parental choice by allowing parents to purchase such materials for their children. *Id.* at 646. The AEA does not regulate the sale of physical products; it does not include a *mens rea* requirement; it has no affirmative defenses; and it disregards parental choice. *Ginsberg* is thus inapposite.

Still, the State claims that the AEA is like the statute in *Ginsberg* because they both regulate "face-to-face transactions" such as "those in bookstores or live performances." App. Br. at 47. The Court need not take this seriously. The AEA does not regulate "transactions;" it regulates the expression and speech of individual performers, whether or not they are performing for pay.

Second, the State insists this Court is bound by the Tennessee Supreme Court's ruling in *Davis-Kidd*, and that "harmful to minors" should be read to mean "harmful to a reasonable, 17-year-old minor." As previously explained, this

argument misstates the court's holding in that case and ignores the many factors that made Tennessee's display statute "readily susceptible" to such a construction. *Reno*, 521 U.S. at 884. The Court should reject the State's atextual reading of the AEA.

"The strictness of the vagueness scrutiny is proportionate to the burden that the law imposes on those whom it regulates. When speech is involved, rigorous adherence to the fair-notice requirements is necessary to ensure that ambiguity does not chill protected speech." *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 422 (6th Cir. 2014). For FOG, the Act imposes a heavy burden: threat of prosecution under a strict liability statute, felony charges, incarceration, and the loss of voting rights.

Yet the AEA fails to provide citizens with a reasonable opportunity to know what conduct is prohibited. More disturbingly, this law does not provide the "precision and guidance necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *FCC v. Fox Tv Stations, Inc.*, 567 U.S. 239, 253 (2012). Enforcement is left to the discretion of police and prosecutors. It also opens up performances to police surveillance and raids, so that law enforcement can be certain that no children are present – or even *could* be present. "The First Amendment protects against the Government;" the AEA leaves citizens "at the mercy of *noblesse oblige*." *United States v. Stevens*, 559 U.S. 460, 480 (2010).

## D. The AEA is Unconstitutionally Overbroad.

The overbreadth doctrine empowers courts to invalidate a statute if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Stevens*, 559 U.S. 460 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 449 (2008)). The threat of enforcement of an overbroad law "deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas." *United States v. Williams*, 553 U.S. 285, 29 (2008). The overbreadth doctrine is "strong medicine" that is not to be "casually employed." *Id.* (quoting *Los Angeles Police Dept. v. United Reporting Publishing Corp.*, 528 U.S. 32, 39 (1999). "The first step in overbreadth is to construe the challenged statute." *Id.*

The AEA is substantially overbroad for two main reasons. First, the "harmful to minors" standard applies to any minor under the age of 18, regardless of whether the content is appropriate for older minors but not for younger children. Second, the AEA's location provision applies anywhere a minor could view the performance. The State repeats its arguments that the Court should apply narrowing constructions to both these provisions, reading "minors' to mean "reasonable 17-year-old minor" and the location provision to mean "anywhere minors could permissibly view the performance." As explained above, the State's reading of the statute would require

this Court to functionally rewrite the text to make it comport with constitutional requirements. This Court should decline to do so.

## IV.    <u>Scope of Relief</u>

The State seeks number of limitations to the scope of injunctive relief granted by the district court. First, the State argues that the district court lacked jurisdiction to enjoin the AEA's public property clause, "because it lacked Article III authority to even consider that provision." App. Br. at 51. But FOG has plausibly alleged that the AEA would affect its participation in the Midsouth Pride Festival, an outdoor event held on public property. Tr. of Consolidated Hr'g, R. 81 at PageID 68. Additionally, the Supreme Court has carved out an exception to traditional rules of prudential standing. In First Amendment overbreadth challenges, litigants "are permitted to challenge a statute not because their own rights of free expression are violated," but because "the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick*, 413 U.S. at 612.

Second, the State argues that injunctive relief should apply only to FOG, leaving D.A. Mulroy free to prosecute any other person in Shelby County. The State cites this Court's recent holding in *L.W. v. Skrmetti*, 73 F.4th 408, 414 (6th Cir. 2023), where this Court held that, "litigants raising a facial challenge to statute normally must establish that *no set of circumstances* exists under which the statute would be

valid." *Id*. (cleaned up). *L.W.* concerns a facial challenge brought under the Fourteenth Amendment; it is unrelated to speech or expression. FOG brings a facial challenge under First Amendment, and the district court found that the AEA "reeks with constitutional maladies of vagueness and overbreadth fatal to statutes that regulate First Amendment rights." Findings, R. 91 at PageID 1459. "[A]ny enforcement of a statute thus placed at issue is totally forbidden" *Broadrick*, 413 U.S. at 613. Indeed, to reduce injunctive relief to these limitations would be absurd, as it would protect FOG itself from prosecution but expose its performers to criminal penalties.

Finally, the State suggests that this Court sever the "entertainers" clause from the AEA. This would exacerbate, rather than remedy, the constitutional deficiencies of the AEA. Severing the entertainers clause would broaden, rather than narrow, the scope of the AEA. It would expand criminal liability to *all* persons, regardless of identity. "[T]he proper remedy for content discrimination generally cannot be to sever the statute so that it restricts more speech than it did before[.]" *Rappa v. New Castle County*, 18 F.3d 1043, 1073 (3rd Cir. 1994) *see also Police Dep't of Chicago v. Mosley*, 408 U.S. 92 (1972) (striking down a statute banning picketing near a school instead of merely severing the exception for peaceful labor picketing.). The State insists this Court must respect the federalism principles that restrain federal courts. App. Br. at 72. Surely those principles do not permit the Court to broaden or

rewrite state laws restricting speech where the legislature has declined to do so. The

Court should reject the State's severability argument.

## **CONCLUSION**

For the foregoing reasons, this Court should affirm the ruling of the district

court.

Respectfully submitted,
*Melissa J. Stewart*

Brice M. Timmons, #029582
Melissa J. Stewart, #040638
Craig A. Edington, #038205
Donati Law, PLLC
1545 Union Ave.
Memphis, TN 38104
(901) 278-1004 (Office)
(901) 278-3111 (Fax)
brice@donatilaw.com
melissa@donatilaw.com
craig@donatilaw.com

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,725 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in 14-point Times New Roman font, a proportionally spaced typeface.

/s/ *Melissa J. Stewart*

Melissa J. Stewart (TN #040638)

## CERTIFICATE OF SERVICE

I hereby certify that on October 23, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Melissa J. Stewart*
Melissa J. Stewart (TN #040638)