No. 23-5611

IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

FRIENDS OF GEORGE'S, INC.,

*Plaintiff-Appellee*,

BLOUNT PRIDE, INC., ET AL.,

*Intervenors*,

v.

STEVEN JOHN MULROY,

*Defendant-Appellant*.

On Appeal from the Judgment of the United States District Court for the
Western District of Tennessee (No. 2:23-cv-02163) (Parker, J.)

**BRIEF OF INTERVENORS
BLOUNT PRIDE, INC., AND MATTHEW LOVEGOOD**

DANIEL A. HORWITZ (TN #032176)
LINDSAY E. SMITH (TN #035937)
MELISSA K. DIX (TN #038535)
HORWITZ LAW, PLLC
4016 WESTLAWN DR.
NASHVILLE, TN 37209
(615) 739-2888
daniel@horwitz.law
lindsay@horwitz.law
melissa@horwitz.law

STELLA YARBROUGH (TN #033637)
LUCAS CAMERON-VAUGHN (TN #038451)
JEFF PREPTIT (TN #038451)
ACLU FOUNDATION OF TENNESSEE
P.O. BOX 120160
NASHVILLE, TN 37212

*Counsel for Intervenors*

BRICE M. TIMMONS (TN #029582)
MELISSA J. STEWART (TN #040638)
CRAIG A. EDINGTON (TN #038205)
DONATI LAW, PLLC
1545 UNION AVE.
MEMPHIS, TN 38104
(901) 278-1004
brice@donatilaw.com
melissa@donatilaw.com
craig@donatilaw.com

JUSTIN S. GILBERT (TN # 017079)
100 W. MARTIN LUTHER KING BLVD.
SUITE 501
CHATTANOOGA, TN 37402
TELEPHONE: 423.756.8203
justin@schoolandworklaw.com

Dated: October 23, 2023

-i-

# I.  TABLE OF CONTENTS

II. TABLE OF AUTHORITIES _____iv

III. INTRODUCTION _____1

IV.  SUMMARY OF ARGUMENT _____5

V.  ARGUMENT _____7

    A.    THE DISTRICT COURT CORRECTLY DETERMINED THAT FRIENDS OF GEORGE'S HAD STANDING TO CONTEST THE AEA'S CONSTITUTIONALITY. _____7

        1.    Friends of George's established a substantial probability of engaging in conduct that was arguably affected with a constitutional interest but proscribed by the AEA. _____8

        2.    Friends of George's established a credible threat of prosecution under *McKay*'s third and fourth factors. _____11

        3.    Friends of George's established a credible threat of enforcement based on two additional factors—the recency of the AEA's enactment and its criminal penalties—that this Court should hold are relevant. _____16

    B.    THE DISTRICT COURT CORRECTLY DETERMINED THAT THE AEA IS A CONTENT-BASED SPEECH RESTRICTION UNRELATED TO ITS CLAIMED REGULATION OF OBSCENITY. _____23

    C.    THE AEA CANNOT WITHSTAND STRICT SCRUTINY. _____31

    D.    DISTRICT ATTORNEY MULROY'S PROPOSED REMEDIES ARE IMPROPER. _____34

VI.  CONCLUSION _____38

CERTIFICATE OF COMPLIANCE _____40

CERTIFICATE OF SERVICE _____41

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS _____ 42

## II.  TABLE OF AUTHORITIES

### CASES

*281 Care Comm. v. Arneson*,
    638 F.3d 621 (8th Cir. 2011) _____ 18

*Ammex, Inc. v. Cox*,
    351 F.3d 697 (6th Cir. 2003) _____ 13

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*,
    576 U.S. 787, 135 S. Ct. 2652, 192 L. Ed. 2d 704 (2015)_____ 11

*ASARCO Inc. v. Kadish*,
    490 U.S. 605 (1989) _____ 9–10

*Babbitt v. United Farm Workers Nat. Union*,
    442 U.S. 289 (1979) _____ 3, 7, 9

*Barilla v. City of Houston, Texas*,
    13 F.4th 427 (5th Cir. 2021) _____ 19

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
    140 S. Ct. 2335 (2020) _____ 37

*Bell v. Hood*,
    327 U.S. 678 (1946) _____ 10

*Blount Pride, Inc. v. Desmond*,
    No. 3:23-CV-00316-JRG-JEM, 2023 WL 5662871 (E.D. Tenn. Sept. 1,
    2023) _____ *passim*

*Bookfriends, Inc. v. Taft*,
    223 F. Supp. 2d 932 (S.D. Ohio 2002) _____ 19

*Brewer v. Miller*,
    673 S.W.2d 530 (Tenn. Ct. App. 1984) _____ 33

*Brown v. Ent. Merchants Ass'n*,
    564 U.S. 786 (2011) _____ 32

*Bryant v. Woodall*,
   1 F.4th 280 (4th Cir. 2021) _____ 17, 20

*Caspar v. Snyder*,
   77 F. Supp. 3d 616 (E.D. Mich. 2015)_____ 36

*Cayuga Nation v. Tanner*,
   824 F.3d 321 (2d Cir. 2016)_____ 18

*City of Erie v. Pap's A.M.*,
   529 U.S. 277 (2000) _____ 27

*City of Ladue v. Gilleo*,
   512 U.S. 43, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) _____ 32

*Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*,
   149 F.3d 679 (7th Cir. 1998) _____ 12

*Crawford v. United States Dep't of Treasury*,
   868 F.3d 438 (6th Cir. 2017) _____ 7

*Crotty v. Flora*,
   2023 WL 6342049 (Tenn. Sept. 29, 2023)_____ 30–31

*Davis v. United States*,
   564 U.S. 229 (2011) _____ 10

*Dobbs v. Jackson Women's Health Org.*,
   142 S. Ct. 2228 (2022) _____ 17

*Doe v. Bolton*,
   410 U.S. 179 (1973) _____ 17

*Dombrowski v. Pfister*,
   380 U.S. 479 (1965) _____ 22

*Equity Lifestyle Properties, Inc. v. Cty. of San Luis Obispo*,
   548 F.3d 1184 (9th Cir. 2008) _____ 10

*First Nat'l Bank v. Bellotti*,
    435 U.S. 765 (1978) _____ 31

*Fischer v. Thomas*,
    52 F.4th 303 (6th Cir. 2022) _____ *passim*

*Florida Star v. B.J.F.*,
    491 U.S. 524, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989) _____ 32

*Frogge v. Joseph*,
    2022 WL 2197509 (Tenn. Ct. App. June 20, 2022) _____ 20

*Ginsberg v. State of N. Y.*,
    390 U.S. 629 (1968) _____ 33

*Greater New Orleans Broad. Ass'n v. United States*,
    527 U.S. 173 (1999) _____ 2, 26, 29

*Iancu v. Brunetti*,
    139 S. Ct. 2294 (2019) _____ 24

*Jones v. Haynes*,
    221 Tenn. 50, 424 S.W.2d 197 (1968) _____ 37

*Kiser v. Reitz*,
    765 F.3d 601 (6th Cir. 2014) _____ 3–4, 12, 21

*Lagos v. United States*,
    138 S. Ct. 1684 (2018) _____ 26

*Majors v. Abell*,
    317 F.3d 719 (7th Cir.) _____ 22

*McKay v. Federspiel*,
    823 F.3d 862 (6th Cir. 2016) _____ 5, 14, 15

*Minnesota Democratic-Farmer-Lab. Party by Martin v. Simon*,
    970 N.W.2d 689 (Minn. Ct. App. 2022) _____ 4, 17

*N. Carolina Right to Life, Inc. v. Bartlett*,
    168 F.3d 705, 528 U.S. 1153, 120 S.Ct. 1156, 145 L.Ed.2d 1069 (4th Cir. 1999) _____ 18

*NAACP v. Button*,
    371 U.S. 415 (1963) _____ 22

*Nat'l Shooting Sports Found. v. Att'y Gen. of New Jersey*,
    80 F.4th 215 (3d Cir. 2023) _____ 4–5, 23

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
    138 S. Ct. 2361 (2018) _____ 31

*New Hampshire Right to Life Political Action Com. v. Gardner*,
    99 F.3d 8 (1st Cir.1996) _____ 4, 18

*New Jersey Physicians, Inc. v. Obama*,
    757 F. Supp. 2d 502 (D.N.J. 2010), *aff'd sub nom. New Jersey Physicians, Inc. v. President of U.S.*, 653 F.3d 234 (3d Cir. 2011) _____ 22

*New Mexicans for Bill Richardson v. Gonzales*,
    64 F.3d 1495 (10th Cir. 1995) _____ 12–13

*Online Merchants Guild v. Cameron*,
    995 F.3d 540 (6th Cir. 2021) _____ 5, 12, 16–17

*Pederson v. La. State Univ.*,
    213 F.3d 858 (5th Cir. 2000) _____ 8

*Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Ct.*,
    769 F.3d 447 (6th Cir. 2014) _____ 10

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) _____ 2, 25–26

*Rappa v. New Castle Cnty.*,
    18 F.3d 1043 (3d Cir. 1994) _____ 37

*Reno v. Am. C.L. Union*,
    521 U.S. 844 (1997) _____ 21, 33

*Sanders Cty. Republican Cent. Comm. v. Bullock*,
    698 F.3d 741 (9th Cir. 2012) _____ 21

*Scholl v. Mnuchin*,
    494 F. Supp. 3d 661 (N.D. Cal. 2020) _____ 10

*Sec'y of State of Md. v. Joseph H. Munson Co.*,
    467 U.S. 947 (1984) _____ 36

*Sharpe v. Cureton*,
    319 F.3d 259 (6th Cir. 2003) _____ 36

*St. Paul Area Chamber of Com. v. Gaertner*,
    439 F.3d 481 (8th Cir. 2006) _____ 4, 17

*State v. Culp*,
    900 S.W.2d 707 (Tenn. Crim. App. 1994) _____ 37, 38

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) _____ 9

*Tennesseans for Sensible Election Laws v. Slatery*,
    2021 WL 4621249 (Tenn. Ct. App. Oct. 7, 2021) _____ 19–20

*Thomas v. Chicago Park Dist.*,
    534 U.S. 316 (2002) _____ 2, 26, 29

*Thomas v. City of Memphis*,
    996 F.3d 318 (6th Cir. 2021) _____ 8

*Troxel v. Granville*,
    530 U.S. 57 (2000) _____ 35

*Turner Broad. Sys. v. FCC*,
    512 U.S. 622 (1994) _____ 28

*United States v. Davis*,
    139 S. Ct. 2319 (2019) _____ 37, 38

*United States v. Harriss*,
    347 U.S. 612 (1954) _____ 38

*United States v. One-Sixth Share Of James J. Bulger In All Present And Future*
    *Proceeds Of Mass Millions Lottery Ticket No. M246233*,
    326 F.3d 36 (1st Cir. 2003) _____ 11

*Virginia v. Am. Booksellers Ass'n, Inc.*,
    484 U.S. 383 (1988) _____ 10

*Virginia v. Hicks*,
    539 U.S. 113 (2003) _____ 36

*Warth v. Seldin*,
    422 U.S. 490 (1975) _____ 9

*Wheaton Coll. v. Sebelius*,
    703 F.3d 551 (D.C. Cir. 2012) _____ 13

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990) _____ 9

*Wilson v. Stocker*,
    819 F.2d 943 (10th Cir.1987) _____ 18

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) _____ 34

## STATUTES

Tenn. Code Ann. § 7-51-1401 _____ *passim*

Tenn. Code Ann. § 70-51-1407 _____ *passim*

Tenn. Code Ann. § 39-17-901 _____ 2

Tenn. Code Ann. § 39-17-911 _____ 34

Tenn. Code Ann. § 40-12-105 _____ 15

## STATE RULES

Tenn. R. Crim. P. 6

_____15

### III.  INTRODUCTION

Tennessee's Adult Entertainment Act threatens "male or female impersonators, or similar entertainers"—better known as "drag queens"—with criminal penalties under specified circumstances.  *See* Tenn. Code Ann. §§ 7-51-1401(12)(A); 7-51-1407(c)(1).  After determining that the AEA suffered from a host of constitutional infirmities, the District Court declared the AEA unconstitutional and enjoined its enforcement.  Because the District Court correctly held that Friends of George's had standing to maintain its claims—and because the AEA violates (at minimum) the First Amendment—the District Court's judgment should be affirmed.

On its merits, whether the AEA violates the First Amendment is not a close call.  Its central provision criminalizes performing "adult cabaret entertainment"—a defined term, *see* Tenn. Code Ann. § 7-51-1401(12)—on public property or where a minor can view it.  *See* Tenn. Code Ann. § 7-51-1407(c)(1).  Even if "adult cabaret" were restricted to regulating speech that is obscene to minors, though, *see* Appellant's Principal Br. at 48 (arguing that the AEA applies narrowly to "sexual speech that is obscene to minors"), the AEA makes the further content discrimination of prohibiting such speech *only* if it "feature[s] topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers[.]"  *See* Tenn. Code Ann. § 7-51-1401(12)(A); Tenn. Code Ann. § 7-51-1401(2).  Even then, such speech is only prohibited if it is part of an entertainment-oriented

"performance."  *See* Tenn. Code Ann. § 7-51-1401(12)(A)–(B).

The First Amendment forbids this approach.  As the Supreme Court explained in *R.A.V. v. City of St. Paul*, 505 U.S. 377, 383–84 (1992), while certain categories of speech "can, consistently with the First Amendment, be regulated *because of their constitutionally proscribable content* (obscenity, defamation, etc.)[,]" those categories may not "be made the vehicles for content discrimination unrelated to their distinctively proscribable content." *Id.*  "Thus, the government may proscribe libel; but it may not make the further content discrimination of proscribing *only* libel critical of the government." *Id.* at 384.

The AEA's "further content discrimination of proscribing *only*" obscene performances by disfavored entertainers contravenes this prohibition.  *Id.*; *see also Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002) ("Granting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional[.]"); *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 194 (1999) ("[D]ecisions that select among speakers conveying virtually identical messages are in serious tension with the principles undergirding the First Amendment.").  The AEA also would not have been enacted without that second tier of content discrimination, as Tennessee already had a host of general obscenity laws on the books.  *See* Tenn. Code Ann. § 39-17-901, *et seq*.; *see also* Appellant's Principal Br. at 3 ("Tennessee has long regulated obscenity").  More to

the point: the AEA's second layer of content discrimination was its purpose.  As its House co-sponsor explained, the AEA was born of a desire to shut down "'family-friendly pride' – or a 'family friendly' drag show."  Op., R. 91 at PageID #1404–05.

Because the merits of this appeal are straightforward, *see supra* at 1–3, the more serious question presented is whether Friends of George's—a producer of drag-centric performances that filed suit just before the AEA took effect—had standing to seek pre-enforcement relief.  The answer is yes.  Friends of George's "alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute[.]"  *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979).  There also "exist[ed] a credible threat of prosecution thereunder[.]"  *Id.*

Here, Friends of George's established the credibility of the threat that it faced based on two of the "four commonly recurring factors" that this Court considers when addressing pre-enforcement standing questions.  *See Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022).  That District Attorney Mulroy both did not disavow enforcement and affirmatively stipulated that he "intends to enforce all State of Tennessee laws that fall within his prosecutorial jurisdiction, including the felony and misdemeanor crimes recently codified at Tennessee Code Annotated § 7-51-1407[,]" *see* Pretrial Order, R. 69 at PageID #955, feature prominently in this analysis. *See Kiser v. Reitz*, 765 F.3d 601, 609 (6th Cir. 2014) ("a threat is considered

especially substantial" when the regulating entity has not disavowed enforcement).

Beyond establishing two of the "commonly recurring" factors that this Court considers when evaluating pre-enforcement standing, *see Fischer*, 52 F.4th at 307, Friends of George's *also* established a credible threat of enforcement based on two other, less common factors that are nevertheless material. In particular, Friends of George's established a credible threat of enforcement based on:

(1)    the <u>recency</u> of the AEA's enactment, *see, e.g., St. Paul Area Chamber of Com. v. Gaertner*, 439 F.3d 481, 486 (8th Cir. 2006) ("the threat of prosecution is greater under a statute enacted relatively recently."); *Minnesota Democratic-Farmer-Lab. Party by Martin v. Simon*, 970 N.W.2d 689, 696 (Minn. Ct. App. 2022) ("When analyzing whether a 'credible threat of prosecution' exists, federal courts have considered the history of the statute's enforcement, as well as how recently it was enacted.") (collecting cases); *New Hampshire Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996) ("When dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence."); and

(2)    the fact that the AEA contains <u>criminal</u> penalties, rather than merely civil ones. *See, e.g., Nat'l Shooting Sports Found. v. Att'y Gen. of New Jersey*, 80

F.4th 215, 222 (3d Cir. 2023) ("The attenuated risk of enforcement here matters less for Article III standing than in many pre-enforcement cases because the Law is exclusively civil.  In *Driehaus* and every pre-enforcement case that it recounted, the statutes at issue included criminal penalties. . . .  But civil penalties lower the temperature.").

These factors affect the credible threat inquiry.  The factors that this Court discussed in *McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016), also "are not exhaustive[.]"  *See Online Merchants Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021) ("These *McKay* factors are not exhaustive, nor must each be established."). Thus, this Court should hold—as other courts have—that the recently-enacted nature of a statute and the fact that it carries criminal penalties are relevant to the credible threat analysis.

For all of these reasons, and for the other reasons detailed below, the District Court's judgment should be **AFFIRMED**.

### IV.  SUMMARY OF ARGUMENT

A.    The District Court correctly determined that Friends of George's had standing to contest the AEA's constitutionality.  Friends of George's established a substantial probability of engaging in conduct that was arguably affected with a constitutional interest but proscribed by the AEA.  Friends of George's also established a credible threat of enforcement under *McKay*'s third and fourth

factors—the government's refusal to disavow enforcement and a feature of the AEA that makes enforcement more likely—and based on two other non-recurring factors: the recency of the AEA's enactment and the AEA's criminal penalties.

B.     The District Court correctly determined that the AEA is a content-based speech restriction unrelated to its claimed regulation of obscenity.  By regulating obscenity only by certain "entertainers," and by applying only to "performance," the AEA is a vehicle for content discrimination unrelated to its claimed regulation of sexual speech that is obscene to minors.

C.     The AEA cannot withstand strict scrutiny.  The AEA is at once fatally underinclusive—allowing abundant obscene content that the AEA purportedly aims to regulate to evade liability—and fatally overinclusive, prohibiting far more speech than is necessary to protect minors from obscene sexual content.

D.     District Attorney Mulroy's proposed remedies are improper.  Friends of George's has standing to challenge the public-property provision of the AEA, so there is no limitation on Friends of George's right to obtain relief enjoining its enforcement.  Further, when courts invalidate speech-restricting laws on facial overbreadth grounds, "all" enforcement may be lawfully suspended.  District Attorney Mulroy's suggestion that this Court may remedy the AEA's unconstitutionality by severing "the entire 'entertainers' clause" would also improperly expand the AEA's criminal liability, which courts may not do.

## V. ARGUMENT

### A. THE DISTRICT COURT CORRECTLY DETERMINED THAT FRIENDS OF GEORGE'S HAD STANDING TO CONTEST THE AEA'S CONSTITUTIONALITY.

Though not designated as such in his Statement of the Issues, *see* Appellant's Principal Br. at xvi, District Attorney Mulroy argues that "FOG Lacks Article III Standing." *See* Appellant's Principal Br. at 11–19.   District Attorney Mulroy is wrong.

"When contesting the constitutionality of a criminal statute, 'it is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights.'"  *Babbitt*, 442 U.S. at 298 (alterations in original) (cleaned up).   Instead, plaintiffs may maintain pre-enforcement claims when they have "alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder[.]"  *Id.*

This Court's precedent reflects this standard.  *See Crawford v. United States Dep't of Treasury*, 868 F.3d 438, 455 (6th Cir. 2017) ("to have standing to bring a pre-enforcement challenge to a federal statute, there must be a *substantial probability* that the plaintiff actually will engage in conduct that is *arguably affected* with a constitutional interest, and there must be a *certain* threat of prosecution if the plaintiff does indeed engage in that conduct.").  The District Court also correctly

identified and applied it. *See* Op., R. 91 at PageID ## 1411, 1420–26. On appeal, the District Court's factual findings supporting Friends of George's standing are reviewed for clear error. *See Thomas v. City of Memphis*, 996 F.3d 318, 323 (6th Cir. 2021); *see also Pederson v. La. State Univ.*, 213 F.3d 858, 869 (5th Cir. 2000) ("If the district court resolves any factual disputes in making its jurisdictional findings, the facts expressly or impliedly found by the district court are accepted on appeal unless the findings are clearly erroneous.") (cleaned up).

### 1. Friends of George's established a substantial probability of engaging in conduct that was arguably affected with a constitutional interest but proscribed by the AEA.

The District Court determined that Friends of George's established a substantial probability of engaging in conduct that was arguably affected with a constitutional interest but proscribed by the AEA. *See* Op., R. 91 at PageID ## 1420–22. It did so based on: (1) Friends of George's arguably correct interpretation of the AEA, and (2) credible and uncontroverted evidence that Friends of George's produces drag-centric performances in public spaces and intends to continue doing so. *Id.*

District Attorney Mulroy contests the District Court's determinations. As grounds, District Attorney Mulroy insists that his own competing construction of the AEA "control[led]" the standing inquiry. *See* Appellant's Principal Br. at 13. Thus, because his narrower, competing construction of the AEA is correct (or so he claims),

District Attorney Mulroy maintains that Friends of George's alleged conduct does not violate the AEA and therefore precludes standing. *See* Appellant's Principal Br. at 12–15.

District Attorney Mulroy has confused the inquiry, conflating the Parties' merits dispute over how the AEA should be interpreted with whether Friends of George's has standing to challenge the AEA in the first place.[1] *Id.*; *see also id.* at 19 (wrongly suggesting that the "proper 'construction' of the restriction imposed" is determined first). Contrary to District Attorney Mulroy's claims, the Supreme Court has made clear—repeatedly—that a court's "threshold inquiry into standing '*in no way depends on the merits of the [plaintiff's] contention that particular conduct is illegal*[.]'" *See Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (emphasis added) (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal")); *see also ASARCO Inc. v. Kadish*, 490 U.S. 605, 624 (1989) ("although federal standing 'often turns on the nature and source of the claim asserted,' it 'in no way depends on the merits of the [claim].'") (cleaned up). Thus, Friends of George's arguably correct

---

[1] District Attorney Mulroy is also wrong about whether plaintiffs must confess an intention to violate the law to have standing to challenge it. *See* Appellant's Principal Br. at 13–14. They need not do so. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014) ("Nothing in this Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law.") (citing *Babbitt*, 442 U.S., at 301 (case was justiciable even though plaintiffs disavowed any intent to "propagate untruths")).

interpretation of the AEA—rather than District Attorney Mulroy's competing claim about how the AEA should be construed—controls for standing purposes. *See id.*; *see also Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988) (pre-enforcement standing "is met here, as the law is aimed directly at plaintiffs, who, *if their interpretation of the statute is correct*, will have to take significant and costly compliance measures or risk criminal prosecution.") (emphasis added); *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Ct.*, 769 F.3d 447, 451 (6th Cir. 2014) ("in a pre-enforcement review case under the First Amendment (like this one), courts do not closely scrutinize the plaintiff's complaint for standing when the plaintiff 'claims an interest in engaging in protected speech that implicates, if not violates, each [provision of the law at issue].'") (cleaned up).

Put another way: Whether Friends of George's is correct on the merits and whether Friends of George's has standing to find out are different questions. By asserting otherwise, District Attorney Mulroy "confuses [claimed] weakness on the merits with absence of Article III standing." *Davis v. United States*, 564 U.S. 229, 249 n.10 (2011). "This argument is in error." *See Scholl v. Mnuchin*, 494 F. Supp. 3d 661, 675 (N.D. Cal. 2020) (citing *Equity Lifestyle Properties, Inc. v. Cty. of San Luis Obispo*, 548 F.3d 1184, 1189 n.10 (9th Cir. 2008) ("The jurisdictional question of standing precedes, and does not require, analysis of the merits.")); *see also Bell v. Hood*, 327 U.S. 678, 682 (1946) ("Jurisdiction . . . is not defeated . . . by the

possibility that the averments might fail to state a cause of action on which petitioners could actually recover.  For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction.").  Thus, this Court should avoid erroneously conflating the two questions as District Attorney Mulroy has invited it to do.  *See United States v. One-Sixth Share Of James J. Bulger In All Present And Future Proceeds Of Mass Millions Lottery Ticket No. M246233*, 326 F.3d 36, 41 (1st Cir. 2003) ("Courts should not . . . conflate the constitutional standing inquiry with the merits determination that comes later."); *cf. Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 800, 135 S. Ct. 2652, 2663, 192 L. Ed. 2d 704 (2015) ("Although we conclude that the Arizona Legislature does not have the exclusive, constitutionally guarded role it asserts, . . . one must not 'confus[e] weakness on the merits with absence of Article III standing.'") (cleaned up).

2.   **Friends of George's established a credible threat of prosecution under *McKay*'s third and fourth factors.**

"Beyond chill, a variety of facts can demonstrate a credible threat of enforcement." *Fischer*, 52 F.4th at 307.  This Court's cases

> have highlighted four commonly recurring factors to consider: (1) Does the relevant prosecuting entity have a prior history of enforcing the challenged provision against the plaintiffs or others? (2) Has that entity sent warning letters to the plaintiffs regarding their conduct? (3) Does the challenged regulatory regime make enforcement easier or more likely? and (4) Did the prosecuting entity refuse to disavow enforcement of the challenged provision against the plaintiffs?

-11-

*Id.* (citing *Online Merchants Guild*, 995 F.3d at 550 (recounting factors articulated in *McKay*, 823 F.3d at 869)). "This isn't a laundry list; [plaintiffs] don't have to satisfy all the factors." *Id.* at 307–08.

Here, factors three and four were met. Beginning with *McKay*'s fourth factor, "the prosecuting entity refuse[d] to disavow enforcement of the challenged provision against the plaintiffs." *Id.* at 307. Indeed, District Attorney Mulroy affirmatively *stipulated* that he "intends to enforce all State of Tennessee laws that fall within his prosecutorial jurisdiction, including the felony and misdemeanor crimes recently codified at Tennessee Code Annotated § 7-51-1407[.]" *See* Pretrial Order, R. 69 at PageID #956.

Under this Court's precedent, that fact alone established that the threat Friends of George's faced was "especially substantial." *See Kiser*, 765 F.3d at 609 ("a threat is considered especially substantial" when the regulating entity has not disavowed enforcement). Other Circuits have gone even further, suggesting that failure to disavow enforcement against would-be violators establishes the credibility of a threat by itself. *See, e.g., Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 149 F.3d 679, 687 (7th Cir. 1998) ("The Supreme Court has instructed us that a threat of prosecution is credible when a plaintiff's intended conduct runs afoul of a criminal statute and the Government fails to indicate affirmatively that it will *not* enforce the statute."); *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d

1495, 1502 (10th Cir. 1995) (finding a credible threat of prosecution existed because the State had "not affirmatively disavowed any intention of bringing criminal prosecution" against violators of the challenged campaign funding statute, even though "[t]he record before us contains no affirmative evidence that prosecution for violating the statute is imminent.").

With these competing approaches in mind, this Court should hold that a District Attorney's affirmative stipulation that he "intends to enforce" a challenged statute—which is materially more significant than a mere failure to disavow enforcement—establishes a credible threat of enforcement. The reason is simple: If a prosecuting entity affirmatively declares an intention to prosecute, then the ultimate question—whether a credible threat of enforcement exists—has already been answered, so other considerations that would otherwise bear on that question (prior history, warning letters, special features of the enforcement regime, etc.) become irrelevant. Thus, when the government affirmatively threatens enforcement, courts should simply take the government at its word, as they routinely do in other contexts when standing is disputed. *See, e.g., Wheaton Coll. v. Sebelius*, 703 F.3d 551, 552 (D.C. Cir. 2012) (holding, in ripeness dispute, that "[w]e take the government at its word and will hold it to it."); *Ammex, Inc. v. Cox*, 351 F.3d 697, 705 (6th Cir. 2003) (the government gets "'more solicitude'" in mootness disputes involving claims of voluntary cessation).

-13-

As to *McKay*'s third factor: There are features of the challenged regulatory regime—some of them Tennessee-specific—that make enforcement easier and more likely.  Three reasons support this finding.

<u>First</u>, because the AEA is a criminal statute, anyone with law enforcement authority—including police officers, sheriff's deputies, and prosecutors—can enforce it by making arrests or initiating prosecutions under it.  *See, e.g.,* R. 30-2, Ex. 2 to Intervenors' Mot. to Intervene (enforcement letter from District Attorney General Ryan K. Desmond to, among others, the Maryville Police Chief, the Blount County Sheriff, and the Alcoa Police Chief); *Blount Pride, Inc. v. Desmond*, No. 3:23-CV-00316-JRG-JEM, 2023 WL 5662871, at *5 (E.D. Tenn. Sept. 1, 2023) ("the Court cannot help but wonder, why would District Attorney Desmond send the notice to multiple local law enforcement officials—Chief Crisp, Sheriff Berrong, and Chief Carswell—if, as he now claims, his notice is merely a paper tiger and nothing more?").

<u>Second</u>, because the AEA is a *Tennessee* criminal statute, there is "an attribute of the challenged statute that makes enforcement easier or more likely"—specifically: a "provision allowing any member of the public to initiate an enforcement action[.]"  *See McKay*, 823 F.3d at 869.  Recognizing that District Attorney Mulroy maintains that "the 'universe of potential' enforcers is limited to 'state officials who are constrained by . . . ethical obligations[,]'" *see* Appellant's

Principal Br. at 17, he is wrong. Instead, Tennessee law authorizes citizen-initiated indictments by citizen complainants, who both have the right to address Tennessee's citizen grand juries directly and are expressly encouraged to do so. *See* Tenn. R. Crim. P. 6 Advisory Commission Comment ("T.C.A. §§ 40-12-104--40-12-107 provide a procedure designed to give citizens free access to the local grand jury."); Tenn. Code Ann. § 40-12-105(a) (requiring clerks to publish in a newspaper of general circulation notice of the time and place the grand jury will meet and that "Any person having knowledge or proof that an offense has been committed may apply to testify before the grand jury"). Tennessee's citizen grand jurors may also investigate and indict AEA charges on their own without any independent action by law enforcement officials. *See* Tenn. R. Crim. P. 6(d) ("The grand jury has inquisitorial powers over—and has the authority to return a presentment—of all indictable or presentable offenses found to have been committed or to be triable within the county."); Tenn. R. Crim. P. 6(e)(2) ("It is the duty of the grand jury to: . . . inquire into any report of a criminal offense brought to its attention by a member of the grand jury[.]"); Tenn. R. Crim. P. 6(f) ("If a member of the grand jury knows or has reason to believe that an indictable public offense has been committed in the county, he or she shall inform the other jurors, who shall investigate it."). Thus, based on Tennessee-specific criminal procedure, there is a "provision allowing any member of the public to initiate an enforcement action" under the AEA. *McKay*,

-15-

823 F.3d at 869.

*Third*, under the AEA, "the reference point for conduct that is subject to prosecution is amorphous and vague, making enforcement not only easier but also the threat of prosecution to an individual virtually impossible for that individual to forecast[.]" *Blount Pride, Inc.*, 2023 WL 5662871, at *5. Further, "[t]he Act's lack of any scienter requirement, without question, makes enforcement of the statute easier, and it also makes the Act's implications under the First Amendment more palpable." *Id.* at *6.

For all of these reasons, *McKay*'s third factor is satisfied, too.

3. **Friends of George's established a credible threat of enforcement based on two additional factors—the recency of the AEA's enactment and its criminal penalties—that this Court should hold are relevant.**

In *Fischer*, 52 F.4th at 307, this Court observed that "[o]ur cases have highlighted four commonly recurring factors to consider" when analyzing pre-enforcement standing. *Id.* The four "commonly recurring" factors that this Court has identified as relevant to pre-enforcement standing determinations have never purported to be exhaustive, though. *Id.* Thus, contrary to District Attorney Mulroy's misunderstanding, *see* Appellant's Principal Br. at 16 (arguing that "the Court *requires* 'some combination' of the following factors") (emphasis added), this Court has explained that the *McKay* factors "are not exhaustive[.]" *See Online Merchants Guild*, 995 F.3d at 550 ("These *McKay* factors are not exhaustive, nor must each be

-16-

established.").

Because the four *McKay* factors "are not exhaustive," *id.*, other factors may be considered. And here, there are two other considerations that are not "commonly recurring" that powerfully affect the determination of whether a threat of enforcement is credible or not. In particular, when assessing the credibility of the threat that Friends of George's faced, this Court should consider both: (1) the recency of the AEA's enactment; and (2) the fact that the AEA contains criminal penalties.

As to recency, Supreme Court guidance holds a statute's recent enactment is a relevant consideration. *See Doe v. Bolton*, 410 U.S. 179, 188 (1973), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) (emphasizing that "Georgia's statute, in contrast, is recent and not moribund."). Based on that guidance, several federal courts have held that a recently enacted statute supports a credible threat of enforcement. *See, e.g., Bryant v. Woodall*, 1 F.4th 280, 286 (4th Cir. 2021), *as amended* (June 23, 2021) ("laws that are 'recent and not moribund' typically do present a credible threat. . . . This is because a court presumes that a legislature enacts a statute with the intent that it be enforced."); *St. Paul Area Chamber of Com.*, 439 F.3d at 486 ("the threat of prosecution is greater under a statute enacted relatively recently."); *Minnesota Democratic-Farmer-Lab. Party by Martin*, 970 N.W.2d at 696 (Minn. Ct. App. 2022) ("When analyzing whether a 'credible threat of prosecution' exists, federal courts have considered the

history of the statute's enforcement, as well as how recently it was enacted.") (collecting cases); *281 Care Comm. v. Arneson*, 638 F.3d 621, 628 (8th Cir. 2011) (emphasizing that a statute "was adopted comparatively recently and was amended fewer than five years before this suit was filed."); *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016) ("courts are generally 'willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund.'").

Other Circuits have gone even further and held—at least in the First Amendment context—that there is a *presumption* of a credible threat whenever a statute is "non-moribund[,]" and that that presumption can only be overcome with compelling contrary evidence. *See, e.g., N. Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999) *cert. denied*, 528 U.S. 1153, 120 S.Ct. 1156, 145 L.Ed.2d 1069 (2000) ("A non-moribund statute that 'facially restrict[s] expressive activity by the class to which the plaintiff belongs' presents such a credible threat, and a case or controversy thus exists in the absence of compelling evidence to the contrary. . . . This presumption is particularly appropriate when the presence of a statute tends to chill the exercise of First Amendment rights.") (citing *Wilson v. Stocker*, 819 F.2d 943, 946 (10th Cir. 1987)); *New Hampshire Right to Life Political Action Comm.*, 99 F.3d at 15 ("When dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive

activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence."); *Barilla v. City of Houston*, Texas, 13 F.4th 427, 432 (5th Cir. 2021) ("Regarding this third requirement, 'when dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence.'") (cleaned up).

"In the absence of Sixth Circuit authority to the contrary," District Courts in this Circuit have assumed that the latter rule applies. *See Bookfriends, Inc. v. Taft*, 223 F. Supp. 2d 932, 941 (S.D. Ohio 2002) ("In *New Hampshire Right to Life Political Action Com. v. Gardner*, 99 F.3d 8 (1st Cir.1996), the First Circuit indicated that, 'when dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence.' *Id.* at 15. The Fourth, Seventh and Eleventh Circuits have followed the approach adopted by the First Circuit. . . .  In the absence of Sixth Circuit authority to the contrary, this Court will do the same."). Tennessee state courts—which have relied on this Court's decision in *McKay* for guidance as to the pre-enforcement inquiry, *see Tennesseans for Sensible Election Laws v. Slatery*, No. M2020-01292-COA-R3-CV, 2021 WL 4621249, at *3 (Tenn.

Ct. App. Oct. 7, 2021), *appeal denied* (Mar. 24, 2022)—hold that recency is a

relevant consideration, too.  As the Tennessee Court of Appeals held in *Frogge v.*

*Joseph*, No. M2020-01422-COA-R3-CV, 2022 WL 2197509, at *13 (Tenn. Ct. App.

June 20, 2022), for example:

> Aside from any history of *enforcement*, however, we conclude that the
> history and circumstances surrounding the very *adoption* of the
> Severance Agreement are relevant. *See Minn. Democratic-Farmer-*
> *Lab. Party by Martin v. Simon*, 970 N.W.2d 689, 696-97 (Minn. Ct.
> App. 2022) ("[F]ederal courts have considered the history of the
> statute's enforcement, as well as how recently it was enacted."); *see,*
> *e.g., St. Paul Area Chamber of Com. v. Gaertner*, 439 F.3d 481, 486
> (8th Cir. 2006) ("[T]he threat of prosecution is greater under a statute
> enacted relatively recently."). Again, the stated factors above are not
> exhaustive. . . . This case involves a Severance Agreement only recently
> negotiated by Dr. Joseph and the Board and then legislatively adopted
> by the Board. It is reasonable to conclude that Dr. Joseph and the Board
> approved the Severance Agreement, over Plaintiffs' objection, with the
> expectation and intention that it would be enforced against them. Thus,
> the history of this restriction supports a finding that there is a credible
> threat of its enforcement.

*Id.*  Thus, if the exact claims presented here had been filed in Tennessee state court,

the recency of the AEA's enactment would be a consideration that supports Friends

of George's standing.  *Id.*

There are also good reasons to consider recency when evaluating the

credibility of a threat of enforcement, especially when dealing with a statute that was

not only recently enacted but *just* enacted.  The first is that—as the Fourth Circuit

has observed—"a court presumes that a legislature enacts a statute with the intent

that it be enforced." *Bryant*, 1 F.4th at 286.  The second is that when a just-enacted

statute is challenged, there will never be either (1) "prior history of enforcing the challenged provision against the plaintiffs or others" or (2) "warning letters to the plaintiffs regarding their conduct[.]" *Fischer*, 52 F.4th at 307. The absence of that evidence, of course, has nothing to do with the credibility of the threat a plaintiff faces and does not suggest that enforcement is unlikely, though District Attorney Mulroy wrongly implies otherwise. *See* Appellant's Principal Br. at 16–17. Instead, the lack of such evidence simply reflects the linear passage of time and a reality of American law: no matter how eager the government is to prosecute, laws may not be enforced—and the government may not threaten to enforce them—before they take effect.

A second non-recurring consideration—that the AEA contains criminal (rather than merely civil) penalties—supports Friends of George's standing as well. Though a pre-enforcement threat "need not stem from a criminal action" to be justiciable, *see Kiser*, 765 F.3d at 609, that a statute contains criminal penalties is nonetheless a critical consideration. The reason is that "[t]he severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images." *See Reno v. Am. C.L. Union*, 521 U.S. 844, 872 (1997); *see also Sanders Cty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 745 (9th Cir. 2012) ("The threat to infringement of such First Amendment rights is at its greatest when, as here, the state employs its criminalizing powers.").

Under such circumstances, the "danger of [a] statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution." *See Am. Booksellers Ass'n, Inc.*, 484 U.S. at 393; *cf. Dombrowski v. Pfister,* 380 U.S. 479, 486–87 (1965) ("We have fashioned this exception to the usual rules governing standing. . . because of the 'danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application.'") (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).  Thus, from the Supreme Court down, federal courts have often observed that a threat of enforcement carries more credence when a challenged statute carries criminal penalties.  *See, e.g., id.; Majors v. Abell*, 317 F.3d 719, 721 (7th Cir.) ("because most people are frightened of violating criminal statutes especially when the gains are slight, as they would be for people seeking only to make a political point and not themselves political operatives, there is standing."); *New Jersey Physicians, Inc. v. Obama*, 757 F. Supp. 2d 502, 508 (D.N.J. 2010), *aff'd sub nom. New Jersey Physicians, Inc. v. President of U.S.*, 653 F.3d 234 (3d Cir. 2011) ("in *Pierce*, failure to comply with the statute resulted in a misdemeanor, giving the plaintiff's claim for standing more credence because the threat of criminal penalties is sufficient for standing in a pre-enforcement challenge to the statute. . . .  Unlike *Pierce*, the Act specifically states that failure to procure insurance does not result in a criminal penalty.").  As the Third Circuit explained in a recent decision bearing on the issue:

> The attenuated risk of enforcement here matters less for Article III standing than in many pre-enforcement cases because the Law is exclusively civil. In *Driehaus* and every pre-enforcement case that it recounted, the statutes at issue included criminal penalties. 573 U.S. at 158–60, 166, 134 S.Ct. 2334. Indeed, as we noted at the start, much of the point of pre-enforcement challenges is to let people vindicate their constitutional rights without having to risk prosecution. *See id.* at 161, 134 S.Ct. 2334. But civil penalties lower the temperature.

*Nat'l Shooting Sports Found.*, 80 F.4th at 222–23.

Here, AEA violations are punishable by criminal sanction, with a first offense being punishable as "a Class A misdemeanor, and a second or subsequent such offense [being] a Class E felony." *See* Tenn. Code Ann. § 7-51-1407(c)(3). That fact raises the temperature and the corresponding risk of self-censorship, particularly when coupled with the fact that "the reference point for conduct that is subject to prosecution" under the AEA "is amorphous and vague[.]" *See Blount Pride, Inc.*, 2023 WL 5662871, at *5. Thus, the fact that the AEA contains criminal penalties supports Friends of George's standing.

## B. THE DISTRICT COURT CORRECTLY DETERMINED THAT THE AEA IS A CONTENT-BASED SPEECH RESTRICTION UNRELATED TO ITS CLAIMED REGULATION OF OBSCENITY.

The AEA criminalizes performing "adult cabaret entertainment" on public property or where a minor can view it. *See* Tenn. Code Ann. § 7-51-1407(c)(1). Both "Adult cabaret" and "Adult cabaret entertainment" are defined terms limited to certain "entertainers." *See* Tenn. Code Ann. § 7-51-1401(2) ("'Adult cabaret' means a cabaret that features topless dancers, go-go dancers, exotic dancers, strippers, male

or female impersonators, or similar entertainers"); Tenn. Code Ann. § 7-51-1401(12)

("'Adult cabaret entertainment': (A) Means adult-oriented performances that are

harmful to minors, as that term is defined in § 39-17-901, and that feature topless

dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or

similar entertainers; and (B) Includes a single performance or multiple performances

by an entertainer[.]").

　　　To preserve the AEA's constitutionality, District Attorney Mulroy maintains

that "adult cabaret entertainment" should be construed to apply narrowly to "sexual

speech that is obscene to minors[.]" *See* Appellant's Principal Br. at 48.  District

Attorney Mulroy further maintains that its definition of "harmful to minors" should

be limited "to materials that lack value *for a reasonable 17-year-old.*" *Id.* at 9.

　　　There are some issues with District Attorney Mulroy's proposed limiting

constructions.[2]  Even if these constructions were proper, though, the AEA suffers

---

[2] For one, District Attorney Mulroy himself appears to be confused about his own
proposed construction. *Compare* Appellant's Principal Br. at 1 (referring to "kids"),
*with id.* at 48 (referring to "reasonable 17-year-olds.").  For another, the
government's proposed limiting constructions "veer[] . . . far from the AEA's text[.]"
*See* Op., R. 91, at PageID # 1424; *cf. Iancu v. Brunetti*, 139 S. Ct. 2294, 2301 (2019)
("Even assuming the Government's reading would eliminate First Amendment
problems, we may adopt it only if we can see it in the statutory language. And we
cannot.").  For a third, the government's proposed limiting constructions would
come as a surprise to the very members of law enforcement who have threatened
enforcement under the AEA, who do not share District Attorney Mulroy's view. *See,
e.g., Blount Pride, Inc*., 2023 WL 5662871, at *2 (recounting threat letter from
district attorney precipitated by "'numerous communications from law enforcement,

from a separate infirmity that renders it facially unconstitutional: it is a "vehicle[]
for content discrimination unrelated to" its claimed regulation of sexual speech that
is obscene to minors.  *See R.A.V.*, 505 U.S. at 383–84.

The AEA's second layer of content discrimination shows up in two places.
*First*, even as construed and narrowed by District Attorney Mulroy, the AEA
exclusively regulates obscenity by certain "entertainers."  *See* Tenn. Code Ann. § 7-
51-1401(2).  That means that identically obscene displays by anyone who is *not* an
"entertainer" within the meaning of the AEA escape its criminal penalties.  Thus, for
instance, while some district attorneys have felt comfortable threatening drag queens
with prosecution under the AEA (regardless of any claim of obscenity), *see Blount
Pride, Inc.*, 2023 WL 5662871, at *2, other *non*-"entertainers" who perform in drag
lack the same worries.  *See, e.g.,* Matt Lavietes, *Tennessee governor appears to have
dressed in drag, an art form he wants to restrict*, NBC NEWS (Feb. 27, 2023),
https://www.nbcnews.com/nbc-out/out-politics-and-policy/tennessee-governor-
appears-dressed-drag-art-form-wants-restrict-rcna72569.

Given this context, even if limited in the way District Attorney Mulroy
suggests, the AEA does not merely proscribe obscenity.  Instead, it makes the
"further content discrimination of proscribing *only*" obscenity by certain disfavored

---

local officials, and concerned citizens'" that mere planned performance of a drag
show in public Pride event would violate the AEA).

entertainers. *See R.A.V.*, 505 U.S. at 383–84. As *R.A.V.* instructs, this is impermissible. *See id.*; *see also Chicago Park Dist.*, 534 U.S. at 325 ("Granting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional[.]"); *Greater New Orleans Broad. Ass'n*, 527 U.S. at 194 ("[D]ecisions that select among speakers conveying virtually identical messages are in serious tension with the principles undergirding the First Amendment.").

*Second*, the AEA does not apply assiduously to "sexual speech that is obscene to minors" in the way District Attorney Mulroy suggests. *See* Appellant's Principal Br. at 48. Instead, even if narrowed to speech that is obscene to minors, the AEA only applies to "*performance* or multiple performances by an entertainer[.]" Tenn. Code Ann. § 7-51-1401(12)(B) (emphasis added); *id.* at Tenn. Code Ann. § 7-51-1401(12)(A) ("Adult cabaret entertainment": (A) Means adult-oriented *performances* . . . .") (emphasis added). Thus, an entertainment-oriented "performance"[3] is a necessary component of a violation.

By specifically regulating "performance[,]" Tenn. Code Ann. § 7-51-

---

[3] The context in which the term "performance" is used in the AEA—where it is included as part of the definition of "Adult cabaret entertainment" and "by an entertainer"—makes clear that performance means an *entertainment-oriented* performance, rather than some generalized reference to taking an action. *See* Tenn. Code Ann. § 7-51-1401(12)(A)–(B); *cf. Lagos v. United States*, 138 S. Ct. 1684 (2018) ("statutory words are often known by the company they keep").

1401(12)(B), the AEA is targeted "to the suppression of expression[,]" and it "must be justified under a more demanding standard" as a result. *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000) ("If the governmental purpose in enacting the regulation is unrelated to the suppression of expression, then the regulation need only satisfy the 'less stringent' standard from *O'Brien* for evaluating restrictions on symbolic speech. . . . If the government interest is related to the content of the expression, however, then the regulation falls outside the scope of the *O'Brien* test and must be justified under a more demanding standard."). By specifying both: (1) that "whether a fee is charged or accepted for the performance" does not matter, Tenn. Code Ann. § 7-51-1401(13)(B), and (2) that "adult cabaret" is criminalized whether or not it occurs at an establishment, *see* Tenn. Code Ann. § 7-51-1407(a)(1), the AEA has also taken itself outside the ambit of a business regulation aimed at, for instance, "combating crime and other negative secondary effects caused by the presence of adult entertainment establishments[.]" *See City of Erie*, 529 U.S. at 279.

These second-tier content regulations notwithstanding, District Attorney Mulroy maintains that the District Court disagreed with his position "mostly because it 'refus[ ed] to adopt Defendant's reading of [the Act's] Location Provision.'" *See* Appellant's Principal Br. at 49 (quoting Op., R. 91 at PageID #1450). This is not a fair characterization of the District Court's judgment, though. Instead, the District Court also held that—in contravention of *R.A.V.*—the AEA engaged in second-tier

content discrimination, stating:

> The Court need only ensure that the government not use a class of speech—like sexual speech that is not obscene but potentially harmful to minors—as a "vehicle for content discrimination unrelated to [its] distinctively proscribable content." *See R.A.V.*, 505 U.S. at 383–84. While Tennessee has the power to protect children from harmful materials, it must do so without an "unnecessarily broad suppression of speech addressed to adults." *Reno*, 875 U.S. at 875. Given an appropriate scope, it may regulate adult-oriented performers who are harmful to minors. But it cannot, in the name of protecting children, use the AEA to target speakers for a reason that is unrelated to protecting children. The Court finds that the AEA's text targets the viewpoint of gender identity—particularly those who wish to impersonate a gender that is different from the one with which they are born. This text makes the AEA a content-based, viewpoint-based regulation on speech.

*See* Op., R. 91, at PageID #1437.

District Attorney Mulroy offers two arguments in response to the second-tier content discrimination defect the District Court observed.  Neither is persuasive.

*First*, citing *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 657 (1994), District Attorney Mulroy maintains that: "'[S]peaker distinctions . . . are not presumed invalid under the First Amendment' or subjected to 'strict scrutiny' unless 'they reflect the Government's preference for[,] . . . or aversion to[,] what the disfavored speakers have to say.'  The Act does no such thing."  *See* Appellant's Principal Br. at 41 (alterations in original; internal citations omitted).  Where, as here, it is the government's aversion to *the message* ("adult-oriented performances that are harmful to minors") that is the issue, though, the Supreme Court has been clear in its post-*Turner* jurisprudence that "decisions that select among speakers conveying

-28-

virtually identical messages are in serious tension with the principles undergirding the First Amendment." *Greater New Orleans Broad. Ass'n*, 527 U.S. at 194. Thus, "[g]ranting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional[.]" *Thomas*, 534 U.S. at 325. By criminalizing a message when conveyed by an "Entertainer" but allowing non-entertainers to convey the same message without restriction, that is exactly what the AEA does.

*Second*, District Attorney Mulroy characterizes the AEA's "similar entertainers" terminology as a "catchall" that "covers anyone—regardless of viewpoint—who engages in a 'adulted-oriented performance' that is 'harmful to minors.'" *See* Appellant's Principal Br. at 42–43. This misses the issue, though, which is that the AEA does not purport to forbid all "adult-oriented performances that are harmful to minors, as that term is defined in § 39-17-901[.]" Tenn. Code Ann. § 7-51-1401(12)(A). Instead, it forbids such performances *only* if they "feature topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers[.]" *Id.*; Tenn. Code Ann. § 7-51-1407(c)(1). Thus, all non-entertainers are safe from the AEA's reach, even if they perform adult-oriented performances that harm minors. *See* Tenn. Code Ann. § 7-51-1407(13). Further adult-oriented content that harms minors escapes the AEA's criminal penalties so long as it is not communicated as part of an entertainment-oriented

-29-

"performance[.]" Tenn. Code Ann. § 7-51-1407(12)(A).

District Attorney Mulroy's separate claim that "the Act extended existing standards to new locations" is not true, either. *See* Appellant's Principal Br. at 17. There has never been a Tennessee statute that targeted "male or female impersonators, or similar entertainers" in the way the AEA does. *See* Tenn. Code Ann. § 7-51-1401(12)(A); Tenn. Code Ann. § 7-51-1401(2). The AEA also incorporates a constitutionally infirm assumption that ~~drag queens~~ "male or female impersonators"—who are qualifying "entertainers" under both § 7-51-1401(12)(A) and § 7-51-1401(2)—necessarily provide "[e]ntertainment within an adult-oriented establishment" or engage in "performance of actual or simulated specified sexual activities, including removal of articles of clothing or appearing unclothed[.]" *See* Tenn. Code Ann. § 7-51-1401(13) (defining "Entertainer"); *see also* Appellant's Principal Br. at 42 (arguing that "the second component merely identifies performers who engage in that type of performance."). This is nonsense. Even so, the AEA— which was widely understood to be a "bill restricting drag shows" when it was enacted, *see* Matt Lavietes, *Tennessee governor signs first-of-its-kind bill restricting drag shows*, NBC NEWS (Mar. 2, 2023), https://www.nbcnews.com/feature/nbc-out/tennessee-governor-signs-first-its-kind-bill-restricting-drag-shows-n1303262— has enabled District Attorneys to wield the AEA's criminal penalties to threaten mere drag performance. *See Blount Pride, Inc.*, 2023 WL 5662871, at *2; *cf. Crotty v.*

*Flora*, No. M2021-01193-SC-R11-CV, 2023 WL 6342049, at *14 (Tenn. Sept. 29, 2023) (the "situation" that the legislature would "have had in mind" in enacting a statute is a relevant interpretive consideration under Tennessee law).

### C.    THE AEA CANNOT WITHSTAND STRICT SCRUTINY.

District Attorney Mulroy insists that the AEA "passes any tier of constitutional review[,]" *see* Appellant's Principal Br. at 47, including the strict scrutiny that applies here, *see id.* at 48; *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018) ("content-based regulations of speech are subject to strict scrutiny."). It does not, though, because the AEA is at once fatally *under*inclusive—allowing abundant obscene content that the AEA purportedly aims to regulate to evade liability—and fatally *over*inclusive, prohibiting far more speech than is necessary to proscribe obscene sexual content that harms minors. *Cf. First Nat'l Bank v. Bellotti*, 435 U.S. 765, 793 (1978) ("This purpose is belied, however, by the provisions of the statute, which are both underinclusive and overinclusive.").

Beginning with the AEA's underinclusiveness: the AEA does not comprehensively regulate all public displays of "sexual speech 'harmful to minors'" as District Attorney Mulroy suggests. *See* Appellant's Principal Br. at 42. Instead, as noted, it prohibits only such speech by specified "entertainers." *See* Tenn. Code Ann. § 7-51-1401(12); *see also supra* at 25–26. Even then, the AEA only prohibits such speech when it is part of an entertainment-oriented "performance." *See* Tenn.

Code Ann. § 7-51-1401(12)(A)–(B); *see also supra* at 26–28. Thus, the AEA is substantially underinclusive in its scope, which "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *See Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 802 (2011) (citing *City of Ladue v. Gilleo*, 512 U.S. 43, 51, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994); *Florida Star v. B.J.F.*, 491 U.S. 524, 540, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989)).

Turning to the AEA's overinclusiveness: Even adopting District Attorney Mulroy's proposed limiting constructions, the AEA is not restricted to locations or circumstances where children are present, even though "safeguarding the physical and psychological well-being of a minor" is the compelling interest that purportedly justifies the statute. *See* Appellant's Principal Br. at 48. Instead, Tenn. Code Ann. § 7-51-1407(c)(1) provides that "[i]t is an offense for a person to perform adult cabaret entertainment: (A) On public property" *whether or not* children are present. *Id.* The AEA further restricts "adult cabaret entertainment . . . In a location where the adult cabaret entertainment *could be* viewed by a person who is not an adult[,]" *see* Tenn. Code Ann. § 7-51-1407(c)(1)(B) (emphasis added), though the necessary likelihood of that possibility is left undefined. These prohibitions dramatically expand the AEA's reach to a host of circumstances when children are not, in fact, present, and it also expands its reach to circumstances when children could not

reasonably be expected to be present.

The AEA makes no exceptions for parental consent, either—a critical fact that District Attorney Mulroy concedes but insists does not matter. *See* Appellant's Principal Br. at 49–50 (arguing that "the State is not required to provide a parental-consent exception for every restriction related to minors[,]" and suggesting that the absence of a parental consent exception in the AEA is akin to prohibiting children from participating in child pornography). Thus, District Attorney Mulroy maintains that while Tennessee parents may, for example, consent to let their minor children *marry*, *see* Tenn. Code Ann. § 36-3-106—a far more serious matter that requires actual sex to be valid, *see Brewer v. Miller*, 673 S.W.2d 530, 532 (Tenn. Ct. App. 1984) (marriage that "was never consummated" is "voidable")—parents have no authority to consent to allowing the same minor children to *view* sexualized, entertainment-oriented performances by disfavored entertainers. *See* Appellant's Principal Br. at 49–50.

The Supreme Court's jurisprudence does not support such a vast intrusion into parental authority. *See, e.g., Ginsberg v. State of N. Y.,* 390 U.S. 629, 639 (1968) (emphasizing that "the prohibition against sales to minors does not bar parents who so desire from purchasing the magazines [depicting nudity] for their children."); *Reno v. Am. C.L. Union*, 521 U.S. at 865 ("we noted in *Ginsberg* that 'the prohibition against sales to minors does not bar parents who so desire from purchasing the

-33-

magazines for their children.'  Under the CDA, by contrast, neither the parents' consent—nor even their participation—in the communication would avoid the application of the statute.") (internal citations omitted).  Thus, Tennessee lacks authority to displace parents' "primary role . . . in the upbringing of their children" in the manner the AEA does.  *Cf. Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition.").  Other Tennessee obscenity laws designed to protect children from exposure to sexualized content appropriately make parental consent an affirmative defense to liability for that reason.  *See, e.g.,* Tenn. Code Ann. § 39-17-911(d) ("It is an affirmative defense to prosecution under this section that the minor to whom the material or show was made available or exhibited was, at the time, accompanied by the person's parent or legal guardian, or by an adult with the written permission of the parent or legal guardian.").

For all of these reasons, the AEA's fatally underinclusive and overinclusive provisions preclude it from satisfying strict scrutiny.  Thus, the District Court's judgment that the AEA contravenes the First Amendment should be affirmed.

**D.    DISTRICT ATTORNEY MULROY'S PROPOSED REMEDIES ARE IMPROPER.**

District Attorney Mulroy concludes by suggesting various limitations to the

scope of the injunctive relief that the District Court granted.  Most are improper.

*First*, District Attorney Mulroy maintains that "[t]he district court lacked the power to enjoin the Act's public-property provision because it lacked Article III authority to even consider that provision."  *See* Appellant's Principal Br. at 51; *see also id.* at 25 (asserting that because mere drag participation in Pride event does "not qualify as 'adult cabaret entertainment[,]'" Friends of George's lacks standing to challenge the AEA's public-property provision).  Friends of George's view that the AEA—which incorporates an assumption that drag performance is inherently adult-oriented entertainment and sexualized, *see supra* at 30—applies to its participation in public-property Pride events is arguable, though.  Indeed, it is sufficiently arguable that *other District Attorneys share it.  See Blount Pride, Inc*., 2023 WL 5662871, at *2 (recounting threat letter from district attorney asserting that mere planned performance of a drag show in public Pride event could violate the AEA). That Tennessee law enforcement officials have actually applied the AEA in that way thus powerfully bolsters Friends of George's position that its construction is arguable.  *See id.*; *cf. Troxel v. Granville*, 530 U.S. 57, 74 (2000) ("There is no need to hypothesize about how the Washington courts might apply § 26.10.160(3) because the Washington Superior Court did apply the statute in this very case.").  As a result, Friends of George's established its standing to challenge the public-property provision of the AEA, and there is no limitation on Friends of George's right to seek

relief enjoining its enforcement.

*Second*, when courts invalidate a speech-restricting law on facial overbreadth grounds, the Supreme Court has suggested that "*all*" enforcement may be lawfully suspended. *See Virginia v. Hicks*, 539 U.S. 113, 119 (2003) ("Overbreadth adjudication, by suspending *all* enforcement of an overinclusive law, reduces these social costs caused by the withholding of protected speech."); *cf. Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 958 (1984) ("Facial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society—to prevent the statute from chilling the First Amendment rights of other parties not before the court."). Further, "[c]ourts have regularly held that a plaintiff may seek an injunction applicable to all similarly-situated individuals harmed by the same unconstitutional practice, without the necessity of seeking class-action treatment." *Caspar v. Snyder*, 77 F. Supp. 3d 616, 642 (E.D. Mich. 2015) (collecting cases). Thus, "district courts are not categorically prohibited"—as a matter of judicial authority—"from granting injunctive relief benefitting an entire class in an individual suit" as District Attorney Mulroy asserts, even if "such broad relief is rarely justified . . . ." *Sharpe v. Cureton*, 319 F.3d 259, 273 (6th Cir. 2003).

*Third*, District Attorney Mulroy suggests severing "the entire 'entertainers' clause" as a way to remedy the AEA's second-tier content discrimination problem. *See* Appellant's Principal Br. at 54. Doing so would *expand* the AEA's criminal

liability by removing its current "entertainers" limitation, though.  Courts have no authority to broaden criminal liability in this way.  *See State v. Culp*, 900 S.W.2d 707, 711 (Tenn. Crim. App. 1994) ("Only the legislature may enact criminal laws.") (citing *Jones v. Haynes*, 221 Tenn. 50, 424 S.W.2d 197, 198 (1968)); *cf. United States v. Davis*, 139 S. Ct. 2319, 2323 (2019) ("Only the people's elected representatives in Congress have the power to write new federal criminal laws.").

It is true that when an equal-treatment constitutional violation is sustained and a statute's unequally-disbursed *benefits* are the problem, courts have authority to remedy the violation either by extending benefits to a previously-omitted class or by nullifying the benefits for everyone.  *See Barr v. Am. Ass'n of Pol. Consultants, Inc*., 140 S. Ct. 2335, 2354 (2020) ("When the constitutional violation is unequal treatment, as it is here, a court theoretically can cure that unequal treatment either by extending the benefits or burdens to the exempted class, or by nullifying the benefits or burdens for all.").  But courts cannot similarly remedy an unconstitutional restriction on individual liberty by restricting more speech and broadening the scope of criminal liability.  *See Rappa v. New Castle Cnty*., 18 F.3d 1043, 1072–73 (3d Cir. 1994) ("we are unwilling to sever the exception, because our severability inquiry here has a constitutional dimension. Eliminating the offending exception would mean that we would be requiring the State to restrict more speech than it currently does. . . . To our knowledge, no court has ever mandated issuance of an injunction

such as that, and we decline to be the first."). Beyond invading the Tennessee General Assembly's exclusive authority to enact criminal laws, *see Culp*, 900 S.W.2d at 711, *Davis*, 139 S. Ct. at 2323, doing so would pose serious due process problems by subjecting—through a non-text-based judicial remedy—citizens to criminal liability who have no reason to know that their conduct is proscribed. *See United States v. Harriss*, 347 U.S. 612, 617 (1954) ("no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed."). The Appellant's invitation to sever the AEA's "entertainers" restriction and expand the AEA's criminal liability to all "adult-oriented performances that are harmful to minors, as that term is defined in § 39-17-901[,]" *see* Tenn. Code Ann. § 7-51-1401(12)(A), should be rejected as a result.

## VI.  CONCLUSION

For the foregoing reasons, the District Court's judgment should be affirmed.

Respectfully submitted,

By:    /s/ Daniel A. Horwitz
DANIEL A. HORWITZ (TN #032176)
LINDSAY E. SMITH (TN #035937)
MELISSA K. DIX (TN #038535)
HORWITZ LAW, PLLC
4016 WESTLAWN DR.
NASHVILLE, TN 37209
(615) 739-2888
daniel@horwitz.law
lindsay@horwitz.law
melissa@horwitz.law

-38-

Brice M. Timmons, #029582
Melissa J. Stewart, #040638
Craig A. Edington, #038205
Donati Law, PLLC
1545 Union Ave.
Memphis, TN 38104
(901) 278-1004 (Office)
(901) 278-3111 (Fax)
brice@donatilaw.com
melissa@donatilaw.com
craig@donatilaw.com

Stella Yarbrough, #033637
Lucas Cameron-Vaughn,#038451
Jeff Preptit, #038451
ACLU Foundation of Tennessee
P.O. Box 120160
Nashville, TN 37212
(615) 320-7142
syarbrough@aclu-tn.org
lucas@aclu-tn.org
jpreptit@aclu-tn.org

Justin S. Gilbert, # 017079
100 W. Martin Luther King Blvd,
Suite 501
Chattanooga, TN 37402
Telephone: 423.756.8203
justin@schoolandworklaw.com

*Counsel for Intervenors*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,339 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Microsoft Word 2016 in 14-point Times New Roman font, a proportionally spaced typeface.

By:     /s/ Daniel A. Horwitz
DANIEL A. HORWITZ (TN #032176)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 23, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

By:    /s/ Daniel A. Horwitz
DANIEL A. HORWITZ (TN #032176)

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| Docket Entry No. | Description | PageID # |
|---|---|---|
| R. 69 | Pretrial Order | 952–970 |
| R. 91 | Op. | 1394–1463 |