# 23-5611

## United States Court of Appeals
### for the
## Sixth Circuit

————————————————

FRIENDS OF GEORGE'S, INC.,

*Plaintiff-Appellee,*

*v.*

STEVEN J. MULROY,

*Defendant-Appellant.*

————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE

**BRIEF OF AMICUS CURIAE ACTORS' EQUITY ASSOCIATION
IN SUPPORT OF APPELLEE**

Megan Stater Shaw
COHEN, WEISS AND SIMON LLP
900 Third Avenue, Suite 2100
New York, NY 10022
(212) 356-0205

Samuel Morris
GODWIN, MORRIS, LAURENZI &
BLOOMFIELD, P.C.
50 N. Front St., Suite 800
Memphis, TN 38103
(901) 528-1702

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST ................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 2

ARGUMENT ...................................................................................... 5

I.   TENNESSEE'S STATUTE IS UNCONSTITUTIONALLY
     OVERBROAD AND VAGUE ........................................................ 5

     A.   The Statute Applies to Protected, Non-Obscene Speech .................... 6

     B.   States Cannot Ban Protected Speech Altogether to Shelter
          Children ................................................................................ 7

     C.   The Statute Applies to Speech Deemed "Harmful to Minors"
          Without Providing Further Guidance .................................... 9

II.  THE STATUTE DETERS LIVE THEATRICAL PRODUCTIONS
     PERFORMED BY EQUITY MEMBERS IN TENNESSEE ..................... 11

     A.   The Controversial Live Theatrical Productions Performed by
          Equity Members are Indistinguishable from Drag Shows ................ 12

     B.   By Covering Equity Productions, the Statute will Chill
          Protected Speech in Tennessee ........................................... 15

     C.   A Chill on Live Theatrical Productions will have a Significant
          Economic Impact on the State of Tennessee ................................... 15

CONCLUSION ................................................................................... 17

CERTIFICATE OF COMPLIANCE ....................................................... 17

CERTIFICATE OF SERVICE ............................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Free Speech Coalition*,
  535 U.S. 234 (2002)......................................................................................6, 7

*Broadrick v. Oklahoma*,
  413 U.S. 601 (1973)...........................................................................................5

*City Council v. Taxpayers for Vincent*,
  466 U.S. 789 (1984)...........................................................................................5

*Cohen v. California*,
  403 U.S. 15 (1971).............................................................................................6

*Erznoznik v. City of Jacksonville*,
  422 U.S. 205 (1975)...........................................................................................7

*Ginsberg v. New York*,
  390 U.S. 629 (1968).........................................................................................10

*Jennings v. Rodriguez*,
  138 S. Ct. 830 (2018).........................................................................................9

*Kolender v. Lawson*,
  461 U.S. 352 (1983)...........................................................................................5

*New York v. Ferber*,
  458 U.S. 747 (1982)...........................................................................................6

*Reno v. American Civil Liberties Union*,
  521 U.S. 844 (1997)..................................................................................5, 9, 10

*Sable Comm's of Cal., Inc. v. F.C.C.*,
  492 U.S. 115 (1989)...........................................................................................7

*Schad v. Borough of Mt. Ephraim*,
  452 U.S. 61 (1981).............................................................................................6

*Southeastern Promotions, Ltd. v. Conrad*,
  420 U.S. 546 (1975).........................................................................................14

*Stanley v. Georgia*,
  394 U.S. 557 (1969)......................................................................9

*United States v. Hansen*,
  599 U.S. 762 (2023)....................................................................11

**Constitutions and Statutes**

U.S. CONST. amend. I................................................................*passim*

T.C.A. §§ 7-51-1401......................................................................3

T.C.A. § 7-51-1407(c)(1) ..............................................................3

T.C.A. § 39-17-901(6) ...............................................................4, 10

**Other Authorities**

*2013 Grammy Winners*, RECORDING ACADEMY GRAMMY AWARDS,
  https://www.grammy.com/awards/56th-annual-grammy-awards
  (last visited Oct. 27, 2023) ........................................................2

Angele Latham, Jackson Pride Organizer Expresses 'Joy,' Rep. Todd
  Calls a 'Win' with Drag Show Ruling, JACKSON SUN (Oct. 7, 2022
  at 4:08 P.M.),
  https://www.jacksonsun.com/story/news/2022/10/07/jackson-
  pride-tn-2022-drag-show-age-18-and-older/69547945007/ ...............................3

*Everybody Say Yeah! Kinky Boots is Available for Licensing*,
  MTISHOWS.COM,
  https://www.mtishows.com/news/everybody-say-yeah-kinky-
  boots-is-available-for-licensing (last visited Oct. 27, 2023)...............................2

Family Research Council (@FRCdc), TWITTER (Feb. 27, 2023 at 5:37
  P.M.),
  https://twitter.com/FRCdc/status/1630336463538737155?cxt=HH
  wWhsC-2YWYj6AtAAAA ...................................................................3

Jeff Lunden, *In the Broadway Musical '1776,' the Revolution is in the Casting* (Oct. 15, 2022 at 5 A.M.), https://www.npr.org/2022/10/15/1128740858/broadway-musical-1776-gender-race#:~:text=Roundabout%20Theatre%20Company-,Elizabeth%20A.,as%20John%20Adams%20in%201776 ................................ 13

Marc Hershberg, *Musicals make more Money on the Road than on Broadway* (Feb. 3, 2019), https://www.forbes.com/sites/marchershberg/2019/02/03/musicals-make-more-money-on-the-road-than-on-broadway/?sh=211799f8a111 ................................ 16

Marybeth Hamilton, *SEX, The Drag, and 1920s Broadway*, 36 THE MIT PRESS 82, 84 (1988) ................................................... 14

Morning Call, *Don't say gay? Students say Bucks School District Killed Musical 'Rent' Because it has Queer Relationships*, THE MORNING CALL (Apr. 19, 2022 at 11:56 A.M.), https://www.mcall.com/2022/04/19/dont-say-gay-students-say-bucks-school-district-killed-production-of-musical-rent-because-it-has-queer-relationships/ ................................ 14

Nancy Roberts Trott, School District Anti-Gay Policy Splits N.H. Town, LOS ANGELES TIMES (Mar. 17, 1996 at 12 A.M.), https://www.latimes.com/archives/la-xpm-1996-03-17-mn-47986-story.html ................................ 3

Page Six Team, *'Kinky Boots' Walks Tall in Macy's After Parade Controversy* (Nov. 30, 2013), https://pagesix.com/2013/11/30/kinky-boots-walks-tall-in-macys-after-thanksgiving-parade-controversy/ ................................ 14

*'Rent' Controversy in Idaho: LGBT Content in Lake City Playhouse Musical Sparks Backlash* (Dec. 23, 2011 at 1:36 P.M.), https://www.huffpost.com/entry/rent-controversy-in-idaho_n_1167896; ................................ 14

*Touring Broadway 2016-2017*, THE BROADWAY LEAGUE, https://www.broadwayleague.com/research/research-reports/ (Nov. 2019) ................................ 16

iv

*Winners / Kinky Boots*, TONY AWARDS,
    https://www.tonyawards.com/winners/year/any/category/any/show
    /kinky-boots/ (last visited Oct. 27, 2023) ..........................................................2

## <u>STATEMENT OF INTEREST</u>[1]

Actors' Equity Association ("Equity"), a labor organization that represents live theatrical actors and stage managers, is devoted to protecting live theatre as an essential component of a thriving civil society and the basis of its members' livelihoods.  Since 1913, Equity has fought to win its members a dignified workplace at the theatre, from pay guarantees and pension and welfare benefits to the rules governing auditions.  With more than 51,000 members across the nation, Equity is among the oldest and largest labor unions in the performing arts in America.  Broadway tours of America's favorite musicals come to Tennessee each year, and approximately 380 Equity members reside in Tennessee, where they can perform in fifteen Equity-affiliated theatres.  Preserving the First Amendment right to perform in uncensored, controversial works of art in the public sphere is essential to Equity's mission.  It is in defense of this freedom, and for the reasons set out in this brief, that Equity now urges this Court to affirm the ruling of the district court.

---

[1] In accordance with Federal Rule of Appellate Procedure 29(a)(4)(E), amicus certifies that no counsel for any party authored this brief in whole or in part and no person or entity other than amicus or its counsel made any monetary contribution towards its preparation or submission. Under Federal Rule of Appellate Procedure 29(a)(2), all parties to this appeal have been asked to consent to the filing of this brief, and all parties consent.

## <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

The audience's first introduction to Lola, a principal character in the hit Broadway musical *Kinky Boots*, is in an alleyway.  Charles, the inheritor of a bankrupt family shoe business, chances upon an alleyway assault: a group of men hassling a woman in high-heeled shoes.  The woman uses one of her shoes to knock one man unconscious before Charles can intervene.  "He wasn't the first man to fall for me," she says, slipping out of her coat and breaking into song.  This is Lola, a drag queen who performs with a retinue of Angels, all in drag.  She inspires Charles to revitalize his shoe factory by manufacturing high heels for her underserved niche.[2]

*Kinky Boots* is a heartwarming comedy that won six Tony Awards and a Grammy.[3]  It also may be prohibited by Tennessee's recent enactment of Public Chapter No. 2, 113th General Assembly 2023 (the "Statute").

Shortly before its passage, the Statute's sponsor, Rep. Chris Todd of Madison County, sued to enjoin a drag show billed as a family-friendly event from performing in public and declared that drag shows are "child abuse."  Angele

---

[2] *See* Libretto at pp. 16-20, available at *Everybody Say Yeah! Kinky Boots is Available for Licensing*, MTISHOWS.COM, https://www.mtishows.com/news/everybody-say-yeah-kinky-boots-is-available-for-licensing (last visited Oct. 27, 2023).

[3] *Winners / Kinky Boots*, TONY AWARDS, https://www.tonyawards.com/winners/year/any/category/any/show/kinky-boots/ (last visited Oct. 27, 2023); *2013 Grammy Winners*, RECORDING ACADEMY GRAMMY AWARDS, https://www.grammy.com/awards/56th-annual-grammy-awards (last visited Oct. 27, 2023).

Latham, *Jackson Pride Organizer Expresses 'Joy,' Rep. Todd Calls a 'Win' with*
*Drag Show Ruling*, JACKSON SUN (Oct. 7, 2022 at 4:08 P.M.),
https://www.jacksonsun.com/story/news/2022/10/07/jackson-pride-tn-2022-drag-
show-age-18-and-older/69547945007/.  In the wake of that lawsuit, Rep. Todd said
that the purpose of the Statute was to "strengthen that law so that the DAs felt
more empowered to pursue these cases" against drag shows.  Family Research
Council (@FRCdc), Twitter (Feb. 27, 2023 at 5:37 P.M.),
https://twitter.com/FRCdc/status/1630336463538737155?cxt=HHwWhsC-
2YWYj6AtAAAA (video interview of Rep. Todd retweeted by Rep. Todd,
@RepChrisTodd).

The Statute prohibits performances of "adult cabaret entertainment"—
defined as performances deemed "harmful to minors" that feature "topless dancers,
go-go dancers, exotic dancers, strippers, male or female impersonators, or similar
entertainers"—on "public property" or "[i]n a location where [it] could be viewed
by a person who is not an adult."  T.C.A. §§ 7-51-1401, 7-51-1407(c)(1).
"Harmful to minors" is defined as "that quality of any description or
representation, in whatever form, of nudity, sexual excitement, sexual conduct,
excess violence or sadomasochistic abuse when the matter or performance: (A)
would be found by the average person applying contemporary community
standards to appeal predominantly to the prurient, shameful or morbid interests of

minors; (B) Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for minors; and (C) Taken as [a] whole lacks serious literary, artistic, political or scientific values for minors." *Id.* § 39-17-901(6).  Violations of the Statute incur criminal penalties.  *Id.* § 7-51-1407(c)(3).

Equity submits this brief because it fears that the Statute could be read to prohibit a wide swathe of live theatre performances protected by the First Amendment.  If that is not the case, then Equity cannot determine what conduct the Statute prohibits.  From Euripides' *Bacchae* to *Mrs. Doubtfire*, theatrical productions frequently take on the attributes of a drag show, even a risqué one.  Beyond a script's requirements, directors may also take creative license to change the gender presentation of any role.  As a result, Equity members cast in potentially affected roles are left with a Hobson's choice:  perform in Tennessee and risk criminal sanctions or decline to perform and breach their contract with the producer.  These unacceptable possibilities hinder Equity's ability to adequately advise its members and will chill protected, theatrical expression in Tennessee.

Equity contends that the Statute is unconstitutionally overbroad and vague, covers a wide range of live theatrical performances in which Equity members perform, and will deter the expression of protected speech in Tennessee.  As the district court stated, the freedom of speech is as much about the right "to

express one's identity, and to realize self-fulfillment in a free society" as it is to "discover the truth in the marketplace of ideas."  Findings of Fact and Conclusions of Law ("Findings"), R. 91 at PageID #1394.  For these reasons, Equity argues that this Court should affirm the district court's ruling.

## **ARGUMENT**

## I.    **TENNESSEE'S STATUTE IS UNCONSTITUTIONALLY OVERBROAD AND VAGUE**

The First Amendment shelters the American people from overbroad laws that prohibit a substantial amount of protected expression and vague laws that fail to give adequate notice concerning the conduct they proscribe.  *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973); *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).  A statute is unconstitutionally overbroad if there is "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court[.]"  *City Council v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984).  A statute is unconstitutionally vague if it ties criminal culpability to enforcement standards that fail to communicate what, specifically, they prohibit.  *Reno v. American Civil Liberties Union*, 521 U.S. 844, 872-73 (1997).

Equity submits that the Statute bans an entire category of protected expression, risqué live theater featuring "male or female impersonators," and fails to give adequately specific guidance regarding what kinds of material are "harmful

to minors." This overbreadth and vagueness will only deter Equity members from performing in Tennessee.

A.    **The Statute Applies to Protected, Non-Obscene Speech**

The First Amendment protects Americans' right to see, speak, read, and hear what they want. If offended, one may "simply . . . avert[] their eyes." *Cohen v. California*, 403 U.S. 15, 21 (1971). There are limits—defamation, threats, obscenity, child pornography—but those limits are tightly constrained. *Compare New York v. Ferber*, 458 U.S. 747 (1982) (holding that child pornography is unprotected speech), *with Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) (protecting simulated child pornography). In *Miller v. California*, the Supreme Court defined obscenity as speech which (1) the average person, applying contemporary community standards, would find, taken as a whole, appeals to the prurient interest, (2) depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law, and (3) lacks serious literary, artistic, political, or scientific value as a whole. 413 U.S. 15, 24 (1973). In other words, Americans have a constitutional right to view and express sexually charged or explicit entertainment, so long as it is not constitutionally obscene. *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61 (1981) (invalidating total ban on nude dancing).

6

The Statute, by its terms, captures a substantial swathe of protected speech. It is without geographical limitation, extending into private residences as well as commercial establishments. It then prohibits certain types of expression if deemed "harmful to minors." As discussed below, although at first glance the Tennessee Code's definition of "harmful to minors" appears to mirror the *Miller* test for obscenity, it does not. Each of its prongs reach beyond that narrow definition to capture speech which may not be prurient to adults, patently offensive for adults, or lack objective and serious literary, artistic, political, or scientific value.

B.    **States Cannot Ban Protected Speech Altogether to Shelter Children**

States may only restrict minors' access to protected speech "in relatively narrow and well-defined circumstances[.]" *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213 (1975) (invalidating ordinance that prohibited drive-in theaters from showing films containing nudity when their screens were visible from a public place). This power cannot be used to totally eliminate expression appropriate for adults just because children might see or hear it. *Ashcroft*, 535 U.S. at 252; *Sable Comm's of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 131 (1989) (disallowing a ban on "dial-a-porn" messages that improperly "limit[ed] the content of adult telephone conversations to that which is suitable for children to hear").

7

The Statute prohibits "adult cabaret entertainment" in locations where it "could be viewed" by a minor. The word "could" has two potential meanings: "is possible" or "is permissible." Depending on which meaning this Court adopts, the Statute is either an overbroad ban of protected speech or hopelessly incoherent. The natural reading of the Statute is to read the word "could" to mean "is possible": "It is an offense for a person to perform adult cabaret entertainment . . . In a location where *it is possible that* the adult cabaret entertainment *be viewed* by a person who is not an adult." This reading is grammatically coherent but makes the Statute unconstitutionally overbroad. It is *possible* for minors, most especially teenagers, to go anywhere, regardless of whether they are authorized to do so by their parents, the Tennessee General Assembly, or the proprietor of a theater that hosts Broadway shows, a problem the district court recognized. Findings, R. 91 at PageID #1447-48. This reading results effectively in a total ban of all covered "adult cabaret entertainment" in Tennessee.

The State argues that "could be viewed" should be read as "could *permissibly* be viewed." Appellant's Br. at 34. This interpretation makes the Statute meaningless. Under the State's proffered interpretation, the Statute makes it "an offense for a person to perform adult cabaret entertainment . . . [i]n a location where *it is permissible that* the adult cabaret entertainment *be viewed* by a person who is not an adult." In short, the State's reimagined Statute would prohibit adult

8

cabaret entertainment in places where it is permitted.  Moreover, in light of this problem, if the Court chose to rewrite the Statue in accordance with the State's underlying argument, that the Statute applies only to locations that minors are permitted to *access*, the Statute would once again be unconstitutionally overbroad. Its reach would still extend into private residences, where it is indisputable that minors are legally permitted to access.  As the Supreme Court stated in *Stanley v. Georgia*, 394 U.S. 557, 565 (1969), "If the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch."

The only way to rehabilitate the Statute would be to rewrite it altogether, a project that the district court rightly refused to entertain and which is outside the bounds of what the constitutional avoidance canon permits.  Findings, R. 91 at PageID #1448; *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018) (Alito, J.) ("a court relying on [the constitutional-avoidance] canon still must *interpret* the statute, not rewrite it") (emphasis in original).

C.    **The Statute Applies to Speech Deemed "Harmful to Minors" Without Providing Further Guidance**

A statute can be unconstitutionally vague if it uses language similar, but not identical, to legal terms of art.  In *Reno*, the Supreme Court found that the statute at issue was vague because it adopted only one prong of the *Miller* test for obscenity ("depicts or describes, in a patently offensive way, sexual conduct

specifically defined by the applicable state law") and deleted the constraining element of that prong ("specifically defined by the applicable state law").  521 U.S. at 872-74.

The Statute prohibits protected speech deemed "harmful to minors" as defined by T.C.A. § 39-17-901(6).  As discussed above, the definition of "harmful to minors" does not track *Miller*'s definition of obscenity.  *See* Section I(A).  Although it appears to resemble the statute in *Ginsberg v. New York*, 390 U.S. 629 (1968), which prohibited the sale of nude or sexually explicit pictures and magazines to minors, it extends beyond what *Ginsberg* allowed.  *Ginsberg*'s statute only regulated "knowing[]" sales to minors, *id.* at 643, not conduct which minors chanced upon or "could" figure out how to view.  Likewise, the statute did not prevent parents from purchasing the explicit materials themselves for their children, while the Statute here provides no such carve-out.  *Id.* at 639.

Here, the concept that materials may be "harmful to minors," as incorporated into the Statute, has no limiting principle.  As in *Reno*, the second prong of the definition of "harmful to minors" is not cabined to conduct "specifically defined by state law," nor does the Statute identify prohibited conduct more specifically than all performances featuring "adult cabaret entertainment," including "male or female impersonators," in any location in the State.  Moreover, even though the definition of "harmful to minors" is limited to works with

10

"serious" value for minors, the public statements of the Statute's sponsor, Rep.

Todd, suggest that no performances involving "male or female impersonators"

could have serious value for minors.

Equity can only conclude that the Statute amounts to a total ban on all

performances in Tennessee featuring arguably risqué performances with "male or

female impersonators," with no guidance as to which of these performances may

have serious value for minors. This makes the Statute unconstitutionally vague

and implicates a host of Equity productions performed in Tennessee. *See infra*

Section II(C).[4]

## II.    THE STATUTE DETERS LIVE THEATRICAL PRODUCTIONS PERFORMED BY EQUITY MEMBERS IN TENNESSEE

The Statute's overbreadth and vagueness will have a direct impact on

all actors, including Equity members, in Tennessee. Equity submits that live

theatre has a long history of controversial and sometimes risqué gender-bending

which is impossible to distinguish from the drag shows that the Legislature

---

[4] Amicus curiae America First Legal Foundation, in support of the State, argues that the Supreme Court's recent ruling in *United States v. Hansen*, 599 U.S. 762 (2023), held that a statute is only overbroad if there is a "lopsided ratio" of unconstitutional to constitutional applications of the challenged law. Amicus Curiae America First Br. at 12-13. This holding reaffirmed a basic principle of the overbreadth doctrine. Yet in its differences to the case at hand, *Hansen* shows why the overbreadth doctrine is appropriate. For example, the statute in *Hansen* "encompasse[d] a great deal of nonexpressive conduct—which does not implicate the First Amendment at all[.]" 599 U.S. at 782. Here, every possible application of the Statute involves expressive conduct, and many of its applications involve non-obscene (but possibly risqué, controversial, or indecent), protected speech.

evidently intended to target with the Statute.  Because of this, Equity cannot advise

its members to perform in Tennessee if the Statute goes into effect, a result with

significant economic consequences for the local economy.

A.    **The Controversial Live Theatrical Productions Performed by Equity Members are Indistinguishable from Drag Shows**

The Complaint refers to Shakespeare's use of male actors in drag

playing female roles.  Compl. ¶ 10, R. 1 at PageID #3.  Yet the use of "male or

female impersonators" in Shakespearean drama is not just a historical accident, but

a theme throughout his oeuvre.  Seven of Shakespeare's 37 extant plays involve

gender-bending as a plot point.  In *Twelfth Night*, Viola disguises herself as

Cesario, with whom the Countess Olivia promptly falls in love.  Similarly, in *As

You Like It*, Rosalind flees to the Forest of Arden disguised as Ganymede, with

whom the shepherdess Phoebe falls in love.  Gender-switching plays a role in

*Cymbeline*, one of Shakespeare's last plays, and Act 4, scene 2 of *The Merry Wives

of Windsor* features a memorable Falstaff in drag.  Of course, the Government may

argue that all Shakespearean works have serious literary or artistic value for

minors.  One wonders, given that phrase's vagueness.  A school in New Hampshire

withdrew *Twelfth Night* from instruction for "portraying homosexuality" in 1996.[5] And Shakespeare loved bawdy jokes.  *See Twelfth Night*, Act II, Scene 2 v. 78-79.

Shakespeare aside, musical theatre is full of gender-nonconforming roles.  *Kinky Boots* features a drag queen.  The musical *Priscilla, Queen of the Desert* is a story about two drag queens and a trans woman who perform a drag show in the Australian Outback.  Edna Turnblad, Tracy's mother in *Hairspray*, is a drag role, as is the journalist Mary Sunshine in *Chicago*, Mrs. Doubtfire in *Mrs. Doubtfire*, and Ms. Trunchbull in *Matilda*.  Peter Pan is, traditionally, a "trousers role" (where a woman dresses as a man).  Directors also choose to cast men as women, or vice versa, based on their creative vision for a particular production.  In 2022, the producers of *1776* cast women for all of its Founding Father roles.[6]  Each of these productions feature sets, costumes, dance, and song difficult to distinguish from the sets, costumes, dance, and song of a drag show.  Two of these examples, *Kinky Boots* and *Priscilla, Queen of the Desert*, feature drag show performers as part of their story.

---

[5] Nancy Roberts Trott, *School District Anti-Gay Policy Splits N.H. Town*, LOS ANGELES TIMES (Mar. 17, 1996 at 12 A.M.), https://www.latimes.com/archives/la-xpm-1996-03-17-mn-47986-story.html.

[6] Jeff Lunden, *In the Broadway Musical '1776,' the Revolution is in the Casting*, NPR.ORG (Oct. 15, 2022 at 5 A.M.), https://www.npr.org/2022/10/15/1128740858/broadway-musical-1776-gender-race#:~:text=Roundabout%20Theatre%20Company-,Elizabeth%20A.,as%20John%20Adams%20in%201776.

Just as a drag show and a musical featuring drag roles are formally indistinguishable, live theatre is no stranger to controversy. Mae West never premiered *The Drag* in New York after the police charged her with public obscenity in 1927. Marybeth Hamilton, *SEX, The Drag, and 1920s Broadway*, 36 THE MIT PRESS 82, 84 (1988). Closer to home, Chattanooga municipal officials banned the rock musical *Hair*, which features one drag role, from its public theater in 1971, a decision which the Supreme Court invalidated. *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975). More recently, the public backlash to children seeing *Rent* is well-documented[7] and, in 2013, critics on Twitter of the Macy's Thanksgiving Day Parade went viral, lambasting it for featuring a set piece from *Kinky Boots*.[8]

In sum, many live theatre productions feature "male or female impersonators," essentially similar to drag shows, and there are commentators aplenty who accuse theater productions of being "harmful to minors." Given the

---

[7] *Compare 'Rent' Controversy in Idaho: LGBT Content in Lake City Playhouse Musical Sparks Backlash*, HUFFPOST.COM (Dec. 23, 2011 at 1:36 P.M.), https://www.huffpost.com/entry/rent-controversy-in-idaho_n_1167896; Morning Call, *Don't say gay? Students say Bucks School District Killed Musical 'Rent' Because it has Queer Relationships*, THE MORNING CALL (Apr. 19, 2022 at 11:56 A.M.), https://www.mcall.com/2022/04/19/dont-say-gay-students-say-bucks-school-district-killed-production-of-musical-rent-because-it-has-queer-relationships/.

[8] Page Six Team, *'Kinky Boots' Walks Tall in Macy's After Parade Controversy*, PAGESIX.COM (Nov. 30, 2013), https://pagesix.com/2013/11/30/kinky-boots-walks-tall-in-macys-after-thanksgiving-parade-controversy/.

Statute's overbreadth and vagueness, Equity has reason to fear that many of the productions listed above, if not all, would fall within the Statute's scope.

B.    **By Covering Equity Productions, the Statute will Chill Protected Speech in Tennessee.**

There are currently fifteen theatres in Tennessee that employ Equity members. Additional theaters may play shows that hire Equity members via what Equity terms its guest artist contract. Since the Statute's passage, Equity has received many inquiries from members about "what to do" if cast in a Tennessee production that features gender-nonconforming or drag roles.

In the face of this overbroad and vague statute, Equity members face a Hobson's choice. If a member has already accepted a role in Tennessee, Equity is forced to advise them to either work and risk criminal prosecution or not work and risk a producer's breach of contract claim. The only alternative is for Equity's members to decline gender-nonconforming or drag roles in Tennessee altogether. This will chill protected theatrical expression in the state.

C.    **A Chill on Live Theatrical Productions will have a Significant Economic Impact on the State of Tennessee**

Broadway tours are a boon for local economies. In one week in 2019, the musical *Dear Evan Hansen* played at the Paramount Theatre in Seattle for seven performances and net nearly $1.5 million in ticket sales, the musical *Waitress* made over $1.4 million in Texas, *Miss Saigon* made nearly $1.5 million

in North Carolina, and *The Phantom of the Opera* made nearly $1.4 million in Detroit.[9]  The Broadway League's 2019 report for the 2016-2017 touring season found that "[o]n average, Broadway tours contributed an economic impact of 3.27 times the gross ticket sales to the economy of the metropolitan areas in which they played."[10]  By this rough calculus, those shows introduced over $4.5 million dollars into each local economy in a single week.

At least three Broadway tours featuring cross-gendered casting or drag roles visited Tennessee in the past year, or will visit in the coming year: *Mean Girls*, *1776*, and *Mrs. Doubtfire*.  In the last ten years alone, there have been at least fifteen theatrical productions in Tennessee casting Equity members that portrayed gender non-conforming characters or portrayals of one gender by someone of a different gender:

> *Cabaret* (Studio Tenn, scheduled for 2024)
> *The Prom* (Playhouse on the Square, 2023)
> *Cymbeline* (Nashville Shakespeare Festival, 2022)
> *Rent* (Nashville Repertory Theater, 2022)
> *Peter Pan: Wendy's Adventure to Neverland* (Nashville Children's Theatre, 2022)
> *Twelfth Night* (Nashville Shakespeare Festival, 2021)
> *Shakespeare in Love* (Nashville Repertory Theater, 2019; Playhouse on the Square, 2017)

---

[9] Marc Hershberg, *Musicals make more Money on the Road than on Broadway*, FORBES.COM (Feb. 3, 2019), https://www.forbes.com/sites/marchershberg/2019/02/03/musicals-make-more-money-on-the-road-than-on-broadway/?sh=211799f8a111.

[10] *The Economic Impact of Touring Broadway 2016-2017*, THE BROADWAY LEAGUE, https://www.broadwayleague.com/research/research-reports/ (Nov. 2019).

*As You Like It* (Tennessee Shakespeare Company, 2018)
*Candide* (Clarence Brown Theatre Company, 2018)
*Bloody Bloody Andrew Jackson* (Nashville Repertory Theater, 2017)
*Priscilla, Queen of the Desert* (Playhouse on the Square, 2017)
*Rocky Horror Show* (Playhouse on the Square, 2015)
*Cabaret* (Nashville Repertory Theater, 2013)
*Peter Pan* (Playhouse on the Square, 2011)
*Hairspray* (Playhouse on the Square, 2010)
*Big River* (Studio Tenn Theatre Company, 2013)

Musicals featuring "male or female impersonators" are neither few nor far between in Tennessee. A chill on their performance would not only impact the civil liberties of actors in Tennessee but dampen a profitable sector of Tennessee's economy.

## CONCLUSION

The theater provides a venue for works of undoubted artistic and socially redeeming significance. Broadway performances depict the issues roiling contemporary society, from the acceptance of a drag queen in *Kinky Boots* to a young child's perspective of divorce in *Mrs. Doubtfire*. To protect the freedom of expression in Tennessee, this Court should refuse the Tennessee General Assembly's desire to prioritize one vision of the social good over many and affirm the ruling of the district court.

Dated:      October 30, 2023              Respectfully submitted,

                                          */s/ Megan Stater Shaw*
                                          Megan Stater Shaw
                                          COHEN, WEISS AND SIMON LLP
                                          900 Third Avenue, Suite 2100

New York, NY 10022
Telephone: (212) 356-0205
Email: MShaw@cwsny.com

*/s/ Samuel Morris*
Samuel Morris
GODWIN, MORRIS, LAURENZI &
BLOOMFIELD, P.C.
50 N. Front St., Suite 800
Memphis, TN 38103
Telephone: (901) 528-1702
Email: SMorris@gmlblaw.com

Attorneys for Actors' Equity
Association

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limit of Federal Rules of Appellate Procedure 32(a)(7)(B) and 29(5) because it contains 3,856 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared in 14-point Times New Roman font, a proportionally spaced typeface.

*/s/ Megan Stater Shaw*
Megan Stater Shaw

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 30, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF system.  I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Megan Stater Shaw*
Megan Stater Shaw
