**No. 23-5611**

===============================================================

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

=================================================

FRIENDS OF GEORGE'S, INC.,
*Plaintiff-Appellee*,

BLOUNT PRIDE, INC., ET AL.,
*Intervenors*,

v.

STEVEN JOHN MULROY,
*Defendant-Appellant*.

=================================================

On Appeal from the Judgment of the United States District Court
for the Western District of Tennessee
(No. 2:23-cv-02163) (Parker, J.)

===============================================================

**BRIEF OF CONSTITUTIONAL LAW CENTER FOR MUSLIMS IN
AMERICA AS AMICUS CURIAE IN SUPPORT OF PLAINTIFF-
APPELLEE**

===============================================================

Christina A. Jump
Chelsea Glover
Samira S. Elhosary
Constitutional Law Center for Muslims in America
100 North Central Expressway, Suite 1010
Richardson, TX 75080
(972) 914-2507
cjump@clcma.org
cglover@clcma.org
selhosary@clcma.org

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iii

STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY TO FILE BRIEF OF AMICUS CURIAE ........................................................7

SUMMARY OF ARGUMENT .................................................3

INTRODUCTION ..................................................................4

ARGUMENT ..........................................................................5

   I.    The Overbreadth Doctrine Permits Plaintiffs to Bring Suit Once Their Own First Amendment Rights Become Threatened, Without Waiting for Direct Harm ..................................................................................5

      A.  Federal Courts Recognize the Overbreadth Doctrine's Separate Prudential Requirements for Standing .............................................6

      B.  Friends of George's Demonstrates a Credible Threat of Prosecution .........9

   II.   Tennessee Passed the AEA with An Impermissible Purpose ....................13

CONCLUSION .....................................................................20

CERTIFICATE OF COMPLIANCE.......................................22

CERTIFICATE OF SERVICE ...............................................23

# TABLE OF AUTHORITIES

## Cases

*303 Creative L.L.C. v. Elenis*, 143 S. Ct. 2298 (2023) .............................................4

*Abdullah v. Paxton*, 65 F.4th 204 (5th Cir. 2023) ...................................17

*Amawi v. Paxton*, 956 F.3d 816,(5th Cir. 2020). .....................................17

*Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219 (10th Cir. 2021) ...........................16

*Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184 (9th Cir. 2018).......................15

*Bongo Prods., L.L.C. v. Lawrence*, 603 F. Supp. 3d 584 (M.D. Tenn. 2022).........16

*Bown v. Gwinnett Cnty. Sch. Dist.*, 112 F.3d 1464 (11th Cir. 1997).......................16

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973)............................................................7

*Chrysler Corp. v. Brown*, 441 U.S. 281 (1979)).......................................................15

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)................................................10

*Crawford v. U.S. Dep't of the Treasury*, 868 F.3d 438 (6th Cir. 2017) .................10

*Croft v. Governor of Tex.*, 562 F.3d 735 (5th Cir. 2009).........................................15

*Dombrowski v. Pfister*, 380 U.S. 479 (1965).........................................................8, 9

*Friends of George's, Inc. v. Mulroy,* No. 2:23-cv-02163, 2023 U.S. Dist. LEXIS
    96766 (W.D. Tenn. June 2, 2023) .................................... 10, 11, 13, 14

*Goldberg v. Rocky Hill*, 973 F.2d 70 (2d Cir. 1992) ...............................................19

*Gore v. Lee*, No. 3:19-cv-0328, 2023 U.S. Dist. LEXIS 107984 (M.D. Tenn. June
    22, 2023)..................................................................................................16

*Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor Balt.*, 721 F.3d 264 (4th Cir. 2013) ........................................................................................... 15

*HM Fla.-Orl, L.L.C. v. Griffin*, No. 6:23-cv-950, 2023 U.S. Dist. LEXIS 134665 (M.D. Fla. June 24, 2023) ..................................................................... 17

*Imperial Sovereign Ct. of Mont. v. Knudsen*, No. 2:23-cv-50, 2023 U.S. Dist. LEXIS 184720 (D. Mont. Oct. 13, 2023) ............................................... 17

*Janus v. AFSCME, Council 31*, 138 S. Ct. 2448 (2018) ............................................ 4

*L.W. v. Skrmetti*, 73 F.4th 408 (6th Cir. 2023) ........................................................ 16

*Mothershed v. Justs. of the Supreme Ct.*, 410 F.3d 602 (9th Cir. 2005) .................. 8

*NAACP v. Button*, 371 U.S. 415 (1963) ..................................................................... 7

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) ..................................... 17

*Penny Saver Publ'ns., Inc. v. Hazel Crest*, 905 F.2d 150 (7th Cir. 1990) ................ 8

*Phillips v. DeWine*, 841 F.3d 405 (6th Cir. 2016) .................................................... 7

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ................................................. 13, 15

*Sec'y of Md. v. Joseph H. Munson Co.*, 467 U.S. 947 (1984) .............................. 6, 8

*Snyder v. Phelps*, 562 U.S. 443 (2011) ..................................................................... 4

*Sorrell v. IMS Health Inc.*, 564 U.S. 552, (2011) ................................................... 15

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ...................................... 10

*TransUnion L.L.C. v. Ramirez*, 141 S. Ct. 2190 (2021) ........................................... 6

*United States v. Des Moines Nav. & R. Co.*, 142 U.S. 510 (1892) ......................... 19

*United States v. Gregg*, 226 F.3d 253 (3d Cir. 2000) ..............................................15

*United States v. Hansen*, 143 S. Ct. 1932 (2023) ................................................8, 13

*United States v. Johnson*, 875 F.3d 360 (7th Cir. 2017)..........................................15

*United States v. Stevens*, 559 U.S. 460 (2010) ................................................7, 13

*Video Software Dealers Ass'n v. Webster*, 968 F.2d 684 (8th Cir. 1992) ..............15

*Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383 (1988)....................................7, 14

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ..................................20

*Wallace v. Jaffree*, 472 U.S. 38 (1985)....................................................................15

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)................................................19

*Woodlands Pride, Inc. v. Paxton*, No. 4:23-cv-2847, 2023 U.S. Dist. LEXIS

    171268 (S.D. Tex. Sept. 26, 2023) ........................................................17

## Statutes

Tenn. Code § 7-51-1401 .........................................................................................12

Tenn. Code. § 68-33-101 ........................................................................................18

Tex. Gov't Code § 2271.002.................................................................................... 21

Tex Gov't Code. § 808.001(1) .................................................................................21

**Miscellaneous**

Aaron Howard, *Texas rep to file anti-BDS bill* (Nov. 10, 2016),

    https://www.philking.com/2016/11/11/texas-rep-to-file-anti-bds-bill-by-aaron-

    howard/ .................................................................................................21

*Anti-Semitism: State Anti-BDS Legislation*, JEWISH VIRTUAL LIBRARY (last visited

    Oct. 30, 2023), https://www.jewishvirtuallibrary.org/anti-bds-legislation..........20

*Equality Maps: Restrictions on Drag Performances*, MOVEMENT ADVANCEMENT

    PROJECT (last visited Oct. 30, 2023), https://www.mapresearch.org/equality-

    maps/criminaljustice/drag_restrictions...................................................19

John Russell, *Tennessee issues trans healthcare ban & nation's first drag ban.*

    *Now come the lawsuits*, LGBTQNATION (Mar. 3, 2023),

    https://www.lgbtqnation.com/2023/03/tennessee-issues-trans-healthcare-ban-

    nations-first-drag-ban-now-come-the-lawsuits/ ......................................19

*Legislation targeting advocacy for Palestinian rights: Statistics*, PALESTINE LEGAL

    (last visited Oct. 30, 2023), https://legislation.palestinelegal.org/#statistics

    (identifying 38 states with anti-BDS legislation)...................................20

*Palestinian Civil Society Call for BDS*, BDS MOVEMENT (July 9, 2005),

    https://bdsmovement.net/call.................................................................21

## STATEMENT OF IDENTITY, INTEREST,
## AND AUTHORITY TO FILE BRIEF OF AMICUS CURIAE

*Amicus curiae*, the Constitutional Law Center for Muslims in America ("CLCMA" or "*Amicus*"), is the legal division of the Muslim Legal Fund of America and a 501(c)(3) non-profit legal center dedicated to protecting the rights of Muslim Americans through the federal courts.[1] *Amicus* provides representation and counsel to individuals and organizations through its civil litigation, criminal defense, immigration, and non-profit departments. CLCMA's civil litigation department litigates cases ranging from employment discrimination and religious freedom to federal watchlist-related travel issues. In its work, *Amicus* represents individuals faced with situations analogous to those presented by the facts of the case before this Court. Our clients include Muslim Americans who use their free speech rights to advocate for Palestinian rights, including through support of and/or participation in the Boycott, Divestment, and Sanctions ("BDS") movement. Viewpoint-based speech restrictions against advocacy violate the First Amendment. Therefore,

---

[1] Counsel for *Amicus* drafted this Brief in its entirety. No party or person other than *Amicus* contributed money to fund preparing or submitting this Brief. Per Federal Rule of Appellate Procedure 29, *Amicus* sought consent to file this brief from all parties on October 2, 2023 via email. Counsel for all parties consented to *Amicus*' filing of this brief.

*Amicus* maintains an ongoing concern for the analysis of overly broad speech restrictions under the First Amendment by the federal courts, as this issue affects many of our clients.

## SUMMARY OF ARGUMENT

Standing under the overbreadth doctrine permits plaintiffs to challenge overly broad, vague, and unconstitutional statutes as violating the First Amendment, even in the absence of existing harm to their own First Amendment free speech rights. Without overbreadth standing, these unconstitutional statutes would stay on the books and result in people "choosing" to stay silent on issues of public importance out of fear of reprisal by the state, thereby impeding the purpose of the First Amendment. Tennessee's Adult Entertainment Act ("AEA") is an unconstitutionally overbroad statute targeted against the public free expression of drag performance and motivated by animus against gender-nonconforming members of the LGBTQ+ community. Appellee Friends of George's ("FOG"), as an LGBTQ+ theater company that puts on drag performances in Tennessee, is a direct target of the AEA and therefore possesses standing to challenge the law with no need to wait for the Attorney General to take action against it. The Court faces no requirement to accept Tennessee's last-minute attempt to revise the AEA within this litigation to save it from unconstitutionality, despite the legislators' well-publicized statements describing the intent of the AEA to keep *all* drag performances out of the public eye.

**INTRODUCTION**

The Supreme Court recently recognized that "sexual orientation and gender identity" are "sensitive political topics" that are "undoubtedly matters of profound 'value and concern to the public.'"[2]  Speech and expression regarding sensitive political topics "occup[y] the highest rung of the hierarchy of First Amendment values," meriting "special protection."[3]   More recently, the Supreme Court held that the "First Amendment envisions the United States as a rich and complex place where all persons are free to think and speak as they wish, not as the government demands."[4]

Rather than heed the Court's warning that "tolerance, not coercion, is our Nation's answer" to "ideas we consider unattractive,"[5] the Tennessee General Assembly dealt with its aversion to drag performance by enacting the AEA, which includes all "male and female impersonators"—regardless of performance content— in the definition of "adult cabaret," then criminalizes "adult cabaret" found to be "harmful to minors."   Unsurprisingly, many LGBTQ+ Pride organizers, drag performance theaters, and drag performers in Tennessee fear the AEA would be used to shut down public (*i.e.*, open to all ages) drag performances.  Instead of waiting to

---

[2] *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2476 (2018) (citing *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)).
[3] *Id.* (citing *Snyder*, 562 U.S. at 452).
[4] *303 Creative L.L.C. v. Elenis*, 143 S. Ct. 2298, 2322 (2023).
[5] *Id.* at 2321–22.

be prosecuted for holding public drag performances, FOG took the brave step to challenge the AEA in federal court for violating the First Amendment.  As a result, the district court properly enjoined the AEA, allowing drag performers to continue to exercise their First Amendment rights.

*Amicus* respectfully submits this Brief to provide a wider view of the impact of First Amendment overbreadth standing jurisprudence.  *Amicus* submits this Brief to bring the Court's attention to the concerted efforts taking place in state legislatures, including Tennessee, to infringe upon citizens' free speech rights under the guise of lawful regulation.  The district court's decision protects the rights of ordinary citizens to sue in federal court when they can demonstrate a reasonable risk of harm through enforcement of laws targeting free speech and motivated by animus toward a marginalized group—often based on religion and other protected characteristics, yet cloaked under the guise of "safety," like the purported intent of the AEA.  *Amicus* encourages this Court to affirm the district court's decision.

## ARGUMENT

**I.    The Overbreadth Doctrine Permits Plaintiffs to Bring Suit Once Their Own First Amendment Rights Become Threatened, Without Waiting for Direct Harm**

Pursuant to the First Amendment's overbreadth doctrine, FOG satisfies both the elements of Article III standing and the prudential considerations that allow cases to be heard in federal courts.  This Court should not reverse the district court's holding

based on Tennessee's new presentation of the statutory language, because it contradicts the ordinary meaning of the text.

## A. Federal Courts Recognize the Overbreadth Doctrine's Separate Prudential Requirements for Standing

The Supreme Court recently clarified that, to demonstrate Article III standing sufficient to pursue claims in federal court, a plaintiff must show "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."[6]  In *TransUnion*, the Supreme Court recognized that "[v]arious intangible harms can also be concrete . . . includ[ing] harms specified by the Constitution itself."[7]   In addition to Article III's standing requirements, prudential considerations limit the cases brought before federal courts: "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."[8]   However, federal courts "relax[] the prudential-standing limitation" when "there are situations where competing considerations outweigh any prudential rationale against third-party standing."[9]   These concerns include "the potential for an unconstitutionally overbroad law to 'chill' protected speech—that is, the 'judicial prediction or

---

[6] *TransUnion L.L.C. v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).
[7] *Id.* at 2204.
[8] *Sec'y of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 955 (1984).
[9] *Id.* at 956.

assumption that the statute's very existence may cause others before the court to refrain from constitutionally protected speech or expression.'"[10]

The Supreme Court has long recognized the importance of protecting First Amendment rights from substantially overbroad regulations reasonably likely to chill protected speech.[11] Courts therefore hesitate to reject standing in First Amendment cases based on prudential considerations alone.[12] So rather than wait for the harm to their First Amendment rights, plaintiffs may properly "challenge a statute . . . because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression."[13]

FOG establishes an injury-in-fact directly traceable to Tennessee's anticipated enforcement of the AEA, redressable by a court order striking down the AEA as unconstitutional and unenforceable. FOG therefore demonstrates sufficient Article

---

[10] *Phillips v. DeWine*, 841 F.3d 405, 417 (6th Cir. 2016) (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392–93 (1988)).

[11] *United States v. Stevens*, 559 U.S. 460, 473 (2010) ("In the First Amendment context . . . this Court recognizes a second type of facial challenge, whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.") (citation omitted); *NAACP v. Button*, 371 U.S. 415, 433 (1963) ("Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.").

[12] *Sec'y of Md.*, 467 U.S. at 956 (recognizing that "when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged").

[13] *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).

III standing to pursue its First Amendment overbreadth claims right now.  It need not lie in wait until it suffers its own First Amendment injury to its right to speak prior to challenging the AEA.[14]

As the Supreme Court recognizes, "[f]acial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society—to prevent the statute from chilling the First Amendment rights of other parties not before the court."[15]  Evidence shows that FOG's facial challenge to the AEA has already created this benefit to Tennessean society.  When Tennessee

_____

[14] *Sec'y of Md.*, 467 U.S. at 958 (holding non-charity properly brought First Amendment challenges to a statute regulating charities that "satisfies the requirement of 'injury-in-fact,' and . . . can be expected satisfactorily to frame the issues in the case"); *see also Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965) (noting that by "permitting determination of the invalidity of these statutes" without requiring proof of direct First Amendment harm, the Court "avoided making vindication of freedom of expression await the outcome of protracted litigation"); *United States v. Hansen*, 143 S. Ct. 1932, 1961 (2023) (Jackson, J., dissenting) (explaining that "[o]verbreadth challenges are an exception to the usual rules governing standing . . . permitted in recognition of the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application"); *Mothershed v. Justs. of the Supreme Ct.*, 410 F.3d 602, 611 (9th Cir. 2005) (allowing plaintiff to proceed with constitutional challenges where he "satisfies our requirements for overbreadth standing because he has suffered an injury-in-fact and can be expected to pursue the First Amendment claim vigorously"); *Penny Saver Publ'ns., Inc. v. Hazel Crest*, 905 F.2d 150, 154 (7th Cir. 1990) (holding "the prudential concerns of standing are outweighed by society's interest in having Penny Saver bring this action . . . Penny Saver may still have standing regardless of whether it is complaining about its own [F]irst [A]mendment rights").

[15] *Sec'y of Md.*, 467 U.S. at 958 (clarifying that the plaintiff's own "ability to serve that function has nothing to do with whether or not its own First Amendment rights are at stake").

enacted the AEA, several organizations with scheduled Pride celebrations across Tennessee feared that drag performers would be criminalized as "harmful to minors." Intervenor Blount Pride, Inc. demonstrates the validity of those fears, as it received a threatening letter from the district attorney claiming that the Pride event "may violate certain criminal statutes within the State of Tennessee."[16] Without FOG's motion for a protective order against the AEA, which led to a permanent injunction by the district court, many Pride performers would have chilled their First Amendment free speech and free expression rights by canceling their performances or restricting them to an adult-only audience to avoid prosecution, regardless of whether their performances actually included any sexual content. FOG's facial challenge to the AEA fulfills the purpose anticipated by the relaxation of prudential standing requirements, and this Court should affirm the relaxation of those requirements here.

### B. Friends of George's Demonstrates a Credible Threat of Prosecution

This Court consistently holds that "[i]n a pre-enforcement challenge to a federal statute . . . a plaintiff satisfies the injury requirement of standing by alleging 'an intention to engage in a course of conduct arguably affected with a constitutional

---

[16] *See* Threat Letter from District Attorney to Blount Pride, R. 30-2, Page ID #98; *see also Dombrowski*, 380 U.S. at 487 ("The chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure.").

interest, but proscribed by statute, and that there exists a credible threat of prosecution thereunder.'"[17]   As this Court stressed in *Crawford*, "the threat of prosecution 'must be *certainly impending* to constitute injury in fact.'"[18]   FOG demonstrates a credible threat of prosecution based on the law's vague definition of "harmful to minors" and state officials' statements of intent to broadly prohibit public drag performances.[19]

FOG alleged in its Complaint that it "produces drag-centric performances, comedy sketches, and plays," with most of its shows taking place within Shelby County with no age restrictions.[20]   At trial, FOG testified that it has produced and intends to keep producing multiple performances per year to continue its mission of "raising money for LGBTQ nonprofit organizations and taking drag shows into the mainstream."[21]   These drag performances will inevitably include "male or female impersonators," a category of performers included in the definition of "adult

---

[17] *Crawford v. U.S. Dep't of the Treasury*, 868 F.3d 438, 454 (6th Cir. 2017) (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)).

[18] *Id.* (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)) (emphasis in original); *see also Friends of George's, Inc. v. Mulroy* (hereinafter, "*FOG*"), No. 2:23-cv-02163, 2023 U.S. Dist. LEXIS 96766, at *26 (W.D. Tenn. June 2, 2023) (noting that "a plaintiff still needs to prove such a threat inflicts a concrete harm because fears of prosecution cannot be merely imaginary or speculative") (citation omitted).

[19] *FOG*, 2023 U.S. Dist. LEXIS 96766, at *46–47.

[20] *Id.* at *39.

[21] *Id.* at *40.

cabaret" and therefore subject to the AEA.[22]  Because the AEA criminalizes those who perform adult cabaret entertainment "on public property" or "in a location where the adult cabaret entertainment could be viewed by a person who is not an adult," FOG met the first two *Crawford* elements with yearly drag show productions in Tennessee.[23]

Appellant argues that FOG failed to satisfy the final *Crawford* element: the existence of a credible threat of prosecution.[24]  Appellant argues that because FOG believes its performances possess artistic value, FOG cannot also claim a fear that Tennessee will enforce the AEA against it.[25]  Appellant further posits that no Attorney General or police officer has yet actually threatened to enforce the AEA against FOG, so FOG does not face a credible threat of prosecution.[26]  Finally, Appellant attempts to rewrite the AEA midstream in litigation so the term "minor" means only "reasonable 17-year-old," then argues that FOG's performances therefore become permissible under this non-legislative rewrite of the AEA because FOG's performances admittedly do not harm a "reasonable 17-year-old."[27]

---

[22] Tenn. Code § 7-51-1401 (2)–(3)(A).
[23] *FOG*, 2023 U.S. Dist. LEXIS 96766, at *40, *42.
[24] Op. Br. at 29–32.
[25] *Id.* at 30–32.
[26] *Id.* at 33–34.
[27] *Id.* at 29–30, 37–40; *FOG*, 2023 U.S. Dist. LEXIS 96766, at *44.

These arguments fail both under legal precedent and any reasonable application of logic.  FOG's own opinions about the applicability of the AEA to its performances and performers do not prove dispositive.[28]  And the wide discretion afforded within the AEA to enforcement officers renders the risk to FOG high, regardless of Appellant's views in its briefs.[29]  Finally, Appellant's attempted mid-litigation revision of the AEA's statutory language to substitute "17-year-old" for "minors" renders the statute unenforceable on its own.[30]  Given the parties' stipulation that Appellant "intends to enforce the AEA" as written, and the absence of any safe harbor or affirmative defenses in its language,  FOG remains subject to "a certain threat of enforcement under the AEA."[31]

The district court correctly cut through the legal gamesmanship to recognize the true purpose of the AEA: to prevent **_all_** public drag performances, regardless of content, under the ruse of prohibiting conduct "harmful to minors."[32]  Tennessee

---

[28] *FOG*, 2023 U.S. Dist. LEXIS 96766, at *43 ("Plaintiff can hold the conviction that its productions are not harmful to minors while harboring the fear that Defendant, armed with a criminal statute, disagrees.").

[29] *Id.* at *46 ("The chance that an officer could abuse that wide discretion is troubling given an art form like drag that some would say purposefully challenges the limits of society's accepted norms.").

[30] *Id.* at *45 (finding this stretch of the language "veers so far from the AEA's text that neither reasonable people nor officers in Shelby County would have fair notice of the AEA's meaning.").

[31] *Id.* at *47.

[32] *See id.* at *101 ("[W]hile its citizens believed this powerful law would protect all children, the State's lawyers told the Court this law will only protect 17-year-olds.").

officials openly represent the AEA as warranting prosecution of any Pride festival featuring a drag performance.[33]   This Court bears no obligation to accept Tennessee's sudden and inappropriate mid-litigation attempts to revise the AEA in a last-minute effort to show its constitutionality.[34]  We respectfully request this Court affirm that FOG meets the standing requirements to challenge the AEA.

## II.   Tennessee Passed the AEA with An Impermissible Purpose

Tennessee passed the AEA with the intent to discriminate against particular viewpoints on gender, under the pretext of protecting "children" from inappropriate adult entertainment.[35]  Legislative history makes this clear.[36]  But federal courts do not have to fall for rhetorical tricks like those played by Tennessee's Attorney

---

[33] *See* Threat Letter, *supra* note 16.

[34] *Stevens*, 559 U.S. at 480 ("But the First Amendment protects against the government; it does not leave us at the mercy of noblesse oblige. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly."); *Hansen*, 143 S. Ct. at 1962–63 (Jackson, J., dissenting) (explaining the risk of allowing facially overbroad criminal statutes to remain on the books because "the Government often stakes out a maximalist position, only later to concede limits when the statute upon which it relies might be struck down entirely and the Government finds itself on its back foot").

[35] *FOG*, 2023 U.S. Dist. LEXIS 96766, at *62 ("The Court finds that this phrase ["male or female impersonator"] discriminates against the viewpoint of gender identity—particularly, those who wish to impersonate a gender that is different from the one with which they are born."); *see also Reed v. Town of Gilbert*, 576 U.S. 155, 168 (2015) ("Government discrimination among viewpoints . . . is a more blatant and egregious form of content discrimination.").

[36] *Id.* at *70 ("[T]he legislative history lends credence to the Court's conclusion that the AEA facially discriminates against a particular viewpoint.").

General in this case.[37]  *Amicus* respectfully requests this Court reject Tennessee's attempt to obfuscate the clear intent of the legislators who enacted the law.

Here, Tennessee's motives behind enacting the AEA were no secret: the legislature wanted to remove drag performances from public life and chill local Pride celebrations that feature drag.  When asked if there were any times when "adult cabaret" in public harmed his constituents, the AEA's House Sponsor Representative Todd referred to a "'family-friendly' drag show" at a "family-friendly pride" in his community, without referring to the show's sexual content or describing the show's harm to minor children.[38]  Representative Todd explained the need for the AEA by stating, "How can we have such a thing [drag shows] in this community in a public park when it clearly says 'male and female impersonators cannot be in those locations?'  And so that's what started the whole discussion around the law[.]"[39]  Representative Todd's express motivation for introducing the AEA was to keep "male and female impersonators" and their protected free expression out of public spaces, regardless of the content of their performances.

---

[37] *See Am. Booksellers Ass'n*, 484 U.S. at 395 (1988) (explaining that because "the Attorney General does not bind the state courts or local law enforcement authorities, we are unable to accept her interpretation of the law as authoritative").
[38] *FOG*, 2023 U.S. Dist. LEXIS 96766, at *16.
[39] Legislative History Transcript, R. 35-1, Page ID ## 588–89.

Although Representative Todd co-sponsored the AEA, his remarks "are not controlling in analyzing legislative history."[40]   But legislators' comments and remarks in support of a statute challenged on First Amendment grounds do bear high relevance for the Court's determination whether the statute was enacted for impermissible purposes.  The Supreme Court and circuit courts frequently consider the legislative history of a statute when evaluating a facial First Amendment challenge.[41]

---

[40] *FOG*, 2023 U.S. Dist. LEXIS 96766, at *71 (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 311 (1979)).

[41] *See, e.g.*, *Reed,* 576 U.S. at 166 ("Because strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based, a court must evaluate each question before it concludes that the law is content neutral[.]"); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011) ("Any doubt that § 4631(d) imposes an aimed, content-based burden on detailers is dispelled by the record and by formal legislative findings."); *Wallace v. Jaffree*, 472 U.S. 38, 58 (1985) (considering the "legislative intent contained in the legislative record and in the testimony of the sponsor" to determine the religious motives behind a statute); *United States v. Gregg*, 226 F.3d 253, 267 (3d Cir. 2000) (holding that the "language of the statute and the legislative history" demonstrates that "FACE is not view-point based"); *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor Balt.*, 721 F.3d 264, 282 (4th Cir. 2013) ("[C]ourts have routinely admitted evidence . . . to supplement a legislative record or explain the stated interests behind challenged regulations."); *Croft v. Governor of Tex.*, 562 F.3d 735, 739 (5th Cir. 2009) ("Nevertheless, transcripts from committee hearings and floor debates . . . provide significant insight into the purpose of the legislation."); *United States v. Johnson*, 875 F.3d 360, 368 (7th Cir. 2017) (finding the "legislative history" of a statute "reinforces the conclusion that [it] is not intended to criminalize speech or expressive conduct"); *Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 687–88 (8th Cir. 1992) (considering statements by sponsoring legislator in absence of legislative history to determine scope of law targeting violent video games); *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1198 (9th Cir. 2018) (noting that court's "suspicion that [a statute] may have been enacted with an impermissible purpose" was "not

This Court need not ignore Tennessee's well-publicized stated reasons for enacting the AEA. Several state legislatures openly engage in a culture war against LGBTQ+ persons, taking particular aim at transgender and gender-nonconforming people, including drag performers. Tennessee leads this movement,[42] becoming the first state to enact an anti-drag law in March 2023.[43] Since then, Montana enacted

---

eased after reading the legislative history"); *Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1233 (10th Cir. 2021) (highlighting that the "legislative history . . . confirms what the text of the law alone demonstrates: the Act places pro-animal facility viewpoints above anti-animal facility viewpoints"); *Bown v. Gwinnett Cnty. Sch. Dist.*, 112 F.3d 1464, 1471 (11th Cir. 1997) ("The Act's legislative history . . . is not inconsistent with the express statutory language articulating a clear secular purpose and disclaiming a religious purpose.").

[42] Many controversies arising from Tennessee's anti-LGBTQ laws have already come before this Court and district courts in this Circuit. *See, e.g.*, *L.W. v. Skrmetti,* 73 F.4th 408, 412 (6th Cir. 2023) (granting stay of preliminary injunction against Tennessee's Prohibition on Medical Procedures Performed on Minors Related to Sexual Identity, Tenn. Code. § 68-33-101); *Gore v. Lee*, No. 3:19-cv-0328, 2023 U.S. Dist. LEXIS 107984, at *104 (M.D. Tenn. June 22, 2023) (rejecting constitutional challenges to Tennessee's Vital Records Act as applied to deny transgender individuals the ability to change sex on birth certificate); *Bongo Prods., L.L.C. v. Lawrence*, 603 F. Supp. 3d 584, 589-90 (M.D. Tenn. 2022) (granting plaintiff's motion for preliminary injunction against Tennessee law requiring entities whose facilities allow people to use bathroom associated with their gender identity to display government sign notifying customers of policy).

[43] John Russell, *Tennessee issues trans healthcare ban & nation's first drag ban. Now come the lawsuits*, LGBTQNATION (Mar. 3, 2023), https://www.lgbtqnation.com/2023/03/tennessee-issues-trans-healthcare-ban-nations-first-drag-ban-now-come-the-lawsuits/.

its own anti-drag law,[44] followed by Arkansas, Florida, North Dakota, and Texas with similar laws targeting "adult" or "sexual" performances used to target drag.[45]

The proliferation of state-level anti-drag legislation follows the blueprint of state anti-BDS legislation. BDS refers to "Boycott, Divestment, and Sanctions," and the BDS movement refers to the nonviolent pro-Palestinian movement that "'seeks to put economic pressure on Israel' to substantially improve its treatment of Palestinians."[46] Although the Supreme Court recognized the right to boycott as political speech protected by the First Amendment in 1982,[47] since 2014, at least 37 states enacted laws, executive orders, or resolutions designed to penalize those who participate in the BDS movement.[48] These laws often require people entering into

---

[44] *Imperial Sovereign Ct. of Mont. v. Knudsen*, No. 2:23-cv-50, 2023 U.S. Dist. LEXIS 184720, at \*59 (D. Mont. Oct. 13, 2023) (permanently enjoining Montana's anti-drag law because the law "targets protected speech and expression" and the "statutory text and legislative history evince LGBTQ+ animus").

[45] *Equality Maps: Restrictions on Drag Performances*, MOVEMENT ADVANCEMENT PROJECT, (last visited Oct. 30, 2023), https://www.mapresearch.org/equality-maps/criminaljustice/drag_restrictions. Courts have since permanently enjoined such laws in Florida and Texas. *HM Fla.-Orl, L.L.C. v. Griffin*, No. 6:23-cv-950, 2023 U.S. Dist. LEXIS 134665, at \*25 (M.D. Fla. June 24, 2023) (noting that the harm to Plaintiff's First Amendment rights "clearly outweighs any purported evils not covered by Florida law"); *Woodlands Pride, Inc. v. Paxton*, No. 4:23-cv-2847, 2023 U.S. Dist. LEXIS 171268, at \*50 (S.D. Tex. Sept. 26, 2023) (holding Texas's anti-drag law "impermissibly infringes on the First Amendment and chills free speech," which constitutes "irreparable injury").

[46] *Abdullah v. Paxton*, 65 F.4th 204, 207 (5th Cir. 2023) (citing *Amawi v. Paxton*, 956 F.3d 816, 819-20 & n.1 (5th Cir. 2020)).

[47] *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 914 (1982).

[48] *See Legislation targeting advocacy for Palestinian rights: Statistics*, PALESTINE LEGAL (last visited Oct. 30, 2023), https://legislation.palestinelegal.org/#statistics

government contracts to affirm that they will not "boycott Israel," a phrase often

described in vague and broad terms that include any cessation of business with Israel

or any person in Israel and Israeli-occupied territories.[49]  When attempting to justify

the legislation, sponsors do not hesitate to assert that the statutes aim to chill or

reduce speech disfavored for political or religious reasons.[50]

     Appellant's argument that courts must assume legislators enacted a particular

statute in good faith asks this Court to ignore obviously unlawful and impermissible

---

(identifying 38 states with anti-BDS legislation); *Anti-Semitism: State Anti-BDS Legislation*, JEWISH VIRTUAL LIBRARY (last visited Oct. 30, 2023), https://www.jewishvirtuallibrary.org/anti-bds-legislation (identifying 37 states with anti-BDS laws).  Once again, Tennessee led the trend in anti-BDS legislation by becoming the first state to formally condemn the BDS movement in 2015, falsely accusing the BDS movement of being "one of the main vehicles for spreading anti-Semitism and advocating the elimination of the Jewish state."  JEWISH VIRTUAL LIBRARY (last visited Oct. 30, 2023), https://www.jewishvirtuallibrary.org/anti-bds-legislation.  Of course, this defamatory characterization is untrue, as the goal of the BDS Movement is to improve the lives of Palestinians and end Israeli occupation of the West Bank, whose territory belongs to Palestine under international law. *Palestinian Civil Society Call for BDS*, BDS MOVEMENT (July 9, 2005), https://bdsmovement.net/call.

[49] *See, e.g.*, Tex. Gov't Code § 2271.002 (requiring businesses entering into state contracts to affirm that they will not "boycott Israel"); *id.* § 808.001(1) (defining "boycott Israel" to mean any "taking any action that is intended to . . . limit commercial relations specifically with Israel, or with a person or entity doing business in Israel or in an Israeli-controlled territory")*.*

[50] *See* Aaron Howard, *Texas rep to file anti-BDS bill* (Nov. 10, 2016), https://www.philking.com/2016/11/11/texas-rep-to-file-anti-bds-bill-by-aaron-howard/ (noting that King stated "You can't have Christianity without having a literal, historical, and spiritual Israel" as a reason for introducing the bill).

motivations.[51]  *Des Moines*, an outdated case from the nineteenth century on which
Appellant and Appellant's supporting amici rely, does not actually establish a
principle that courts will never inquire as to legislators' motives when considering
constitutionality challenges to enacted legislation.[52]  As the Second Circuit noted in
1992, "the demands of constitutional litigation have therefore overridden any earlier
notions as to presumed motive or purpose of local legislation."[53]  Tennessee, in its
zeal to purportedly "protect children" from exposure to any LGBTQ+ content,
drafted and enacted an unconstitutionally overbroad statute that unlawfully targets
drag performers' free expression.  This Court should not allow Tennessee to hide
behind outdated and dubious case law in its attempt to avoid the proper remedy of
striking down the unconstitutional statute, any more than this Court should permit
mid-litigation rewrites not voted on by elected officials or comporting with their
expressed intent.

---

[51] Op. Br. at 62 (citing *United States v. Des Moines Nav. & R. Co.*, 142 U.S. 510,
544 (1892)).

[52] *See, e.g.*, *United States v. Windsor,* 570 U.S. 744, 770 (2013) ("The history of
DOMA's enactment and its own text demonstrate that interference with the equal
dignity of same-sex marriages . . . was more than an incidental effect of the federal
statute. It was its essence."); *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)
("The principal inquiry in determining content neutrality, in speech cases generally
. . . is whether the government has adopted a regulation of speech because of
disagreement with the message it conveys. The government's purpose is the
controlling consideration.").

[53] *Goldberg v. Rocky Hill*, 973 F.2d 70, 75 (2d Cir. 1992) (citing Supreme Court
cases from the 1970s and 1980s).

## CONCLUSION

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion[.]"[54]  The First Amendment does not allow Tennessee to statutorily deem drag performances unorthodox or obscene.  The district court would not agree to do so either.  *Amicus* therefore respectfully urges this Court to affirm the district court's well-reasoned decision.

---

[54] *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

Respectfully submitted this 30th day of October 2023,

*/s/ Christina A. Jump*
Christina A. Jump
Chelsea Glover
Samira S. Elhosary
Constitutional Law Center for
Muslims in America
100 N. Central Expy. Ste. 1010
Richardson, TX 75080
(972) 914-2507

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32 and 29(a)(5) and 6th Cir. R. 32(a), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and 29(a)(5) because this brief contains 4992 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(b).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Times New Roman, 14-point type. As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of their word processing system in preparing this certificate.

Dated: October 30, 2023,

*/s/ Christina A. Jump*
Christina A. Jump

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by CM/ECF delivery on October 30, 2023, on counsel or parties of record on the service list.

Dated: October 30, 2023.

Respectfully submitted,

*/s/ Christina A. Jump*
Christina A. Jump

*Counsel for Amicus Curiae*