No. 23-5611

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT
_____

**FRIENDS OF GEORGE'S INC.,**

*Plaintiff-Appellee,*

**V.**

**STEVEN J. MULROY,**

*Defendant-Appellant.*
_____

On Appeal from the United States District Court
for the Western District of Tennessee, Western Division
Case No. 2:23-cv-02163-TLP-tmp
_____

**BRIEF OF *AMICUS CURIAE*
DRAMATISTS' LEGAL DEFENSE FUND
IN SUPPORT OF APPELLEE**

**BRUCE E.H. JOHNSON**

Davis Wright Tremaine LLP
920 Fifth Avenue
Suite 3300
Seattle, WA  98104
Ph:  (206) 757-7069
Email: brucejohnson@dwt.com

**GAURAV K. TALWAR
LEENA CHARLTON**

Davis Wright Tremaine LLP
1251 Avenue of the Americas
21st Floor
New York, NY 10020
Ph:  (212) 603-6461
Email: gauravtalwar@dwt.com
           leenacharlton@dwt.com

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel for The Dramatists Legal Defense Fund hereby certifies that it is not a publicly-traded entity, it does not have a corporate parent, and there is no publicly held corporation that owns 10% or more of its stock.

## <u>TABLE OF CONTENTS</u>

STATEMENT OF INTEREST ...................................................................7

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................8

ARGUMENT ....................................................................12

I.    The AEA Was Passed with a Discriminatory Intent and Was Not Narrowly Tailored. ...........................................................................12

       A.    The Legislative and Textual Intent Behind the AEA .........................13

       B.    The AEA is Not Narrowly Tailored ....................................................15

II.   Appellant Ignores the Historical, Social, and Theatrical significance of Drag. 19

III.  The AEA is Both Vague and Overbroad. ......................................................23

IV.   If the AEA is Upheld, It Will Have A  Chilling Effect on The Performing Arts. ..............................................................................................30

CONCLUSION ....................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*ACLU v. Gonzales*,
    478 F. Supp. 2d 775 (E.D. Pa. 2007)...................................................30

*ACLU v. Mukasey*,
    534 F.3d 181 (3d Cir. 2008) ............................................................30

*Barnes v. Glen Theatre, Inc.*,
    501 U.S. 560, 111 S. Ct. 2456, 115 L. Ed. 2d 504 (1991) .................................18

*Blount Pride, Inc. v. Desmond*,
    No. 323CV00316JRGJEM, 2023 WL 5662871 (E.D. Tenn. Sept. 1, 2023)...11, 27

*Brown v. Ent. Merchants Ass'n*,
    564 U.S. 786, 131 S. Ct. 2729, 180 L. Ed. 2d 708 (2011) ................................9

*City Council v. Taxpayers for Vincent*,
    466 U.S. 789 (1984)...................................................................24

*Daunt v. Benson*,
    956 F.3d 396 (6th Cir. 2020) ..........................................................17

*Erzonzik v. Jacksonville*,
    422 U.S. 205 (1975)..............................................................15, 27

*Ginsberg v. New York*,
    390 U.S. at 646 (Appendix A to opinion of the Court) ....................................28

*Grayned v. Rockford*,
    408 U.S. 104 (1972)...................................................................23

*HM Fla.-ORL, LLC v. Griffin*,
    No. 6:23-CV-950-GAP-LHP, 2023 WL 4157542 (M.D. Fla. June 23, 2023)...11

*Joseph Burstyn, Inc. v. Wilson*,
    343 U.S. 495, 72 S. Ct. 777, 96 L. Ed. 1098 (1952)...........................................9

*Luke Recs., Inc. v. Navarro*,
    960 F.2d 134 (11th Cir. 1992) .........................................................9

*Marland v. Trump*,
   498 F. Supp. 3d 624 (E.D. Pa. 2020) ................................................................10

*Miller v. California*,
   413 U.S. 15 (1973) .............................................................................................15

*Reno v. American Civil Liberties Union*,
   521 U.S. 844 (1997) ...........................................................................................26

*Renton v. Playtime Theatres, Inc.*,
   475 U.S. 41 (1986) ...............................................................................16, 17, 24

*S. Utah Drag Stars v. City of St. George*,
   No. 4:23-CV-00044-DN-PK, 2023 WL 4053395 (D. Utah June 16, 2023) ......11

*Schad v. Borough of Mt. Ephraim*,
   452 U.S. 61 (1981) .............................................................................................27

*Triplett Grille, Inc. v. City of Akron*,
   40 F.3d 129 (6th Cir. 1994) .........................................................................17, 18

*United States v. Requena*,
   980 F.3d 30 (2d Cir. 2020) ...............................................................................23

*United States v. Stevens*,
   559 U.S. 460 (2010) ...........................................................................................24

*United States v. Williams*,
   553 U.S. 285 (2008) ...........................................................................................23

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
   425 U.S. 748, 96 S. Ct. 1817, 48 L. Ed. 2d 346 (1976) ....................................24

*Woodlands Pride, Inc. v. Paxton*,
   No. CV H-23-2847, 2023 WL 6226113 (S.D. Tex. Sept. 26, 2023)..................11

STATE CASES

*Davis-Kidd Booksellers, Inc. v. McWherter*,
   86 S.W.2d 520 (Tenn. 1993) .......................................................................16, 25

*People v. Bookcase, Inc.*,
   14 N.Y.2d 409, 201 N.E.2d 14 (1964)................................................................9

STATE STATUTES

Tenn. Code Ann. § 7-51-1401 (13)...................................................................12, 28

Tenn. Code § 7-51-1407 .............................................................................12

Tennessee Code § 39-17-901(6) ...............................................................15

**RULES**

Federal Rule of Appellate Procedure 26.1 ...................................................2

**CONSTITUTIONAL PROVISIONS**

United States Constitution
    First Amendment ................................................................7, 10, 18, 23

The Dramatists Legal Defense Fund (the "DLDF") respectfully submits this memorandum of law as *amicus curiae* in support of Plaintiff-Appellee Friends of George's Inc. ("FOG") and to apprise the Court of additional considerations.

## STATEMENT OF INTEREST

The Dramatists Guild of America, Inc. (the "Guild") formed the DLDF in 2009 to advocate for free expression in the dramatic arts as guaranteed in the First Amendment of the United States Constitution.

The DLDF is governed by an elected Board of Directors that currently includes such renowned dramatists as J.T. Rogers (Oslo, Blood and Gifts), Lydia Diamond (Stick Fly), and the current President, John Weidman (Assassins, Contact, Anything Goes). The Board also includes several lawyers well established within the theatre industry. The sole member of the DLDF is the Dramatists Guild (the "Guild"), a century-old trade association with a governing board of playwrights and musical theatre authors that has included Marsha Norman (The Color Purple, 'Night Mother), Stephen Schwartz (Wicked, Godspell, Pippin), Tony Kushner (Angels in America), and Lynn Nottage (Sweat, Ruined). The current president of the Guild is Amanda Green (Hands on a Hardbody, Bring It On).

While Appellee and its members are not a part of the DLDF, the DLDF and the Guild recognize that their interests and the interests of the public are threatened by Appellant's attempts to uphold an unconstitutional law, which not only targets

members of the LGBTQ community, but theatrical performances in general, particularly because of the history and expressive use of drag in the theatre. Because the DLDF's mission is to advocate for free expression while advancing the interests of theatre writers and the surrounding audience, we take great exception to any law that attempts to curtail the free speech of any playwright, actor, or artist in general. As shown below, this unconstitutional law threatens to chill the speech of theatrical performances (and beyond) in Tennessee by threatening criminal sanctions on performers. The DLDF, in its mission to advocate for free expression, cannot let that stand unopposed.

All parties have consented to the filing of this brief. No counsel for a party authored any part of this brief. And no one other than the *amicus curiae*, its members, or its counsel finance the preparation or submission of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

In March 2023, the State of Tennessee passed the "Adult Entertainment Act," (the "AEA") which claimed to protect minors from "dangerous" and "explicit" performances. In truth, the AEA was passed with the intent of banning "drag" shows, or theatrical performances in which performers dress and act as another gender. While the intended consequence of the AEA is to force drag performances into the shadows— a targeting of specific content that is unconstitutional in its own right—the AEA's staggering vagueness and breadth will chill the speech rights of writers, performers,

and association rights of audiences, as well as further marginalize the LGBTQ community in Tennessee, as the law is seemingly designed for selective enforcement.

Since the Stonewall Riots in 1969, America has grappled with whether and how to accept the LGBTQ community as a part of mainstream culture. That history is complex and scattered with policy disasters and public callousness but, in the 21st century, acceptance has blossomed and steadied. Sodomy laws, which were used to criminalized same sex relationships, are now unconstitutional; the Supreme Court finally accepted the sanctity of same sex marriage; and, most recently, trans and nonbinary visibility has increased.[1] For the LGBTQ community and its allies, these changes have been long-awaited steps towards civil and social equality.

Politicians and activist groups, however, have reacted by sparking a moral panic. Moral panics and subsequent legislative overcorrections are negative reactions to progress, broadening social norms, and democratic (and demographic) changes in society. Like moral panics before this one, opponents focus on modes of communication—comic books, *People v. Bookcase, Inc.*, 14 N.Y.2d 409, 418, 201 N.E.2d 14, 19 (1964), movies, *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 497, 72 S. Ct. 777, 778, 96 L. Ed. 1098 (1952), rap music, *Luke Recs., Inc. v. Navarro*, 960

---

[1] Especially in the last 10 years, there have been multiple award-winning television series centered on trans and non-binary characters including *Pose* and *Transparent*. Further, multiple trans actors, writers, and directors have been featured in television, cinema, and the theatre.

F.2d 134 (11th Cir. 1992), video games, *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 792, 131 S. Ct. 2729, 2734, 180 L. Ed. 2d 708 (2011) , and most recently social media, *see e.g.*, *Marland v. Trump*, 498 F. Supp. 3d 624 (E.D. Pa. 2020)—to prevent the spread of ideas.[2] The new target is drag—a performance style closely linked with the LGBTQ community—which has become the center of various new state laws attempting to ban it.[3]

As shown below, the AEA plainly targets drag performers in Tennessee.  Even if there were a legitimate way to curtail Tennessee's love of drag, the AEA certainly is not it.  This legislation undoubtedly violates the First Amendment by failing to properly narrow its application, provide sufficient clarity, or limit the inevitable selective

---

[2] Indeed, the country is now seeing a resurgence of book bans, as a small group of people—11 people are responsible for 60% of books ban requests nationwide—contest any books that provide perspectives different from their own or include content to which they personally object.  *See* WASHINGTON POST, Hannah Natanson, Objection To Sexual, LGBTQ Content Propels Spike In Book Challenges, 2023 WLNR 17897699 (May 23, 2023)

[3] Alabama Public Radio, All Sides Speak Out on Proposed Alabama Drag Show, *available at*, https://www.apr.org/news/2023-05-10/all-sides-speak-out-on-proposed-alabama-drag-show-ban (Alabama); LGBTQ Nation, Arkansas Moves Forward on Criminalizing Drag Shows, *available at* https://www.lgbtqnation.com/2023/01/arkansas-moves-forward-on-criminalizing-drag-shows/#:~:text=A%20bill%20in%20Arkansas%20that%20reclassifies%20%E2%80%9Cdrag%20performance%E2%80%9D,property%20or%20%E2%80%9Cwhere%20a%20minor%20can%20view%E2%80%9D%20them (Arkansas); Reuters, U.S. Court Blocks Florida Law Restricting Drag Performances, *available at* https://www.reuters.com/legal/us-court-blocks-florida-law-restricting-drag-performances-2023-06-23/ (Florida).

enforcement. Even if the AEA were intended to "protect children," the legislation will have the effect of suppressing the First Amendment rights of playwrights, performers, and their audience and force performers to risk criminal charges or to stop performing altogether in Tennessee. Such a broad and vague statute as the AEA, which has no affirmative defenses and almost no limits, should not be allowed to stand.

In deciding whether Appellant has demonstrated that the AEA passes constitutional muster, the Court should look beyond Appellant's and the State's stated reasoning for the AEA and consider the vast consequences this law has and will have on the writers, producers, and performers of drag (and of other performances swept up by this law) and on the LGBTQ community as a whole.

In truth, moral panics are as American as drag and apple pie. But, it is also a deeply American tradition to correct course and recenter our core constitutional rights. In Utah, Montana, Florida, and even in Tennessee, courts have ruled that these attempts to ban drag performances are unconstitutional.[4] This Court should do the same and affirm the District Court's finding that the AEA is unconstitutional.

---

[4] *See Woodlands Pride, Inc. v. Paxton*, No. CV H-23-2847, 2023 WL 6226113, at *17 (S.D. Tex. Sept. 26, 2023); *HM Fla.-ORL, LLC v. Griffin*, No. 6:23-CV-950-GAP-LHP, 2023 WL 4157542 (M.D. Fla. June 23, 2023); *Blount Pride, Inc. v. Desmond*, No. 323CV00316JRGJEM, 2023 WL 5662871 (E.D. Tenn. Sept. 1, 2023); *S. Utah Drag Stars v. City of St. George*, No. 4:23-CV-00044-DN-PK, 2023 WL 4053395 (D. Utah June 16, 2023).

## **ARGUMENT**

**I.    THE AEA WAS PASSED WITH A DISCRIMINATORY INTENT
AND WAS NOT NARROWLY TAILORED.**

In March 2023, the Republican-led Tennessee legislature passed the AEA,
which amended the established zoning statute regulating adult-oriented business,
such as strips clubs (the "Adult-Oriented Establishment Registration Act" or
"AERA").  The AEA, however, amended the AERA to now state that "[it] is an
offense for a person to perform adult cabaret entertainment," on either public
property or in "a location where the adult cabaret entertainment could be viewed by
a person who is not an adult." Tenn. Code § 7-51-1407.  "Adult cabaret
entertainment," is defined as "adult-oriented performances that are harmful to
minors . . . and that feature topless dancers, go-go dancers, exotic dancers, strippers,
male or female impersonators, or similar entertainers; and . . . [i]ncludes a single
performance or multiple performances[.]" *Id.* § 7-51-1401.  Whereas the AERA
provided strict regulations for the adult establishments, the AEA specifically aims
to punish the performers of allegedly adult performances.  Legislative Transcript
("Tr."), Dist Ct. Dkt 35-1, Tr. 8:9-15.

The AEA was passed with the impermissible intent to discriminate against
drag performers and the LGBTQ community, as shown through the legislative
statements in support of the AEA and the text of the law itself.  Additionally, the
AEA was not narrowly tailored to supports its claim to "protect children."

### A.     The Legislative and Textual Intent Behind the AEA

As repeatedly stated in the news, on social media, and in the testimony of witnesses and legislatures in support, the AEA was introduced to facially discriminate against the LGBTQ community generally and drag performers specifically.  One of the sponsors of the AEA, Representative Chris Todd, stated that he was "asked to come up with legislation," based on *one* drag performance in Jackson, Tennessee.  Only knowing that the performers would be in drag, without previewing the substance of the performance, and even upon the representation that the performance was "family friendly," Representative Todd sued the organization holding the performance and, through a settlement, "forced [it] to be indoors."  Tr. 73:22-74:12.  Subsequently, Representative Todd and a Senate colleague proposed the AEA to materially change the regulatory scheme for adult-oriented businesses, insert criminal sanctions against performers themselves, and broaden the definition of a performer.

Although the AEA applies to "topless dancers, go-go dancers, exotic dancers, [and] strippers" as well as "male and female impersonators," the only examples of prohibited performances provided by the legislators or witnesses in support of the AEA were drag performances or LGBTQ events, such as:  the Boro Pride Event, the Tennessee Tech's Backdoor Playhouse, and Knox County Tennessee Theater "A Drag Queen Christmas."  Further, the transcript of the legislative session discussing

the AEA contains twenty-nine references to "drag," and eleven references to "male and/or female impersonators". *See e.g.*, Tr. 22-24; 40-44.

Nevertheless, no proof was offered regarding the substance of any of these drag performances or LBTGQ events, or how they serve as an example of a clearly violative offense of the AEA, or even harm minors. The only consistent feature of the examples provided is that they involve male-presenting people dressed in traditionally-female costume. Indeed, the Backdoor Playhouse performance organized by the Tennessee Tech's theatre program and described as "graphic," is simply a drag queen dressed in a monk's habit, lip syncing to Hozier and Whitney Houston. The drag performer removes the monk's habit to reveal an ankle-length lacy gown and corset, more clothing than a Tennessee Titans' cheerleader. No explanation was provided how this performance was harmful to a minor.

In addition to the legislative statements, as the District Court correctly found, the AEA's text is clearly indicative of its impermissible purpose to criminalize the performance of drag and other LGBTQ events. The AEA abruptly departs from the statutory scheme of the AERA, which regulated the operators of businesses who offered "adult-cabaret entertainment," to now regulate and criminalize the actions of the actual performers of "adult-cabaret entertainment." The AEA, additionally, contains no *mens rea* requirement to be applied to performers, making this a strict liability criminal statute, which also contains no affirmative defenses, such as

parental consent. As the District Court found, the lack of a textual scienter requirement as well as any mention of affirmative defenses "can be evidence that the legislature passed the law to chill constitutionally-protected speech[.]" Dist. Ct. Dkt, ECF No. 91.

It is clear from the legislature's statements and the text of the AEA, that the obvious purpose of the law was to stigmatize and marginalize members of the LGBTQ community and specifically to target drag performances.[5]

### B. The AEA is Not Narrowly Tailored

The Supreme Court makes clear that laws that restrict "indecent" speech, which is not obscene to adults, must be "relatively narrow and well-defined[.]" *See Erzonzik v. Jacksonville*, 422 U.S. 205, 212 (1975). In Appellant's attempt to have the AEA pass constitutional muster, it refers to the AEA's "harmful to minors" standard and claims it is allegedly based on Supreme Court precedent. *Compare Miller v. California*, 413 U.S. 15 (1973) to Appellant Br. at 28-29. To qualify as "harmful to minors" under § 39-17-901(6), a performance must, among other things, "lack[] serious literary, artistic, political or scientific values for minors" when "[t]aken as a whole."

---

[5] In addition, the law was passed alongside an anti-trans bill that prohibits doctors from prescribing puberty blockers or hormones, as well as from performing gender-affirming surgeries for transgender minors.

Appellant relies upon the Tennessee Supreme Court's decision in *Davis-Kidd Booksellers, Inc. v. McWherter*, which read the "harmful to minors" standard to apply to what a reasonable 17-year old minor would believe lacked value. 86 S.W.2d 520, 528 (Tenn. 1993). However *Davis-Kidd* is not applicable to the AEA and does not render the AEA narrowly tailored. *Davis-Kidd* involved ordinances governing the display of potentially obscene materials in businesses, but it did not criminalize the actions of performers, nor did it fail to provide for affirmative defenses or a *mens rea* requirement. *Id.* Here, as explained below, the AEA on its face criminalizes all drag performers virtually anywhere, even in private events at people's homes or age-restricted venues. Such an overbroad law, as the District Court correctly found, cannot be narrowly tailored.

Indeed, the "harmful to minor" standard is employed only in an attempt to bypass the otherwise blatant unconstitutionality of the AEA. *See Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47-48 (1986) (holding that secondary-effects doctrine applied regardless of allegedly illicit legislative motive). In *Renton*, the Supreme Court found it was constitutional to pose zoning limits on "adult motion picture theatres," though viewed as arguably content or viewpoint based legislation, because of the "'predominate' intent" in passing the law was to address secondary effects of the businesses and to segment the businesses from areas more likely to be visited by minors. 475 U.S. at 48. *Renton*, however, has a narrow application because it was

16

decided "with respect to businesses that purvey sexually explicit materials" for "zoning ordinances designed to combat the undesirable secondary effects of such businesses." *Id.*, at 49. Here, however, the AEA is about the performance and performers, not the business, and should require a higher standard than the loose "time, place, manner" applied to an adult business. *See id.*

Appellant cites to *Daunt v. Benson* to support their argument for secondary effects, but again that falls short. 956 F.3d 396, 420 (6th Cir. 2020). There, the court found that decisions based on political affiliation of an applicant were not unconstitutional because "differential treatment was *justified* without reference to the content of the ... speech." *Id.* Here, that is not the case. In passing the AEA, the State—made clear by Representative Todd's comments—assumes that all drag has harmful sexual content, which is itself unfounded and untrue. *See* Appellant Brief ("And, here, by protecting children from obscene content, the Act inherently addresses the secondary effects associated with exposure to such content" * * * "type of 'sexual assault' qualifies as a secondary effect," *citing Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 111 S. Ct. 2456, 115 L. Ed. 2d 504 (1991) (upholding a public indecency law requiring adult entertainment dancers to wear pasties and G-strings) and *Triplett Grille, Inc. v. City of Akron*, 40 F.3d 129 (6th Cir. 1994) (regulating "totally nude dancing" via public indecency law). Appellant also ignores that in *Tripplett Grille*, a complete ban on nudity in public places was found "facially

unconstitutional under the First Amendment overbreadth doctrine" because the "City could point to no link between nudity in non-adult entertainment and secondary effects." 40 F.3d at 133. The result is the same here. The State, however, provided no example of any actual "harm to minors" that has been reliably linked to drag performances. And based on a review of the cited drag performances in the legislative history, it appears that the State's mention of touching genitals refers simply to dance moves, similar to those performed by Britney Spears, Elvis, and, yes, even Titans' cheerleaders. *See* Tr. 16:2-12.

Appellant cannot cite allegedly secondary effects to justify application of a looser standard of judicial review without providing a causal link and thus cannot justify the constitutionality of the AEA due to an alleged harm to minors.[6] Particularly where Tennessee already has public indecency laws on the books, providing some threshold for acceptable content. Indeed, academics and law enforcement would agree that there are more direct paths to preventing child sexual abuse and exploitation that involves regulating the perpetrators of those crimes, and not drag queens dancing to Whitney Houston, which is plainly protected by the First Amendment.

---

[6] Indeed, in situations where a direct link can be drawn to  the harm of minors, *i.e.*, mass shootings, the Tennessee government has chosen to avoid legislating all together. *See* Tr. 54:3-8. "Just this May, there was a report that came out that pastors in this state are sexually abusing children in the Southern Baptist Convention." Tr. 84:17-25.

**II.    APPELLANT IGNORES THE HISTORICAL, SOCIAL, AND THEATRICAL SIGNIFICANCE OF DRAG.**

While the AEA is clearly intended to push drag from the mainstream to the shadows, it is also clear that the legislators who passed the AEA had a clear misunderstanding of drag and its importance, not just in the LBGTQ community, but in the broader performing arts generally.

Drag—a multifaceted performance style defined by a performer's apparent impersonation of the opposite gender—has a long history in American and Tennessean culture.  Even the most staunch opponents have encountered drag at one point or another—from Shakespeare's classic plays to more modern theatre like "Some Like It Hot" and "Kinky Boots," to movies and television.  Tyler Perry's Madea, the Wayans Brothers in "White Chicks," or Robin Williams in "Mrs. Doubtfire," and even Disney's "Mulan" all use drag as a performance and storytelling technique.

In Shakespeare's time, it was a historical necessity to use drag performers due to men-only casts.  Similarly, "trouser roles" are commonplace in modern theater.  For example, in operatic roles like Orpheus and Prince Orlofsky, cis-women play male roles, allowing the performer to fit the vocal range the role originally required.[7]  While the inclusion of women in entertainment has removed drag from a tool of

---

[7] Opera's Greatest Trouser Roles, ENO.org, *available at* https://www.eno.org/discover-opera/explore-more/operas-greatest-trouser-roles/.

necessity, drag is still an effective literary tool that provides important criticism and analysis of—and in some ways, upholds—gender norms.  As Andy Warhol stated, "Drag queens are living testimony to the way women used to be, the way some people still want them to be, and the way some women will actually want to be. Drags are ambulatory archives of ideal movie star womanhood.  They perform a documentary service, usually consecrating their lives to keeping the glittering alternative alive and available for (not-too-close) inspection."  Andy Warhol, *The Philosophy of Andy Warhol:  From A to B and Back Again*, New York 1975, p. 54.

Although drag has existed for centuries both in and out of LGBTQ spaces, as it has risen in popularity, it is unquestionably associated with the LGBTQ civil rights movement and pop culture.  This is in large part due to *RuPaul's Drag Race*, a TV program hosted by RuPaul, who himself performs both in and out of drag, where contestants compete to be crowned America's next drag star.  It is this connection with LGBTQ rights that explains the passage of the AEA:  it is based on a fundamental misunderstanding of the role of drag generally and seemingly upon an intent to slander the LGBTQ community as child abusers and groomers.

More importantly, drag has a history in Tennessee as well.  As publicly reported, Governor Bill Lee himself was identified in a yearbook picture in a skirt

and pigtails at his high school powderpuff game.[8]  And in the Memphis in May

Barbeque Festival, men dress as female pigs in the "Ms. Piggy Idol" contest .  The

Ms. Piggy Idol contest has been a staple of the Memphis in May Barbeque Festival

for years, seemingly without objection by the legislators who passed the AEA.  As

described by the Memphis Commercial Appeal, "[where] else in the world will you

find grown men parading around in tutus and snouts?"[9]

Nevertheless, the Tennessee legislators have dressed the Boogey Man in drag,

imposing broad assumptions about the LGBTQ community to the content and intent

of the performances.  The legislative history of the AEA demonstrates this

mischaracterization of transpeople, drag performers, and drag performances as

inherently dangerous, allowing the imaginations of the legislators to override any

version of reality based on factual evidence. *See e.g.*, Tr. 16:2-12.

It is clear the State has no problem with drag by apparently cis-gendered,

heterosexual men—the Ms. Piggy Idol contest and Governor Lee were not cited as

---

[8] Tennessee Governor Appears To Have Dressed In Drag, An Art Form He Wants
To Restrict, NBCnews.com, *available at*, https://www.nbcnews.com/nbc-out/out-
politics-and-policy/tennessee-governor-appears-dressed-drag-art-form-wants-
restrict-rcna72569.

[9] Memphis in May BBQ Contest: 9 Things You Shouldn't Miss (Sauce Wrestling!
Ms. Piggy Idol!), Memphis Commercial Appeal, available at,
https://www.commercialappeal.com/story/entertainment/dining/2023/05/10/memp
his-in-may-bbq-fest-world-championship-barbecue-cooking-contest-
schedule/70147488007/

examples of the "harm" of drag in passing the AEA—instead, the law's proponents cite drag performances at a LGBTQ Pride event as harmful to minors, implying that drag, when performed by a gay man, rather than a straight man, for example, is inherently harmful.  But these examples (or lack thereof) ignore that there is no difference between the two.  Governor Lee's imitation of a cheerleader was more scantily clad than the drag performer at Tennessee Tech that is cited in the state congressional meetings.[10]  The men competing in the Ms. Piggy Idol contest wear corsets, tutus, women's underwear, fake prosthetics to simulate women's breasts, yet no law has been instituted to ban these performances.

Lastly, the AEA also ignores that drag itself is not inherently sexual or explicit.  When someone dresses to impersonate a man or a woman, it can be done for a variety of reasons—including the performance of art, theatre, or comedy.  For example, in *Mrs. Doubtfire*—which includes a scene where "Mrs. Doubtfire" undresses multiple times, while his neighbors watch across the street—Robin Williams uses drag to allow his character to remain close to his children after his divorce and to understand his ex-wife's responsibilities as a parent.  Drag queens

---

[10] *See* Tweet by Landon Starbuck, available at https://rb.gy/gzkiy.

teach math and reading,[11] talk about philosophy and current events,[12] teach literacy,[13] and lip sync to pop tunes. The AEA, as shown below, due to its vague language and incredible overreach, would effectively criminalize this behavior and chill such ability for these performances to take place in Tennessee.

## III. THE AEA IS BOTH VAGUE AND OVERBROAD.

As written, the AEA is vague and overbroad, creating uncertainty about how and where drag can be used in the performing arts. A criminal law is invalid if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams,* 553 U.S. 285 (2008). The "void for vagueness" doctrine ensures that a "person of ordinary intelligence" has "a reasonable opportunity to know what is prohibited" by the law. *Grayned v. Rockford*, 408 U.S. 104, 108 (1972). And, when First Amendment rights are at risk, the

---

[11] The (Drag) Queen of Mathematics, NPR.org, *available at* https://www.npr.org/2022/02/02/1077667303/the-drag-queen-of-mathematics

[12] Drag Superstars Trixie and Katya on World of Wonder Series: "This Show Demystifies Drag" https://www.hollywoodreporter.com/tv/tv-features/trixie-katya-world-of-wonder-unhhhh-series-1235505539/#; Tiktok User: @thewendyweather ("The History Drag Queen")

[13] About Page, Drag Queen Story Hour, *available at* https://www.dragqueenstoryhour.org/about/ ("We envision a world where kids can learn from LGBTQ+ herstories and experiences to love themselves, celebrate the fabulous diversity in their communities, and stand up for what they believe in and each other.").

standard for vagueness is relaxed. *See United States v. Requena*, 980 F.3d 30, 41 (2d Cir. 2020). The overbreadth doctrine allows courts to "invalidate[] [a statute] as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quotations omitted); *City Council v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984)

Here, the vagueness and overbreadth of the AEA work in tandem to prohibit clearly constitutional speech as well as speech that poses no harm to minors and provides no guidance for which performances would result in prosecution. As the District Court points out, though the State insists the law is well-defined, the actual letter of the law does not provide relevant boundaries for enforcement. As a result, it chills the speech of performers, writers, and their audience, who has a right to consume the speech of its choosing. *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756, 96 S. Ct. 1817, 1823, 48 L. Ed. 2d 346 (1976) ("[W]here a speaker exists…the protection afforded is to the communication, to its source and to its recipients both.")

First, the AEA expands the regulation of "adult cabaret entertainment" from the businesses to the performers. This is unusual. While laws have been found constitutional that place certain limitations on stores that sell adult materials, other laws have been held to be unconstitutional when they seek to prohibit the creation

of those materials itself. *See e.g. Renton*, 475 U.S. at 48 (upholding a zoning ordinance restricting adult film theaters because the ordinance was not targeted at the content of the films shown); *see also Davis-Kidd*, 866 S.W.2d at 528-35.

Further, the "male and female impersonator" language within the AEA is not defined, which leaves it unclear as to who qualifies as an impersonator. While other performers listed in the statute are circumscribed by their conduct (strippers, go-go dancers), "male or female impersonator" refers only to the gender identity of the performer. Indeed, the State's legislature refused to define who a "female impersonator" would include.[14] Tr. 67:18-68:8. Given the recent animosity towards trans people being stoked by political rhetoric, under the AEA a trans performer and the theatrical venue where they perform may be subject to criminal prosecution and/or harassment. Tr. 79:5-80:6. The legislators were not able to conclude that a trans performer would not be subject to this law; or that a cis-male pop star, like Harry Styles, who performs in dresses and skirts but does not seek to "impersonate" a woman, would be able to tour in Tennessee without criminal prosecution under the AEA.[15] As the AEA stands currently, it would depend entirely on the local

---

[14] During one legislative hearing, a representative points out that Dolly Parton has identified herself as a female impersonator. Tr. 24:3-9; 24:24

[15] *See e.g.*, https://variety.com/2021/music/news/harry-style-dorothy-harryween-halloween-1235101308/

prosecutor's interpretation of the law to determine who and what actions in a performance constitute a crime.

For writers and producers of theatre, this means that casting certain roles for productions in Tennessee will require notification to all potential cast members that their performance may result in arrest, jail, or prosecution. Trans performers are already anticipating having to avoid performances in Tennessee because "even when not doing drag [they] might be accused of being a male or female impersonator, terms not defined in the statute."[16]

Second, the application of community standards and prosecutorial discretion means that the law will be interpreted differently across Tennessee—a violation in Nashville could be different than Murfreesboro, and different than Paris, Tennessee. *See Reno v. American Civil Liberties Union*, 521 U.S. 844, 871-74 (1997)(affirming that portions Communications Decency Act were unconstitutionally vague, particularly in reference to material deemed "offensive as measured by contemporary community standards"). Several Tennessee legislators pointed out this uncertainty during the debate over the AEA. *See* Tr. 47:18-21 ("[T]here will be 31 different versions of what ["community standards"] means, one for every judicial district in the state").

---

[16] Tennessee Takes Lead in Republican Effort to Restrict Drag Shows, *available at* https://www.nbcnews.com/nbc-out/out-politics-and-policy/tennessee-takes-lead-republican-effort-restrict-drag-shows-rcna72080

These vagaries, inherent in the AEA, create the perfect atmosphere for selective enforcement of the law against only specific subsets of people covered under the law. As Representative Todd states, and other legislators have shown concern for, "certainly, there will be prosecutorial discretion, and…what might be considered offensive to one person might not be offensive to another person." Tr. 13:3-6; Tr. 49-50; 51:10-15; *see also Blount Pride Inc. v. Desmond*, No. 3:23-cv-00316-JRG-JEM, 2023 WL 5662871 (E.D. Tenn. Sept. 1, 2023).

Third, as pointed out by nearly every opponent to the AEA, the location provision, as written, could be applied to nearly every venue, public or private, in the state, including private homes. The AEA applies to performances of adult cabaret entertainment, "[any]where the adult cabaret entertainment could be viewed by a person who is not an adult[.]" Such vast restrictions are not constitutional. *See Schad v. Borough of Mt. Ephraim*, 452 U.S. 61 (1981) (invalidating total ban on nude dancing); *Erznoznik*, 422 U.S. at 213 (invalidating ordinance that prohibited drive-in theaters from showing films containing nudity when their screens were visible from a public place).

Further, the AEA provides no clarity about how it would be applied to performances that are broadcast and viewed strictly online. With so few limitations drafted into the bill, one of the 31 judicial districts in Tennessee could interpret the law in exactly that way. As a result, performers in and out of the State could be held

responsible for Tennessee minors viewing their performances on YouTube, TikTok, Instagram, Snapchat, or any variety of video-streaming applications.

Fourth, the AEA expands what actual content is prohibited beyond the accepted "harmful to minors" standard. Tr. 67:3-5, 67:10-11. Outside of an adult-oriented establishment, this clumsily drafted statute defines an "entertainer" as *any* person who "provides…a performance of actual or simulated specified sexual activities, *including removal of articles of clothing or appearing unclothed*[.]" Tenn. Code Ann. § 7-51-1401 (13). While, "specific sexual activities" is clearly defined in the statute,[17] "the removal of clothing or appearing unclothed" phrase greatly expands what could otherwise be prohibited by statute. In *Ginsberg*, where a restrictive statute was upheld, the statute defined "harmful to minors" as a depiction that "(i) predominantly appeals to the prurient, shameful or morbid interests of minors, and "(ii) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors, and "(iii) is utterly

---

[17] "Specified sexual activities" means activities, services or performances that include the following sexual activities or the exhibition of the following anatomical areas:

> A) Human genitals in a state of sexual stimulation or arousal;
>
> B) Acts of human masturbation, sexual intercourse, sodomy, cunnilingus, fellatio or any excretory function, or representation thereof; or
>
> C) Fondling or erotic touching of human genitals, pubic region, buttocks or female breasts.

Tenn. Code Ann. § 7-51-1401 (11) (A-C).

without redeeming social importance for minors." *Ginsberg*, 390 U.S. at 646 (Appendix A to opinion of the Court) (quoting N. Y. Penal Law §484–h(1)(f)).

The AEA assumes that the removal of clothing is sufficient to meet this standard of harm. If that were the case, a performer wearing a nude bodysuit—think Britney Spears' "Toxic" music video—could now be considered "harmful to minors" and subject to criminal prosecution. Indeed, we need not go that far. One legislator noted that the simple removal of a jacket by any such entertainer would be prohibited under the statute as written. Tr. 67:8-12. While proponents of the law laughed this off, given the vagueness of the statute, it would only take one prosecutor with such beliefs to accuse that performer of a crime. Relatedly, any comedian who makes a sexually-related joke, if it contains reference to any overt sexual acts or includes a rude gesture, could now be considered criminal activity under the AEA. To its logical extremes, under the AEA, a comedian who takes off a leather jacket and makes a sexual gesture could be prosecuted.

Lastly, the AEA does not specify what level of action would rise to the level of a criminal violation. Would one joke be sufficient to shut down an entire show? Assuming the legislature's examples are sufficient harmful to minors, a prosecutor could legally find that one song in a medley or one dance, containing "simulated sexual activities" within a larger performance deemed the entire performance harmful to children and thus susceptible to criminal persecution.

Appellant's attempt to assure the Court of clear limitations on the AEA are simply not present in the statute's language. In support, Appellant cites cases that apparently narrow the statute's construction, but are not binding on Tennessee courts,, *see ACLU v. Mukasey*, 534 F.3d 181 (3d Cir. 2008); *ACLU v. Gonzales*, 478 F. Supp. 2d 775, 818 (E.D. Pa. 2007), and could not remedy such a facially vague and overbroad statute.

## IV.    IF THE AEA IS UPHELD, IT WILL HAVE A CHILLING EFFECT ON THE PERFORMING ARTS.

The AEA is unconstitutional because: (i) it was created for impermissible purpose, to discriminate against drag entertainers and the LGBTQ community; (ii) it was not narrowly tailored to support the State's compelling interest in protecting children; and (iii) it is plainly vague and overbroad. The AEA should also be voided as unconstitutional because it will create, and already has created, a chilling effect on the performing arts in Tennessee and potentially beyond.

As detailed above, the plain reading of the AEA demonstrates its broad application beyond anything the legislature may have believed it was remedying (although for an impermissible purpose) when it created and passed this law. First, the AEA plainly criminalizes qualifying performers virtually anywhere in Tennessee, including private events held at private homes—and contains no context about how the AEA would (or would not) apply to performances viewed over the Internet. Second, AEA's definition of performers and performances of "actual or

simulated specified sexual activities," is so broad that it could encompass performances such as live concerts, comedy shows, parodies, musicals, or any theatrical performance. Given that the AEA applies everywhere in Tennessee and to any performer who "impersonates" another gender or engages in "simulated specified sexual activities," the AEA could apply to a number of situations, which highlight its chilling effects.

Indeed, in 1974, American icons, Bob Hope and Jackie Gleason, performed in Central Park in in drag, as shown below.[18]   These skits likely would be criminalized under the AEA.



---

[18] Hope and Gleason Jest in Central Park, New York Times, *available at* https://www.nytimes.com/1974/09/18/archives/hope-and-gleason-jest-in-central-park-a-medley-of-skits.html

Similarly, if Harry Styles were to perform in Tennessee while "impersonating a woman," as shown below, he may be subject to criminal penalties.[19]



Tennessee residents participating in this year's Ms. Piggy Idol contest, including the men in the photo below, likely should be subject to criminal penalties without any affirmative defenses under the AEA.[20]

---

[19] https://variety.com/2021/music/news/harry-style-dorothy-harryween-halloween-1235101308/

[20] Memphis in May BBQ Contest: 9 Things You Shouldn't Miss (Sauce Wrestling! Ms. Piggy Idol!), Memphis Commercial Appeal, available at, https://www.commercialappeal.com/story/entertainment/dining/2023/05/10/memp



Because the AEA delegates the determination of whether a performer is subject to criminal liability due to the "community standards," of Tennessee's thirty-one judicial districts, there will be thirty-one different community standards that a performer, or the organizers of a performance, will have to investigate and determine (if that is even possible) prior to holding any performance in Tennessee. Shifting such a responsibility to a performer, writer, or producer will necessarily trigger a discussion as to whether it makes sense to hold any performance in Tennessee while the AEA stands.

Clearly, the AEA has and will continue to have chilling effects on the performing arts. For example, following the passage of the AEA, in March 2023,

_____

his-in-may-bbq-fest-world-championship-barbecue-cooking-contest-schedule/70147488007/

numerous news outlets wrote articles detailing the various performers who now questioned whether they could continue to perform in Tennessee without being subject to criminal penalties. A trans woman performer named Peppermint, who rose to fame on RuPaul's Drag Race, said "she would now hesitate going to Tennessee," because of the AEA.[21] An article from NPR on March 21, 2023, entitled "Where am I going to be free to be who I am," details several musicians who have performed in drag in Tennessee, who now are concerned about their livelihood and their personal safety, and are contemplating leaving Tennessee.[22] These examples are only the tip of the iceberg. While the State may claim that it will narrow its enforcement of the legislation – the legislation itself is so broad and delegates so much discretion to each judicial district's prosecutors, that almost no performer or producer can clearly state whether its performance will not result in criminal liability in Tennessee. The AEA must be deemed unconstitutional.

---

[21] Tennessee Takes Lead in Republican Effort to Restrict Drag Shows, *available at* https://www.nbcnews.com/nbc-out/out-politics-and-policy/tennessee-takes-lead-republican-effort-restrict-drag-shows-rcna72080

[22] Tennessee Musicians Grapple with Potential Impact of New Anti-Drag Legislation, NPR.org, *available at* https://www.npr.org/2023/03/21/1164220466/tennessee-anti-drag-law-trans-nonbinary-musicians

## **<u>CONCLUSION</u>**

This Court should affirm the District Court's decision to permanently enjoin the State from enforcing the AEA.

Dated:  October 30, 2023

> Respectfully submitted,
>
> DAVIS WRIGHT TREMAINE LLP
>
> */s/ Bruce E.H. Johnson*
> Bruce E.H. Johnson
> brucejohnson@dwt.com
> 920 Fifth Avenue
> Suite 3300
> Seattle, WA  98104
>
> Gaurav K. Talwar
> gauravtalwar@dwt.com
> Leena Charlton
> leenacharlton@dwt.com
> 1251 Avenue of the Americas, Fl. 21
> New York, New York 10020
> Tel: (212) 880-3580
>
> *Counsel for Amicus Curiae*
> Dramatists Legal Defense Fund

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPE-FACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 6,144 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

*/s/ Bruce E. H. Johnson*
DAVIS WRIGHT TREMAINE LLP
*Counsel for Amicus Curiae*