No. 23-5611

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

FRIENDS OF GEORGE'S, INC.,

*Plaintiff-Appellee,*

v.

STEVEN J. MULROY,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of Tennessee 2:23-cv-02163
(Judge Thomas L. Parker)

## PETITION FOR REHEARING EN BANC
## FOR APPELLEE FRIENDS OF GEORGE'S, INC.

Gregory M. Lipper
LIPPER LAW PLLC
1325 G Street NW, Suite 500
Washington, DC 20005
(202) 996-0919
glipper@lipperlaw.com

Melissa J. Stewart
DONATI LAW, PLLC
1545 Union Avenue
Memphis, TN 38104
(901) 278-1004
melissa@donatilaw.com

*Counsel for Appellee*

# TABLE OF CONTENTS

Table of Authorities ................................................................. ii

Introduction & Rule 35(b) Statement ................................................... 1

    A. Tennessee's Adult Entertainment Act .......................................... 3

    B. Friends of George's ....................................................... 5

    C. Friends of George's requests and receives injunctive relief in the
       district court ............................................................. 6

    D. The panel's decision. ...................................................... 9

Argument ............................................................................. 11

I.  The panel narrowed the Act in a manner foreclosed by the Act's text and
    the decisions of the Tennessee Supreme Court. ................................ 11

    A. The panel impermissibly rewrote the AEA to cover only material
       lacking in value to "a reasonable 17-year-old minor." ..................... 12

    B. Although the AEA imposes strict liability, the panel impermissibly
       rewrote the statute to include a scienter requirement. .................... 14

II. In requiring Friends of George's to show a near-certain threat of
    enforcement, the panel's decision directly conflicts with controlling
    precedent of this Court and the U.S. Supreme Court. ......................... 16

Conclusion ........................................................................... 19

# TABLE OF AUTHORITIES

**Cases**

*Allen v. State*, No. M2005-006010-CCA-R3-PC,
2006 Tenn. Crim. App. LEXIS 214 (Tenn. Crim. App. Mar. 13, 2006) ........... 14

*Babbit v. United Farm Workers National Union*,
442 U.S. 289 (1979) ................................................................. 17

*Counterman v. Colorado*,
600 U.S. 66 (2023) ...................................................................... 3

*Crawford v. U.S. Department of Treasury*,
868 F.3d 438 (6th Cir. 2017) ................................................. 2, 11, 16

*Davis-Kidd Booksellers, Inc. v. McWherter*,
866 S.W.2d 520 (Tenn. 1993) ............................................... 7, 13, 15

*Entertainment Productions, Inc. v. Shelby County*,
588 F.3d 372 (6th Cir. 2009) ....................................................2, 11

*Green Party of Tenn. v. Hargett*,
791 F.3d 684 (6th Cir. 2015) ..................................................... 17

*State v. Stewart,* No. M2011-01994-CCA-R3-CD,
2013 Tenn. Crim. App. LEXIS 618 (Tenn. Crim. App. July 22, 2013) ............. 13

*United States v. Stevens*,
559 U.S. 460 (2010) ....................................................................2

*Universal Life Church Monastery Storehouse v. Nabors*,
35 F.4th 1021 (6th Cir. 2022) .................................................... 17

*Virginia v. American Booksellers Ass'n*,
484 U.S. 383 (1988) .................................................................. 11

**Statutes**

Tenn. Code § 7-51-1401 *et seq.* ......................................................3

Tenn. Code § 7-51-1401(3)(A) ................................................ 4

Tenn. Code § 7-51-1401(3)(B) ................................................ 4

Tenn. Code § 7-51-1407 ....................................................... 5

Tenn. Code § 7-51-1407(c)(1) ................................................ 4

Tenn. Code § 39-11-301 ...................................................... 15

Tenn. Code § 39-17-901 ........................................................ 4

Tenn. Code § 39-17-901(7) ..................................................... 5

Tenn. Code § 39-17-914 ...................................................... 13

# INTRODUCTION & RULE 35(B) STATEMENT

On July 18, a divided panel of this Court held that Friends of George's (FOG), a nonprofit theater company based in Shelby County, Tennessee, lacked Article III standing to bring a First Amendment challenge to Tennessee's Adult Entertainment Act, also known as the drag ban. As a result of the panel's decision, FOG has lost the protection of an injunction ordered by the district court—which concluded that the Adult Entertainment Act targeted unpopular viewpoints and "reeks with constitutional maladies of vagueness and overbreadth fatal to statutes that regulate First Amendment rights." R.91, PageID 1459–60. Yet the panel's analysis conflicts with well-established rules, from both this Court and the U.S. Supreme Court, governing standing to bring pre-enforcement challenges to unconstitutional laws. And as a result, Friends of George's has no protection—other than censoring its own speech—against felony prosecutions for speech clearly protected by the First Amendment.

This decision warrants rehearing en banc, because the panel decision conflicts with decisions of both the U.S. Supreme Court and this Court, such that "consideration by the full court is therefore necessary to secure and maintain uniformity of the court's decisions." Fed. R. App. P. 35(b)(1)(A). The panel's decision does so in two respects.

First, in concluding that FOG lacked an injury in fact, the panel rewrote the Tennessee Act—adopting two different limiting constructions at odds with the statutory text and foreclosed by decisions of the Tennessee Supreme Court. The Supreme Court and this Court have repeatedly held that federal courts "may impose a limiting construction on a statute only if it is 'readily susceptible' to such a construction." *United States v. Stevens*, 559 U.S. 460, 481 (2010). And a federal court must be especially wary of rewriting a state statute, lest the court "trample on the principles of federalism." *Ent. Prods., Inc. v. Shelby Cnty.*, 588 F.3d 372, 387–88 (6th Cir. 2009) (quotation marks omitted). In rewriting the Tennessee Act, the panel contravened these precedents.

Second, the panel heightened the standard for establishing the likelihood of enforcement. This Court's precedent requires a plaintiff to establish (1) "a substantial probability that the plaintiff actually will engage in conduct that is arguably affected with a constitutional interest," and (2) "a certain threat of prosecution if the plaintiff does indeed engage in that conduct." *Crawford v. U.S. Dep't of Treasury*, 868 F.3d 438 (6th Cir. 2017) (emphasis omitted). Yet in this case, the panel conflated these requirements—demanding near certainty that FOG would engage in the conduct in the first place, as well as the prosecutor's specific

expression of intent to prosecute FOG in particular. This too contravened binding precedent, which does not require the showing that the panel demanded.

As a result of the panel's decision, Friends of George's can protect itself from criminal prosecution only by censoring its First Amendment-protected expression. More generally, the panel's decision risks foreclosing a wide range of pre-enforcement challenges to plainly unconstitutional restrictions on speech—forcing speakers to adopt "a cautious and restrictive exercise of First Amendment freedoms." *Counterman v. Colorado*, 600 U.S. 66, 75 (2023).

## BACKGROUND

### A. Tennessee's Adult Entertainment Act

In March 2023, Tennessee enacted the Adult Entertainment Act (AEA or Act), commonly known as the Tennessee drag ban. The AEA was enacted in response to family-friendly show in Jackson, Tennessee; at that show, performers had danced and lip-synced to music while dressed in drag, but the performance had no sexual content or connotations. R.91, PageID 1404.

The AEA amends Tennessee Code § 7-51-1401 *et seq.* Before the AEA, this statutory section regulated only the location, hours, and operations of adult-oriented businesses, such as strip clubs; it governed only commercial businesses and violations were misdemeanors. The AEA, conversely, criminalizes the

expressive conduct of performers themselves—including individuals and nonprofit organizations. Under the AEA, it is a criminal offense for "a person" to "perform adult cabaret entertainment," either on "public property" or in "a location where the adult cabaret entertainment could be viewed by a person who is not an adult." *Id.* § 7-51-1407(c)(1).

"Adult cabaret entertainment" is a phrase new to the Tennessee Code; the AEA defines it to mean "adult-oriented performances that are harmful to minors, as that term is defined in § 39-17-901, and that feature topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers." *Id.* § 7-51-1401(3)(A). It comprises either "a single performance or multiple performances by an entertainer." *Id.* § 7-51-1401(3)(B).

"Harmful to minors" is a phrase borrowed from existing Tennessee law restricting the display of pornography in stores. *See id.* § 39-17-901. It applies to any "description or representation"—"in whatever form"—"of nudity, sexual excitement, sexual conduct, excess violence or sadomasochistic abuse," if the "matter or performance":

> (A) Would be found by the average person applying contemporary community standards to appeal predominantly to the prurient, shameful or morbid interests of minors;

(B) Is patently offensive to prevailing standards in the adult
community as a whole with respect to what is suitable for minors;
and

(C) Taken as whole lacks serious literary, artistic, political or scientific
values for minors[.]

*Id.* § 39-17-901(7).

The Act does not contain a scienter requirement or any affirmative defenses.

R.91, PageID 1443. Additionally, the legislature placed the Act in Title 7, outside

the reach of Tennessee's default scienter statute, which applies to criminal statutes

found in Title 39. *Id.*

Although a first offense is a Class A misdemeanor, any additional violation is

a Class E felony. Tenn. Code § 7-51-1407. If convicted of the latter, a performer

faces up to six years in prison. *Id.*

## B. Friends of George's

Friends of George's is a nonprofit theater organization whose mission is to

"provide a space outside of bars and clubs where people can enjoy" drag shows

and through such performances to "raise money for LGBTQ non-profits." R.91,

PageID 1399. As part of its mission, FOG provides opportunities for people under

18 to enjoy drag performances outside of stigmatized and age-restricted venues. *Id.*

at 1400. Almost all FOG performances take place in Shelby County, Tennessee's

Evergreen Theater and do not have age restrictions. *Id.*

FOG's members write all of their own material and produce, direct, and perform in their shows. *Id.* Members do not perform actual sexual acts and craft their performances to stay in the "PG-13 area." *Id.* Nonetheless, FOG shows often include sexual themes and innuendo, including descriptions and representations of sexual activity.

The defendant, Shelby County District Attorney General Mulroy, has not disavowed any intent to enforce the Act. On the contrary, he concedes that he "intends to enforce all State of Tennessee laws that fall within his prosecutorial jurisdiction, including the felony and misdemeanor crimes recently codified at Tenn. Code Ann. § 7-51-1407." R.69, PageID 955; R.41-3, PageID 727.

### C. Friends of George's requests and receives injunctive relief in the district court.

With the AEA about to take effect, Friends of George's filed suit in the Western District of Tennessee, arguing that the Act violated the First Amendment. After granting a temporary restraining order, the district court held a consolidated preliminary injunction hearing and trial on the merits. The court heard oral testimony about FOG's performances and reviewed several videos of performances, including at least one full show. R.85, PageID 1332; R.91, PageID 1400, 1421.

In its findings of fact and conclusions of law, the district court first held that FOG had Article III standing to challenge the Act. R.91, PageID 1407. FOG was required to show only that its shows were "arguably" barred by AEA, and the evidence about FOG's shows—including videos of its shows—had met that standard. *Id.* at 1419.

The district court also rejected the State's argument that an earlier Tennessee Supreme Court decision, *Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520 (Tenn. 1993), required the court to deviate from the AEA's text and interpret the law more narrowly. R.91, PageID 1455–56. As the district court explained, *Davis-Kidd* involved a statute, regulating the sale or rental of certain "visual depiction[s]," 866 S.W.2d at 522; this "display statute" was "readily susceptible to narrowing construction which makes it only applicable to those materials which lack serious literary, artistic, political, or scientific value for a reasonable 17-year-old minor." R.91, PageID 1455.

In this case, the State argued that *Davis-Kidd* required the court to impose this same narrowing construction (considering the visual material's value to "a reasonable 17-year-old minor") on the broader set of expression criminalized by the AEA. Yet because the Tennessee Supreme Court has refused to apply this narrowing construction to laws regulating expression other than visual materials,

the district court rejected the State's "atextual construction of clear language," which would "transform the Tennessee Supreme Court's holding to 'Accordingly, we hold that the harmful to minors standard in Tenn. Code. Ann. § 39-17-901 applies only to those materials'" which lack value for a reasonable 17-year-old minor. *Id.* at 1456 (emphasis omitted). "The Tennessee Supreme Court never held that, and neither will this Court." *Id.*

In addition, the district court declined to read a scienter requirement into the Act, given that no scienter requirement was found in the statutory text. *Id.* at 1443. "Nothing in the legislative history indicated that the legislators even contemplated adding" a scienter requirement, observed the court. *Id.*

On the merits, the district court held that the AEA facially violated the First Amendment and was enacted for an impermissible purpose of chilling constitutionally protected speech. *Id.* at 1459–60. The Act was a content- and viewpoint-based restriction on speech, explained the court, and it was neither narrowly tailored nor the least restrictive means to advance the State's interest. *Id.* at 1407, 1452. As a result, the court permanently enjoined District Attorney General Mulroy from enforcing the Act in Shelby County, Tennessee. *Id.*

**D. The panel's decision.**

A divided panel of this Court reversed. For one, the panel narrowed the AEA in two ways. The panel interpreted *Davis-Kidd*, the Tennessee Supreme Court's decision interpreting a "visual depiction" law, to confine the AEA to performances that "lack serious literary, artistic, political or scientific values for reasonable, 17-year-old minors." Op. 5–6. And while the AEA's text includes no scienter requirement, the panel applied *Davis-Kidd* to infer a scienter requirement as well. *Id.* at 11–12.

The panel also held that FOG had not established a credible threat of enforcement because the District Attorney General had not specifically vowed to prosecute FOG and on the ground that the record contained only "individual skits and scenes abstracted from the context of an entire show." *Id.* at 8, 12. With respect to the latter, even the State has conceded that the record contains the video of a full show. R.85, PageID 1332. Although the show's video files were subdivided into individual component scenes, the full show was part of the record and reviewed by the district court. *Id.*

Judge Mathis dissented. The panel's narrowing constructions, he explained, were foreclosed by the Tennessee Supreme Court's decision in *Davis-Kidd*, which had specifically limited its holding to "the display statute, Tenn. Code Ann. § 39-

17-914." Op. 25 (citing 866 S.W.3d at 532–33). Indeed, although a number of other Tennessee laws incorporate the same definition of "harmful to minors," *Davis-Kidd* has never been applied to any law other than the original display statute. *Id.*

Nor did the Tennesseee Supreme Court "impose a scienter requirement" to the display statute at issue in that case. Op. 31. Instead, *Davis-Kidd* "noted that a scienter requirement applied already to the display statute, because of its placement in the Criminal Code." *Id.* (citing 866 S.W.2d at 528). The AEA, however, is not found in the Tennessee Criminal Code, and hence is not subject to the default scienter statute. *Id.*

Finally, in addressing the majority's conclusion that FOG had not presented evidence of a complete show, Judge Mathis pointed out that the defendant himself conceded that there was "one complete show in the record," and that the district court judge viewed all of FOG's videos. *Id.* at 27. Ultimately, FOG had "demonstrated a 'substantial probability' that FOG will engage in conduct that is 'arguably affected' by the AEA, and that it will face a 'certain threat of prosecution' if it continues to engage in that conduct." *Id.*

# ARGUMENT

## I. The panel narrowed the Act in a manner foreclosed by the Act's text and the decisions of the Tennessee Supreme Court.

When evaluating whether Tennessee's AEA has caused Friends of George's to suffer an injury in fact, the panel unilaterally reinterpreted the Act—in a manner unsupported by the statutory text and foreclosed by the decisions of the Tennessee Supreme Court. In so doing, the panel deviated from binding precedent from both this Court and the U.S. Supreme Court.

Indeed, the panel's decision conflicts with three related precedents limiting federal courts' power to rewrite statutes subject to constitutional challenge. First, in a pre-enforcement challenge a plaintiff must demonstrate only that its conduct is "arguably proscribed" by the challenged law. *Crawford*, 868 F.3d at 454. Second, in First Amendment challenges a court may adopt a narrowing construction only if the challenged law is "readily susceptible" to that construction. *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397 (1988). Third, a federal court must avoid rewriting a state statute, to avoid "trampl[ing] on the principles of federalism." *Ent. Prods.*, 588 F.3d at 387–88 (quotation marks omitted). Here, the panel's decision conflicts with each of these binding precedents. And because the panel's interpretation is at odds with Tennessee law as interpreted by the Tennessee

Supreme Court, the panel's interpretation will not actually protect FOG from prosecution in Tennessee state courts.

### A. The panel impermissibly rewrote the AEA to cover only material lacking in value to "a reasonable 17-year-old minor."

At the outset, the panel concluded that FOG lacked standing because it had failed to demonstrate that its conduct would lack serious literary, artistic, political, or scientific value for a reasonable 17-year-old minor. But while the panel purported to find this requirement in a state court's interpretation of state law, the Tennessee Supreme Court's decisions foreclose this interpretation. The panel's interpretation is its own, not the Tennessee Supreme Court's; as a result, the panel's narrowing construction will not apply to FOG if it is criminally prosecuted in a Tennessee state court.

According to the panel, in *Davis-Kidd Booksellers, Inc. v. McWherter* the Tennessee Supreme Court held that the phrase "harmful to minors" always applies "'only to those materials which lack serious literary, artistic, political, or scientific value *for a reasonable 17-year-old minor*.'" Op. 5 (quoting *Davis-Kidd*, 866 S.W.2d at 522–23, 528) (emphasis added by the panel). But *Davis-Kidd* concerned one statute, not all statutes, and the Tennessee Supreme Court has refused to apply that limitation to comparable laws. The panel, then, chose not only to extend the

Tennessee Supreme Court's decision, but to extend it in a manner that the Tennessee Supreme Court has already foreclosed.

Far from adopting a universal rule, *Davis-Kidd* interpreted the Tennessee "display statute," Tenn. Code § 39-17-914, which barred the display of books, videos, magazines, etc. which contained materials "harmful to minors" anywhere minors are lawfully admitted. *Davis-Kidd* explicitly and repeatedly stressed that its holding—and the "reasonable 17-year-old minor" requirement—applied to the display statute and only the display statute. *See, e.g.*, 866 S.W.2d at 522 ("the display statute is readily susceptible to a narrowing construction"); *id.* at 528 (same); *id.* at 532–33 (same).

Lest any doubt remain, *Davis-Kidd* did not apply that narrowing construction to a second criminal statute—which had the same definition of "harmful to minors"—challenged in the same case. *See id.* at 531 (interpreting Tenn. Code § 39-17-911). That latter statute is often enforced in Tennessee state courts, and Tennessee state courts do not assume that it applies only to materials harmful to a reasonable 17-year-old minor. *See, e.g.*, *State v. Stewart,* No. M2011-01994-CCA-R3-CD, 2013 Tenn. Crim. App. LEXIS 618 (Tenn. Crim. App. July 22, 2013) (upholding conviction under Tenn. Code § 39-17-11 where defendant had sent explicit materials to a 9-year-old child); *Allen v. State*, No. M2005-006010-CCA-

R3-PC, 2006 Tenn. Crim. App. LEXIS 214 (Tenn. Crim. App. Mar. 13, 2006) (affirming the trial court's sentencing of a defendant under Tenn. Code § 39-17-911).

Given what *Davis-Kidd* did and did not actually hold, the same will happen with the AEA. Because the Tenneesee Supreme Court has not adopted—and has in fact foreclosed—the panel's preferred, narrower interpretation of the AEA, the panel's narrowing construction will not protect performers who are prosecuted in Tennessee criminal courts.

## B. Although the AEA imposes strict liability, the panel impermissibly rewrote the statute to include a scienter requirement.

The panel likewise rewrote the Act—again, in a manner contradicting the statutory text and not authorized by the Tennessee Supreme Court—in inferring a scienter requirement absent from the statutory text. In arguing that it faced a credible threat of enforcement, FOG observed that the AEA makes enforcement easier and more likely because it creates a strict-liability crime. For example, even if FOG were to exclude minors from its performances, without a scienter requirement FOG could be prosecuted if a 17-year-old happened to gain admission using a fake ID. But in rejecting this argument, the panel stated that "'[i]n the context of criminal statutes regulating obscenity, the State must establish that the

defendant had *knowledge of the contents and character* of the' exhibits at issue." Op. 11 (quoting *Davis-Kidd*, 866 S.W.2d at 528) (emphasis added by panel).

Again, this interpretation comes from the panel, not the Tennessee Supreme Court. *Davis-Kidd* did not infer a scienter requirement into all state criminal obscenity laws; it did not even do so for the display statute at issue in that case. That statute was located in Tennessee's Criminal Code (Title 39), which codifies a default scienter requirement to all offenses "within this title," Tenn. Code § 39-11-301; *Davis-Kidd* merely pointed to the codified scienter requirement that applies to all offenses within Title 39, *see* 866 S.W.2d at 529.

The AEA, however, is not found in Title 39; it is found in Title 7. And Title 7 has no default mens rea statute. *Davis-Kidd*, then, does not apply to the AEA; if anything, it suggests that the Tennessee Supreme Court would reach the opposite outcome when evaluating statutes—like the AEA—found outside Title 39.

\* \* \*

For plaintiffs like FOG, the panel's new interpretation of Tennessee law is effectively denying them the protection of an injunction. But the panel's interpretation will not bind Tennessee courts—and hence will not protect FOG— in actual criminal prosecutions under the AEA.

**II.** **In requiring Friends of George's to show a near-certain threat of enforcement, the panel's decision directly conflicts with controlling precedent of this Court and the U.S. Supreme Court.**

In addition to impermissibly rewriting the Tennessee statute, the panel also applied an unduly demanding standard for establishing the threat of enforcement. Friends of George's is required to show (1) "a substantial probability that the plaintiff actually will engage in conduct that is arguably affected with a constitutional interest," and (2) "a certain threat of prosecution if the plaintiff does indeed engage in that conduct." *Crawford*, 868 F.3d at 455 (emphasis omitted). But here, the panel essentially conflated these requirements—effectively requiring FOG to show that it certainly will engage in conduct that is certainly affected with a constitutional interest.

Because the panel conflated these standards, it all but disregarded District Attorney General Mulroy's concession that he "intends to enforce all State of Tennessee laws that fall within his prosecutorial jurisdiction, including the felony and misdemeanor crimes recently codified at Tenn. Code Ann. § 7-51-1407." R.69, PageID 955; R.41-3, PageID 727. According to the panel, his "intention to enforce Tennessee law in the abstract . . . did not suggest that he would enforce the rule against anything like [FOG's] *specific* speech." Op. 12 (alteration and emphasis in original, quotation marks omitted).

But a plaintiff is not required to present an itemized list of each entity against whom a prosecutor specifically intends to enforce a law. *See Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1035 (6th Cir. 2022) (plaintiffs faced credible threat of enforcement, because "defendants have never provided clear assurances that they will *not* prosecute" the plaintiff) (emphasis in original); *Green Party of Tenn. v. Hargett*, 791 F.3d 684, 696 (6th Cir. 2015) (although "defendants have not enforced or threatened to enforce this statute against plaintiffs or any other political party, they also have not explicitly disavowed enforcing it in the future"); *see also Babbit v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979) ("[T]he State has not disavowed any intention of invoking the criminal penalty provision against unions that commit unfair labor practices."). As to whether FOG is likely to engage in conduct that would expose it to prosecution in violation of the First Amendment, FOG need show only "a substantial probability" that it "actually will engage in conduct that is arguably affected with a constitutional interest." The panel, however, required certainty across the board.

The panel raised the "substantial probability" standard even further, arbitrarily disregarding FOG's videos depicting the contents of its shows. In particular, the panel stated that "FOG only presented individual skits and scenes abstracted from the context of an entire show," and hence that FOG had failed to

establish "any intention to exhibit adult cabaret entertainment . . . to an audience containing minors." Op. 8–9. But FOG submitted a recording of at least one full show, *Dragnificient*, and the district court watched this recording—as even the State conceded. R.85, PageID 1332.

In overturning the district court's consideration of this evidence, the panel apparently focused on the fact that *Dragnificient* was submitted as a series of ten component video clips—that is, the complete set of clips constituting the entire show. *See* R.69, PageID 958–67. Needless to say, the substance of the show—and the extent that it would expose FOG to criminal prosecution—is no different merely because it was submitted as ten smaller clips rather than one omnibus. Some readers buy *The Lord of the Rings* as a single, thick volume; others buy separate, slimmer copies of *The Fellowship of the Ring*, *The Two Towers*, and *The Return of the King*; both sets of readers have consumed exactly the same words and chapters. Likewise, the district court gained the same understanding of FOG's full show whether he viewed it as one large video file or ten smaller video files. That full performance established the "substantial probability" that Friends of George's would engage in conduct barred by the Act, whose enforcement the District Attorney General refused to disavow. The panel erred in further heightening FOG's burden.

18

## CONCLUSION

The rehearing petition should be granted.

Respectfully submitted,

Gregory M. Lipper
Lipper Law PLLC
1325 G Street NW, Suite 500
Washington, DC 20005
(202) 996-0919
glipper@lipperlaw.com

/s/ Melissa J. Stewart
Melissa J. Stewart
Donati Law, PLLC
1545 Union Avenue
Memphis, TN 38104
(901) 278-1004
melissa@donatilaw.com

*Counsel for Appellee*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B), because it contains 3,800 words.

This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Microsoft Word version 16.87 in 14-point Equity Text B and Equity Caps B, which are proportionally spaced typefaces.

/s/ Melissa J. Stewart
Melissa J. Stewart

## CERTIFICATE OF SERVICE

On August 2, 2024, I served this corrected rehearing petition on all counsel

of record by electronically filing it using the Court's CM/ECF system. All

participants in the case are registered CM/ECF users.

/s/ Melissa J. Stewart
Melissa J. Stewart

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

────────────────

FRIENDS OF GEORGE'S, INC.,

　　　　　　　　　　*Plaintiff - Appellee*,

　　*v.*

STEVEN J. MULROY, in his official and individual
capacities as the District Attorney General of Shelby
County, Tennessee,
*Defendant-Appellant*,

BLOUNT PRIDE, INC.; MATTHEW LOVEGOOD,

　　　　　　　　　　　　*Intervenors*.

No. 23-5611

Appeal from the United States District Court for the Western District of Tennessee at Memphis.
No. 2:23-cv-02163—Thomas L. Parker, District Judge.

Argued: February 1, 2024

Decided and Filed: July 18, 2024

Before: SILER, NALBANDIAN, and MATHIS, Circuit Judges.

────────────────

## COUNSEL

**ARGUED:** J. Matthew Rice, OFFICE OF THE TENNESSEE ATTORNEY GENERAL,
Nashville, Tennessee, for Appellant. Melissa J. Stewart, Brice M. Timmons, DONATI LAW,
PLLC, Memphis, Tennessee, for Appellee. **ON BRIEF:** J. Matthew Rice, James R. Newsom
III, Robert W. Wilson, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville,
Tennessee, for Appellant. Melissa J. Stewart, Brice M. Timmons, Craig A. Edington, DONATI
LAW, PLLC, Memphis, Tennessee, for Appellee. Daniel A. Horwitz, HORWITZ LAW, PLLC,
Nashville, Tennessee, for Intervenors. Thomas T. Hydrick, OFFICE OF THE ATTORNEY
GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, Gene P. Hamilton, AMERICA
FIRST LEGAL FOUNDATION, Jonathan F. Mitchell, MITCHELL LAW PLLC, Austin, Texas,
Christina A. Jump, CONSTITUTIONAL LAW CENTER FOR MUSLIMS IN AMERICA,

Richardson, Texas, Bruce E.H. Johnson, DAVIS WRIGHT TREMAINE LLP, Seattle, Washington, for Amici Curiae.

NALBANDIAN, J., delivered the opinion of the court in which SILER, J., joined. MATHIS, J. (pp. 14–39), delivered a separate dissenting opinion.

_____

**OPINION**

_____

NALBANDIAN, Circuit Judge.  Tennessee's Adult Entertainment Act (AEA) makes it an offense to perform adult cabaret entertainment in public or in the potential presence of minors. Friends of George's (FOG), a theater organization that performs drag shows, challenged the AEA as facially unconstitutional.  The district court agreed, declaring the AEA unconstitutional in its entirety and permanently enjoining District Attorney General Steven Mulroy from enforcing it anywhere within his jurisdiction (Shelby County, Tennessee).  Mulroy now appeals, challenging both FOG's Article III standing and the merits of the injunction.  FOG did not meet its burden to show standing, so we REVERSE and REMAND with instructions to DISMISS.

**I.**

In 2023, the Tennessee General Assembly passed the Adult Entertainment Act (AEA), which makes it an offense "to perform adult cabaret entertainment:  (A) On public property; or (B) In a location where the adult cabaret entertainment could be viewed by a person who is not an adult."  Tenn. Code Ann. § 7-51-1407(c)(1) (2023).  Although the term "adult cabaret entertainment" is new to Tennessee law, the legislature defined that statutory phrase by reference to existing Tennessee law.

"Adult cabaret entertainment" is defined as "adult-oriented performances that are harmful to minors, as that term is defined in § 39-17-901, and that feature topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers."  Tenn. Code Ann. § 7-51-1401(3)(A) (2023).  By its explicit reference to § 39-17-901, the text incorporates the following definition of "harmful to minors":

that quality of any description or representation, in whatever form, of nudity, sexual excitement, sexual conduct, excess violence or sadomasochistic abuse when the matter or performance:

(A) Would be found by the average person applying contemporary community standards to appeal predominantly to the prurient, shameful or morbid interests of minors;

(B) Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for minors; and

(C) Taken as whole lacks serious literary, artistic, political or scientific values for minors.

Tenn. Code Ann. § 39-17-901(6) (2023). So the new law prevents children from viewing adult performances.

This definition has existed in the Tennessee Code for decades, *see, e.g.*, 1990 Tenn. Pub. Acts 938 (including an identical definition), and the Supreme Court of Tennessee has interpreted it to refer "only to those materials which lack serious literary, artistic, political, or scientific value *for a reasonable 17-year-old minor*." *Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520, 522–23, 528 (Tenn. 1993) (emphasis added) (interpreting identical language from Tenn. Code Ann. § 39-17-901(6) (1991)). Additionally, the second component to "adult cabaret entertainment" copies verbatim from a longstanding definition of "[a]dult cabaret." *See* 1987 Tenn. Pub. Acts 842 ("'Adult cabaret' means a cabaret which features *topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers*." (emphasis added)).

Friends of George's (FOG) is an organization that aims to "provide a space outside of bars and clubs where people can enjoy drag shows." *Friends of Georges, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 843 (W.D. Tenn. 2023) (internal quotation marks omitted). It tries "to stick around the PG-13 area in writing," rather than get "too risqué." R. 81, Trial Tr., p. 30, PageID 1071. And FOG describes its drag shows as an "art form," *id.* at 23, PageID 1064, an art form it likened to "William Shakespeare's plays" and "Ancient Greek theatrical productions," R. 35, FOG Trial Br., p. 3, PageID 489. Even though FOG has never performed "a script play" or any of its "pre-scripted productions" on public property, R. 81, p. 69, PageID 1110, it sells tickets to its shows without distinguishing between adults or minors. FOG says that although its shows do

not contain sexual acts, they contain descriptions and representations of sexual conduct that law enforcement might think violates the AEA.

So on March 27, 2023, FOG sought an injunction to prohibit enforcement of the AEA, arguing that the statute violates its First Amendment rights.[1]  The district court granted FOG a temporary restraining order on March 31, the day before the AEA was scheduled to take effect. Declining to apply *Davis-Kidd*'s narrowing construction because it would "rewrite the AEA," the district court held that (1) FOG had standing and (2) the AEA violates the First Amendment and is unconstitutionally vague, permanently enjoining Mulroy from enforcing the statute anywhere within his jurisdiction (Shelby County, Tennessee).  *Friends of Georges*, 675 F. Supp. 3d at 878–79.

Mulroy now appeals, arguing that (1) FOG lacks Article III standing, (2) the AEA is constitutional, and (3) even if the AEA were unconstitutional, the district court's injunction was overbroad.

## II.

We review standing and legal conclusions de novo.  *Sullivan v. Benningfield*, 920 F.3d 401, 407 (6th Cir. 2019); *Atkins v. Parker*, 972 F.3d 734, 739 (6th Cir. 2020).  To establish Article III standing, a "plaintiff must show (1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, (3) that is likely to be redressed by the requested relief." *FEC v. Cruz*, 596 U.S. 289, 296 (2022) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

Typically "an injury" in this context requires that the government enforce the allegedly unconstitutional law against the challenging party before it has standing to sue.  But we have recognized that in some circumstances, standing "can derive from an imminent, rather than an actual, injury, but only when 'the threatened injury is real, immediate, and direct.'"  *Crawford v. U.S. Dep't of the Treasury*, 868 F.3d 438, 454 (6th Cir. 2017) (quoting *Davis v. FEC*, 554 U.S.

---

[1]Although the AEA targets performers rather than businesses or organizations, § 7-51-1407(c)(1), FOG, as an organization, contends that it can assert standing "as the representative of its members," *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 333 (6th Cir. 2002).  This is not a contested issue on appeal.

724, 734 (2008)). Thus, we have permitted *pre*-enforcement review, but only when the plaintiff (1) "alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest,'" (2) that the challenged statute proscribes, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbit v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)), and (3) the plaintiff's intention generates a "*certainly impending*" threat of prosecution, *Crawford*, 868 F.3d at 454 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).

### A.

To determine whether FOG intends to engage in a course of conduct that the AEA arguably proscribes, *Susan B. Anthony List*, 573 U.S. at 159, we must first figure out what the AEA proscribes, *id.* at 162 (discussing the broad sweep of the Ohio law at issue). Once we account for the history of the relevant provisions as well as the relevant caselaw, that task is relatively straightforward.

The AEA makes it an offense to perform "adult cabaret entertainment" on public property or anywhere it could be viewed by a minor. § 7-51-1407(c)(1). This targets "adult-oriented performances that are harmful to minors . . . that feature topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers." § 7-51-1401(3)(A). And "harmful to minors" expressly incorporates a longstanding definition under Tennessee law, which focuses on whether a performance has "serious literary, artistic, political or scientific values *for minors*." § 39-17-901(6) (emphasis added).

As we noted above, the Supreme Court of Tennessee has interpreted "harmful to minors" before, limiting it "only to those materials which lack serious literary, artistic, political, or scientific value *for a reasonable 17-year-old minor*." *Davis-Kidd*, 866 S.W.2d at 522–23, 528 (emphasis added) (interpreting identical language from Tenn. Code Ann. § 39-17-901(6) (1991)).

The district court, however, declined to apply *Davis-Kidd*'s interpretation of "harmful to minors" to the AEA, calling it "an atextual construction" and reading the standard to require value "for children as young as four or five." *Friends of Georges*, 675 F. Supp. 3d at 875–76. This was error. It is not atextual to apply a state court's interpretation of state law. It's required. *Rhodes v. Brigano*, 91 F.3d 803, 806 (6th Cir. 1996) ("[T]his Court is bound by the state court's

interpretation of its criminal laws."); *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975) (noting that the Supreme Court "repeatedly has held that state courts are the ultimate expositors of state law and that [federal courts] are bound by their constructions except in extreme circumstances" (citing *Murdock v. City of Memphis*, 87 U.S. (20 Wall.) 590 (1875); *Winters v. New York*, 333 U.S. 507 (1948))).

Moreover, the AEA's "harmful to minors" standard, as construed by the Tennessee Supreme Court (1) incorporates the Supreme Court's three-part obscenity test from *Miller v. California* and (2) modifies it to apply to minors. *Compare* 413 U.S. 15, 24 (1973), *with* § 39-17-901(6). And the Supreme Court has rejected neither feature. First, it has already interpreted vagueness challenges against *Miller*'s obscenity test as "nothing less than an invitation to overturn *Miller*," an invitation it rejected. *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 57 (1989). Second, it has also blessed state adaptations of the obscenity test to apply to minors. In *Ginsberg v. New York*, the Supreme Court upheld a "harmful to minors" standard that modified the then-existing obscenity test to apply to "any person under the age of seventeen years." 390 U.S. 629, 635, 645 (1968).

Yet the AEA is even more limited than the New York law upheld in *Ginsberg*. There, the standard was "*any person under* the age of seventeen years." *Id.* at 645 (emphasis added). But here, binding state precedent has made clear that the standard specifically considered value for "a *reasonable 17-year-old* minor." *Davis-Kidd*, 866 S.W.2d at 528 (emphasis added). And the AEA's "harmful to minors" standard is also consistent with our sister circuits. *See, e.g.*, *M.S. News Co. v. Casado*, 721 F.2d 1281, 1286–87 (10th Cir. 1983); *Am. Booksellers Ass'n v. Virginia*, 882 F.2d 125, 127–28 & n.2 (4th Cir. 1989); *Am. Booksellers v. Webb*, 919 F.2d 1493, 1496 (11th Cir. 1990).

In short, the AEA takes (1) adult-oriented performances lacking serious literary, artistic, political, or scientific value for a reasonable 17-year-old[2] that (2) feature topless dancers, go-go

---

[2]Tennessee law describes the "harmful to minors" standard in more detail, largely tracking the Supreme Court's *Miller* test and adapting it to minors, *see Ginsberg*, 390 U.S. at 635, but these other provisions are not at issue here.

dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers and (3) prohibits them both in public and where minors may view them.

So the burden is on FOG to allege its intention to arguably meet all three elements. Failure on any one shows that FOG's intended performances are not proscribed by the statute.

FOG doesn't perform in public, but it does sell tickets without distinguishing between adults or minors. So minors can view FOG's shows. And as a "dragcentric theatre group," its performances certainly include male or female impersonators or similar entertainers. R. 81, p. 23, PageID 1064. So the crux of this case is whether FOG has met its burden to demonstrate that its shows are arguably adult-oriented performances that lack serious value for a reasonable 17-year-old.

To answer this, we need only look at how FOG describes its performances: an "art form," *id.*, one it likened to Shakespeare and Ancient Greek theater. FOG has not alleged that its performances lack serious value for a 17-year-old. In fact, it insists the exact opposite. Its own witness, a member of FOG's board, conceded that its shows "are definitely appropriate" for a 15-year-old and would "absolutely" have artistic value for a 17-year-old. *Id.* at 73, PageID 1114. According to the witness, FOG tries "to stick around the PG-13 area in writing," rather than get "too risqué." *Id.* at 30, PageID 1071. By its own testimony, FOG has failed to show any intention to even arguably violate the AEA.

What's more, if we accept the district court's interpretation of "harmful to minors," FOG has been breaking obscenity law for years. Before the AEA, it was already a crime to admit minors to view sexually explicit shows that are "harmful to minors" under the same statutory standard. Tenn. Code Ann. § 39-17-911(b) (2023) (unamended since 2000).[3] Yet despite selling tickets without distinguishing between adults or minors, neither FOG nor its performers have ever been charged with violating Tennessee obscenity laws or even threatened with prosecution.

---

[3]The AEA's "harmful to minors" definition applies from section 39-17-901 of the Tennessee Code through section 39-17-920, "unless the context requires otherwise." § 39-17-901. This admission law, § 39-17-911(b), is located within that range, and context does not require a different meaning.

FOG nonetheless claims that its productions might be *seen as* violating the AEA by law enforcement and thus could be proscribed. And at the pre-enforcement stage, FOG need not prove conclusively that its intended course of conduct violates the AEA but only that it is *arguably* proscribed by the statute. *See Davis v. Colerain Township*, 51 F.4th 164, 172 (6th Cir. 2022); *Susan B. Anthony List*, 573 U.S. at 162. On the other hand, a party alleging that its conduct could be proscribed by the challenged statute cannot rely on an argument that the statute might be misconstrued by law enforcement. *See Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 544 (6th Cir. 2021). And that's essentially what FOG is asking for here—keeping in mind that the district court's rejection of *Davis-Kidd* was error.

And finally to support its claim, FOG presented videos showing sketches from past performances at trial that it believes could be construed as containing adult content. The videos specifically show FOG performers talking about masturbation, simulating sex acts behind a curtain, and engaging in phallic humor. FOG claims these clips prove that its shows may violate the AEA. The district court credited the argument, saying that a "law enforcement officer could view [FOG]'s productions and reasonably think that they violate the AEA." *Friends of Georges*, 675 F. Supp. 3d at 844.

But FOG only presented individual skits and scenes abstracted from the context of an entire show. As FOG admitted at oral argument, it puts on sketch shows, performing roughly ten skits in each. And "[t]he artistic merit of a work does not depend on the presence of a single explicit scene," because "the First Amendment requires that redeeming value be judged *by considering the work as a whole*." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 248 (2002) (emphasis added) (citing *Memoirs v. Massachusetts*, 383 U.S. 413, 419 (1966) (plurality opinion)); *Miller*, 413 U.S. at 24 ("A state offense must also be limited to works which, *taken as a whole*, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, *taken as a whole*, do not have serious literary, artistic, political, or scientific value." (emphasis added)).

Therefore, to the extent the district court used FOG's videos as independent evidence showing a lack of artistic value for minors, that was also error. And FOG bears the burden to submit enough evidence for us to judge the value of its shows as a whole. Cherry-picked scenes

and skits do not remedy FOG's failure to allege any intention to exhibit adult cabaret entertainment—performances lacking value for even reasonable 17-year-olds—to an audience containing minors.

So for a number of reasons, FOG cannot show a pre-enforcement injury without alleging an intention to arguably violate the AEA. *Susan B. Anthony List*, 573 U.S. at 162. It has not, so FOG lacks standing.

**B.**

But even if FOG alleged an intention to engage in a course of conduct arguably proscribed by the AEA, it would also need to show that this alleged intention to breach the AEA is "arguably affected with a constitutional interest." *Id.* at 159. For example, a plaintiff challenging a law banning protest must show a constitutional interest in protesting. Or a newspaper challenging a censorship law must show a constitutional interest in freely publishing.[4]

But the law in this area is clear—there is no constitutional interest in exhibiting indecent material to minors. The Supreme Court's "First Amendment jurisprudence has acknowledged limitations on the otherwise absolute interest of the speaker in reaching an unlimited audience where the speech is sexually explicit and the audience may include children." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 684 (1986) (citing *Ginsberg*, 390 U.S. 629). "The protections of the First Amendment have always adapted to the audience intended for the speech. Specifically, we have recognized certain speech, while fully protected when directed to adults, may be restricted when directed towards minors." *James v. Meow Media, Inc.*, 300 F.3d 683, 696 (6th Cir. 2002); *see also Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989) (States may "shield[] minors from the influence of [sexual expression] that is not obscene by adult standards."). So the government "may punish adults who provide unsuitable materials to

---

[4]This part of the standing analysis inevitably bleeds into the merits a bit because we must trace the contours of FOG's constitutional interest. *See Moncier v. Haslam*, 570 F. App'x 553, 559 (6th Cir. 2014) (finding no standing when Plaintiff had "no recognized right under the United States Constitution" to engage in his intended course of conduct); *see also Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 666–67 (8th Cir. 2023) (deciding at the standing stage that the "student's proposed activity 'concerns political speech' and is 'arguably affected with a constitutional interest'" because the "child wishes to engage in an 'open exchange of ideas' and to express beliefs that others might find disagreeable or offensive" (quoting *Susan B. Anthony List*, 573 U.S. at 161–62)).

children," so long as non-obscene speech is not "silenced completely in an attempt to shield children from it." *Ashcroft*, 535 U.S. at 251–52.

And, as discussed above, when state law adapts the *Miller* test to minors, the Supreme Court has had no quibble. In fact, the Supreme Court has embraced variations of the *Miller* test that are less specific than the AEA's formulation. *Compare Ginsberg*, 390 U.S. at 645 (upholding a statute that modified the *Miller* test to apply to "*any person under* the age of seventeen years" (emphasis added)), *with Davis-Kidd*, 866 S.W.2d at 528 (interpreting the "harmful to minors" standard incorporated into the AEA to specifically consider value for "a *reasonable 17-year-old* minor" (emphasis added)).

The only constitutionally protected expressions implicated by the AEA are adult-oriented performances that can be constitutionally restricted from minors but not from adults—a narrow slice of speech. *See Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 452 (2015). And the statute doesn't even ban these performances, merely restricting them to adult-only zones. § 7-51-1407(c)(1).

In sum, if FOG's shows, taken as a whole, are an "art form" with artistic value for a reasonable 17-year-old, then the AEA is no restriction. But if FOG deals in adult content *lacking* value for reasonable 17-year-olds, then FOG has no constitutional interest in violating the AEA by exhibiting those performances to minors. *Susan B. Anthony List*, 573 U.S. at 159. Any intention FOG might have to violate the AEA is not arguably affected with a constitutional interest. So FOG lacks pre-enforcement standing because it has shown no injury.

## C.

Finally, even if we assume for the sake of argument that FOG successfully alleged an intention to engage in a course of conduct arguably affected with a constitutional interest that is also arguably proscribed by the AEA, *id.*, "mere allegations of a 'subjective chill' on protected speech are insufficient to establish an injury-in-fact for pre-enforcement standing purposes," *McKay v. Federspiel*, 823 F.3d 862, 868–69 (6th Cir. 2016). FOG must also show a "*certainly impending*" threat of prosecution. *Crawford*, 868 F.3d at 454 (quoting *Clapper*, 568 U.S. at 409).

We judge threats of prosecution using a holistic test consisting in four main "*McKay* factors":

> (1) "a history of past enforcement against the plaintiffs or others"; (2) "enforcement warning letters sent to the plaintiffs regarding their specific conduct"; (3) "an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action"; and (4) the "defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff."

*Online Merchs. Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021) (quoting *McKay*, 823 F.3d at 869).  Each factor cuts against FOG's claim of standing.

FOG only contends that the third and fourth factors weigh in its favor.  This is probably because there is no history of past enforcement of the AEA, and FOG has received no warning letters.

As for the third factor, FOG claims that, through the AEA, Tennessee's "legislature has 'emboldened prosecutors in a way that they were not before.'"  Appellee Br. at 16 (quoting *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1035 (6th Cir. 2022)).  But there, the legislature "may have emboldened prosecutors" by both "making the proscription so much clearer," and by altering the "enforcement mechanism" when it was "not clear" beforehand that "prosecutors had even realized they could collaterally enforce" the prohibition at issue.  *Universal Life Church*, 35 F.4th at 1035.  Here, the AEA does not clarify the "harmful to minors" standard—it is unchanged.  And the authority of prosecutors to enforce the law was always clear.  The AEA does not "allow[] any member of the public to initiate an enforcement action."  *Online Merchs.*, 995 F.3d at 550.  Instead, "a district attorney general has the sole duty, authority, and discretion to prosecute criminal matters in the State of Tennessee."  *State v. Spradlin*, 12 S.W.3d 432, 433–34 (Tenn. 2000).

FOG also argues that the AEA is easier to enforce because it is "a strict liability statute with felony penalties."  Appellee Br. at 14.  But the Supreme Court of Tennessee already made clear that "[i]n the context of criminal statues regulating obscenity, the State must establish that the defendant had *knowledge of the contents and character* of the" exhibits at issue.  *Davis-Kidd*, 866 S.W.2d at 528 (emphasis added).  So the AEA "implicitly incorporates the traditional state

of mind required for" all Tennessee obscenity offenses.  *United States v. Hansen*, 599 U.S. 762, 779 (2023).  For all intents and purposes, the AEA is a standard criminal law with no attributes making enforcement easier or more likely.

Finally, FOG argues that "Mulroy has refused to disavow enforcement" because "he has unequivocally stated that he 'intends to enforce all State of Tennessee laws that fall within his prosecutorial jurisdiction, including the [AEA].'"  Appellee Br. at 18 (quoting R. 69, Pretrial Order, p. 4, PageID 955).  But the disavowal factor focuses on "a particular plaintiff."  *Online Merchs.*, 995 F.3d at 550.  And Mulroy's stated intention to enforce Tennessee law "in the *abstract . . .* did not suggest that he would enforce the rule against anything like [FOG's] *specific* speech."  *Davis*, 51 F.4th at 174.

Under the *McKay* factors, FOG has not shown a certainly impending threat of prosecution.

A quick review of Supreme Court cases yields the same result.  In *Steffel v. Thompson*, the Supreme Court found a threat of prosecution where police officers warned the petitioner twice that if he continued distributing handbills "he will likely be prosecuted," and his companion was, in fact, "arrested and subsequently arraigned on a charge of criminal trespass."  415 U.S. 452, 456, 459 (1974).  Similarly, in *Susan B. Anthony List*, the organization "was the subject of a [recent] complaint."  573 U.S. at 164.  And in *Holder v. Humanitarian L. Project*, the government had already "charged about 150 persons" with violating the law and declined to disavow prosecution, should the plaintiffs "do what they say they wish to do."  561 U.S. 1, 16 (2010).  FOG, by contrast, points to nothing of the like.

The district court, however, ignored *McKay* completely and, in spite of Supreme Court precedent, found "a certainly-impending threat" because it claimed that "a reasonable officer" could "arrest [FOG]'s performers" under the erroneous assumption that the AEA's "harmful to minors" standard considers "a five- or eight-year-old."  *Friends of Georges*, 675 F. Supp. 3d at 857.  But even if we assume for the sake of argument that this supposed threat of false *arrest* could then amount to a threat of false *prosecution*, "fear [of] wrongful prosecution and conviction under the [AEA]" is "inadequate to generate a case or controversy the federal courts

can hear." *Glenn v. Holder*, 690 F.3d 417, 422 (6th Cir. 2012). FOG faces no certainly impeding threat of prosecution.

FOG has shown no pre-enforcement injury and thus lacks standing.

### III.

For the reasons set forth above, we REVERSE and REMAND with instructions to DISMISS for lack of standing.[5]

---

[5]Intervenors Blount Pride and Matthew Lovegood cannot continue this suit without FOG because they only seek relief in Blount County, Tennessee, beyond Mulroy's jurisdiction, so they also lack Article III standing. *See Diamond v. Charles*, 476 U.S. 54, 68 (1986).

———————————

**DISSENT**

———————————

MATHIS, Circuit Judge, dissenting.  A bedrock principle of our democratic republic is the protection of unorthodox expression.  The freedom to convey one's ideas—no matter how unpopular—was seen as inalienable to the human experience, and the Framers of our Federal Constitution believed such freedom was "essential if vigorous enlightenment was ever to triumph over slothful ignorance." *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943).  It is altogether fitting that they chose to enshrine it atop our Bill of Rights as a "fixed star in our constitutional constellation": "Congress shall make no law . . . abridging the freedom of speech." *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 584 (2023) (quotation omitted); U.S. Const. amend. I.

Of course, these protections are not absolute.  The Supreme Court has "long recognized that the government may regulate certain categories of expression consistent with" the First Amendment. *Virginia v. Black*, 538 U.S. 343, 358 (2003).  But the Constitution does not avert its eyes merely because a law mentions such a category.

Today, we consider a challenge to Tennessee's Adult Entertainment Act ("AEA").  This law prohibits actual or simulated sexual performances by certain types of individuals (like male or female impersonators) that are harmful to minors and that are performed anywhere that a minor can view them.  Friends of George's, Inc. ("FOG"), a producer of risqué drag shows in Shelby County, Tennessee, challenged the AEA because it engages in conduct that the AEA criminalizes.  FOG sued Shelby County District Attorney Steven Mulroy, contending that the AEA is an unconstitutional content- and viewpoint-based restriction on speech.  FOG also argued that the AEA is unconstitutionally overbroad and vague.  The district court agreed with FOG and enjoined the Act's enforcement.

The majority finds that FOG lacks standing to sue Mulroy.  Because Supreme Court and Sixth Circuit precedent dictate a different result, and because the part of the AEA that FOG has standing to challenge is an unconstitutional content-based restriction on speech, I respectfully dissent.

## I.

In 2023, the Tennessee General Assembly enacted the AEA. The AEA amended Tenn. Code Ann. § 7-51-1407—a zoning ordinance governing "adult-oriented establishments"[1]—to impose criminal sanctions on those who perform "adult cabaret entertainment" in certain locations. *See* Tenn. Code Ann. § 7-51-1407. Specifically, the AEA provides:

> (c)(1) It is an offense for a person to perform adult cabaret entertainment:
>
> > (A) On public property; or
> >
> > (B) In a location where the adult cabaret entertainment could be viewed by a person who is not an adult.
>
> . . .
>
> (3) A first offense for a violation of subdivision (c)(1) is a Class A misdemeanor, and a second or subsequent such offense is a Class E felony.

*Id.* The AEA defines "adult cabaret entertainment" as:

> > (A) [A]dult-oriented performances that are harmful to minors, as that term is defined in § 39-17-901, and that feature topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers; and
> >
> > (B) Includes a single performance or multiple performances by an entertainer[.]

*Id.* § 7-51-1401(3).

Tennessee Senator Jack Johnson introduced the AEA as a bill seeking to "clarify current law."[2] R. 35-1, PageID 515. "[U]nder current law," Senator Johnson explained, "businesses that predominantly provide adult-oriented entertainment must be licensed and age restricted to prevent children from attending." *Id.* at 516; *see also* Tenn. Code Ann. § 7-51-1113(e). The AEA "simply clarifies that if this type of adult-oriented entertainment occurs in locations that are

---

[1] "Adult-oriented establishment" means "any commercial establishment, business or service, or portion thereof, that offers, as its principal or predominant stock or trade, sexually-oriented material, devices, or paraphernalia or specified sexual activities, or any combination or form thereof, whether printed, filmed, recorded or live and that restricts or purports to restrict admission or to any class of adults." Tenn. Code Ann. § 7-51-1401(5).

[2] The AEA's legislative history is relevant only to the secondary-effects-doctrine discussion in Part IV.B.1 below.

not required to be regulated . . . because the adult entertainment is not predominant to that business" (*e.g.*, restaurants), "then that business must ensure that the location is age restricted and children are not allowed to view the performance."  R. 35-1, PageID 575–76.  He stressed that "the bill only applies to performances that are considered harmful to minors," as already defined in Tennessee's "obscenity statute," *see* Tenn. Code Ann. § 39-17-901(6), and that such performances would not be banned entirely: "[The bill] simply says it can't be done on public property, and if it's going to be done in a private venue, then you have to ensure that children are not present."  R. 35-1, PageID 516–17.  He also stated that the AEA's scope of criminality was narrowly tailored to "the entertainer who acts in violation of this law," rather than "the business where the performance took place."  *Id.* at 545.

Multiple members of the Tennessee General Assembly voiced support, with some noting the importance of the bill considering recent "sexual" drag shows witnessed by children.  For example, Representative Jason Zachary told of a show in Knox County that was marketed as "family-friendly," but had previously "show[n] stripping, simulating of sexual acts, and inappropriate touching" at a prior performance.  *Id.* at 602.  Senator Johnson stated that he had "received hundreds of calls, e-mails from outraged parents that this type of performance was taking place in front of kids."  *Id.* at 520.  And Senator Kerry Roberts said that he did not "think it [was] appropriate for grown men to perform in front of children simulated sex acts."  *Id.* at 567.

Landon Starbuck, the founder of Freedom Forever which "combats all forms of child exploitation," testified at a committee hearing as a supporting witness.  *Id.* at 525.  She declared a "pandemic of child sexual abuse in America," and claimed that "early sexualization and exposure to explicit adult content" was harmful to youths because "[i]t grooms them into accepting adult sexual behavior as normal, healthy, and even celebrated," while encouraging them to "simulate and participate in high-risk sexual behaviors."  *Id.*  When asked to provide an example, Ms. Starbuck mentioned an incident at Boro Pride involving "an adult performer" who spread "their legs in front of children."  *Id.* at 530.

However, the AEA was not met with universal acceptance.  Several individuals opposed the bill's passage, including David Taylor, a Nashville business-owner whose operations "cater

predominantly to the LGBTQ+ community" and whose employees include "13 full-time and more than 60 guest drag performers." *Id.* at 533. Mr. Taylor expressed concern that the "bill places male and female impersonation in the category of strippers, go-go dancers, and exotic dancers." *Id.* at 534. Performances by strippers and other dancers are regulated because of the behavior exhibited, he reasoned; drag impersonation was distinct because it "is solely based on the choice of clothing by a human being." *Id.*

## II.

Founded in 2010, FOG is a nonprofit theater company based in Memphis, Tennessee. FOG's mission is to stage three drag-centric productions a year to raise money for fellow LGBTQ organizations. These shows feature sketches that are written, produced, and performed by FOG members. When writing a show, FOG endeavors to "stick around the PG-13 area." R. 81, PageID 1071. Because its shows are performed mostly in Memphis's Evergreen Theater—which follows a general admissions policy—parents are known to bring their children.

On March 27, 2023, and shortly before the AEA was to take effect, FOG sued Mulroy under 42 U.S.C. § 1983 to enjoin its enforcement. Four days later, the district court issued a temporary restraining order enjoining the AEA's enforcement. The district court later extended the TRO and consolidated the preliminary injunction hearing with a trial on the merits.

At trial, FOG offered the testimony of several witnesses, including Vanessa Rodley—a member of FOG's board. Ms. Rodley described "content that is common in [FOG] shows" including one sketch titled "Bitch, You Stole My Purse," which featured a song referencing "blow jobs and possibly having sex," and other sketches that satirized popular figures. R. 81, PageID 1074–83. She also testified about the artistic value of FOG's sketches, surmising that she did not know if she would bring her five-year-old to a show, "but [she] would definitely [bring] a 15, 16-year old, 17-year old." *Id.* at 1114.

FOG also introduced several video clips into evidence. The district court made the following findings of fact regarding these clips:

> The first video is from a production entitled "The Tea with Sister Myotis" that
> Ms. Rodley claimed to be a satire of the show "The View." The video showed

four individuals, whom Ms. Rodley characterized as "female impersonators." The sixteen-minute video centered on one character's discussion of various issues, punctuated by several jokes and innuendos about sexual intercourse and masturbation. . . . Ms. Rodley testified that Plaintiff held this production in the Evergreen Theater with no age restrictions.

The second video is from a production entitled "Paradise by the Dashboard Light," in which six individuals—half of whom were characterized by Ms. Rodley as "female impersonators"—pretended to sing while acting out the lyrics to the song. During the four-minute song, the performers made sexual gestures with each other behind a translucent curtain. . . . Ms. Rodley testified that Plaintiff held this production in the Evergreen Theater with no age restrictions.

The third video is entitled "Trixie Thunderpussy—Pussycat Song," which featured one performer whom Ms. Rodley characterized as a "female impersonator." This clip showed the performer pretending to sing the lyrics to a song while making gestures toward the pubic area. . . . Ms. Rodley testified that this production was held in an age-restricted venue and before the Plaintiff's formation as a nonprofit.

R. 91, PageID 1418–19.

## III.

After a bench trial, the district court declared the AEA unconstitutional and permanently enjoined Mulroy from enforcing the law in Shelby County. This court uses various standards when reviewing a decision imposing a permanent injunction. *CSX Transp., Inc. v. City of Sebree*, 924 F.3d 276, 282 (6th Cir. 2019). "Factual findings are reviewed under the clearly erroneous standard, legal conclusions are reviewed de novo, and the scope of injunctive relief is reviewed for an abuse of discretion." *Id.* (quotation omitted).

## IV.

Mulroy makes three primary arguments on appeal: (1) FOG lacked standing to sue Mulroy; (2) the AEA passes constitutional muster; and (3) the scope of the permanent injunction was improper. I address each argument in turn.

### A. FOG has Article III Standing

Mulroy argues that FOG's suit should be dismissed for lack of subject-matter jurisdiction. Article III of the U.S. Constitution limits federal courts' jurisdiction to deciding

"Cases" or "Controversies." U.S. Const. art. III, § 2. To that end, a party must have standing to bring an action in federal court. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "The doctrine of standing gives meaning to" the Article III "limits by identify[ing] those disputes which are appropriately resolved through the judicial process." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (alteration in original; quotation omitted).

As the party invoking our jurisdiction, FOG bore the burden of showing standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). And because FOG is an organization, it can meet this burden in one of two ways: (1) it "can claim that it suffered an injury in its own right," or, (2) "it can assert 'standing solely as the representative of its members.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). It is the former approach that is at issue. FOG needed to show that it suffered an injury in fact, that Mulroy caused the injury, and that the district court could redress the injury with a decision in FOG's favor. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). A plaintiff must prove standing "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. For cases that proceed to trial, like this one, "the specific facts set forth by the plaintiff to support standing 'must be supported adequately by the evidence adduced at trial.'" *TransUnion*, 594 U.S. at 431 (quoting *Lujan*, 504 U.S. at 561).

Where, as here, the plaintiff raises a pre-enforcement challenge against a statute, standing "often turns upon whether [the plaintiff] can demonstrate an 'injury in fact' before the state has actually commenced an enforcement proceeding against [it]." *Kiser v. Reitz*, 765 F.3d 601, 607 (6th Cir. 2014).

Not surprisingly, Mulroy focuses his jurisdictional challenge on the injury-in-fact component of the standing analysis. The injury-in-fact requirement helps to "ensure that the plaintiff has a personal stake in the outcome of the controversy." *Susan B. Anthony List*, 573 U.S. at 158 (citation omitted). To meet it, the plaintiff must establish "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks omitted). An injury is

"imminent" if it "is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List*, 573 U.S. at 158 (internal quotation marks omitted).

An organizational plaintiff like FOG "may sue on its own behalf because it has suffered a palpable injury as a result of the defendant['s] actions." *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 624 (6th Cir. 2016) (internal quotation marks omitted). This occurs when the organization's "ability to further its goals has been 'perceptively impaired' so as to constitute[] far more than simply a setback to the organization's abstract social interests." *Greater Cincinnati Coal. for the Homeless v. City of Cincinnati*, 56 F.3d 710, 716–17 (6th Cir. 1995) (alteration in original) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

FOG did not have to wait for Mulroy to enforce the AEA before challenging the constitutionality of the law. Threats of future harm equate to an injury in fact "as long as there is a 'substantial risk' that the harm will occur." *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 405 (6th Cir. 2019) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)). To bring a pre-enforcement challenge to a criminal statute, a plaintiff must show (1) "a *substantial probability* that the plaintiff actually will engage in conduct that is *arguably affected* with a constitutional interest," and (2) "a *certain* threat of prosecution if the plaintiff does indeed engage in that conduct." *See Crawford v. U.S. Dep't of Treasury*, 868 F.3d 438, 455 (6th Cir. 2017).

FOG had standing to bring its pre-enforcement challenge. The AEA is "far more than simply a setback to [FOG's] social interests," *see Greater Cincinnati Coal. for the Homeless*, 56 F.3d at 716 (quotation omitted); FOG's "ability to further its goals [through the performance of drag-centric entertainment] has been 'perceptively impaired,'" *see id.* (quoting *Havens Realty*, 455 U.S. at 379). Given the nature of its shows, along with the general admissions policy followed by the Evergreen Theater, there is a substantial probability that FOG will engage in conduct that is arguably affected by the AEA because it performs adult cabaret entertainment in a location where it could be viewed by a minor. *See* Tenn. Code Ann. § 7-51-1407(c)(1)(B). And if it does, FOG faces a certain threat of prosecution by Mulroy.

### 1.

First, FOG must show "an intention to engage in a course of conduct arguably affected with a constitutional interest." *Susan B. Anthony List*, 573 U.S. at 161. To make such a showing, FOG needed to make specific factual claims of past conduct involving a constitutionally protected right, along with a stated intent to engage in substantially similar conduct in the future. *See, e.g.*, *id.* at 161–62; *Kiser*, 765 F.3d at 608 (finding requirement satisfied because petitioner "alleged that he has advertised both general dentistry and endodontic services in the past and that he intends to do so in the future."); *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 549–50 (6th Cir. 2021).

FOG did so. At trial, FOG played videos of its productions. One video showed a group of drag performers satirizing the co-hosts of The View by "describ[ing] sexual acts including intercourse and masturbation," and another video showed a group of actors satirizing a song by Meatloaf while portraying sexual acts. R. 91, 1400–01; R. 81, PageID 1081–83. The trial evidence reflected, and the district court found, that these productions were "typical of [FOG]'s productions since 2011." R. 91, PageID 1401. And FOG indicated that it intended "to continue producing these types of shows in pursuit of its mission." *Id.* Thus, FOG showed that its conduct is affected with a constitutional interest because it intends to continue producing satirical drag shows—expressive conduct protected by the First Amendment.

In addition to the verbal and written word, the First Amendment's Free Speech Clause shelters acts "sufficiently imbued with elements of communication," *i.e.*, "expressive conduct." *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (citation omitted). Discerning what conduct is "expressive" requires the application of the *Spence* test, which asks: (1) whether the speaker intended to convey "a particularized message"; and (2) whether there was a great likelihood that "the message would be understood by those who viewed it." *Id.* (quoting *Spence v. Washington*, 418 U.S. 409, 410–411 (1974)).

FOG's drag shows satisfy both elements. To start, the organization's shows are intended to convey a "particularized message" because of the satirical elements found therein. And because these sketches frequently satirize popular figures, there is a "great likelihood" that they

will be understood by audiences. Thus, FOG's prior conduct is arguably protected by the First Amendment. *See Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386 (4th Cir. 1993) (finding fraternity's "ugly woman contest" skit featuring students dressed as satirical representations of women protected as expressive conduct). And because FOG has stated that it will continue with these kinds of sketches even if it "does not know the precise content of its future shows," it has also shown that it intends to continue to engage in substantially similar conduct. R. 81, PageID 1100; R. 91, PageID 1421.

Mulroy argues that FOG was required to articulate with more "specificity, the speech or conduct to be included in its future shows." D. 26 at p.31. For that proposition, he cites *Fieger v. Michigan Supreme Court*, 553 F.3d 957 (6th Cir. 2009). Yet *Fieger* is factually distinct, as that case involved a plaintiff who was twice charged with violating the "courtesy and civility" provisions of the Michigan Rules of Professional Conduct and who then challenged the constitutionality of those provisions on their face. *Id.* at 957. There, we held that the plaintiff could not show a reasonable threat of future sanction because the "chain of events" that needed to occur was "simply too attenuated." *Id.* at 967. That was because the plaintiff had to establish, among other things, that he was "likely to be . . . speaking about a pending case" in the future that would subject him to the provisions; that the speech would "concern participants in that case and be vulgar, crude, or personally abusive"; and "that the Michigan Supreme Court would, in its discretion, impose . . . sanctions." *Id.*

FOG's theory of harm is not so attenuated. To the contrary, its evidence showed that it was highly likely to engage in conduct that is central to the group's mission as a "dragcentric theater group," R. 81, PageID 1064, and that its future shows are likely to involve risqué material involving "male or female impersonators" based on the content of its past shows, *see* Tenn. Code Ann. § 7-51-1401(3). This court's precedent does not require more.

## 2.

FOG must also show that the conduct in which it intends to engage in the future is "proscribed by a statute." *Susan B. Anthony List*, 573 U.S. at 159 (quotation omitted). This requires consideration of whether FOG's proposed future conduct violates the AEA's plain text.

Recall that the AEA makes it a Class A misdemeanor (first offense) to "perform adult cabaret entertainment" where a minor could view it or "[o]n public property." Tenn. Code Ann. § 7-51-1407(c)(1), (c)(3). The AEA defines "adult cabaret entertainment" as:

>   (A)     [A]dult-oriented performances that are harmful to minors, as that term is defined in § 39-17-901, and that feature topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers; and
>
>   (B)     Includes a single performance or multiple performances by an entertainer[.]

*Id.* § 7-51-1401(3). An "entertainer" performs "actual or simulated specified sexual activities, including removal of articles of clothing or appearing unclothed." *Id.* § 7-51-1401(7)(B). A person is an adult if the person "has attained eighteen (18) years of age." *Id.* § 7-51-1401(1).

The Tennessee legislature placed the definition of "harmful to minors" in Tennessee's Criminal Code with the obscenity laws. The definition states that "harmful to minors"

>   means that quality of any description or representation, in whatever form, of nudity, sexual excitement, sexual conduct, excess violence or sadomasochistic abuse when the matter or performance:
>
>   (A)     Would be found by the average person applying contemporary community standards to appeal predominantly to the prurient, shameful or morbid interests of minors;
>
>   (B)     Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for minors; and
>
>   (C)     Taken as whole lacks serious literary, artistic, political or scientific values for minors[.]

*Id.* § 39-17-901(6). The Tennessee legislature defines a "minor" as "any person who has not reached eighteen (18) years of age and is not emancipated." *Id.* §§ 1-3-105(16); 39-17-901(8).

So, did FOG establish at trial that they intend to engage in adult cabaret entertainment in public or in a place that minors can view the performances? Yes. FOG produces "adult-oriented performances" that feature male and female impersonators. *See id.* § 7-51-1401(3)(A). And FOG's performers could also be considered "entertainers" because they perform simulated sex acts.

FOG's evidence also showed that its productions are held in locations where they "could be viewed by a person who is not an adult." *Id.* § 7-51-1407(c)(1)(B). Due to the Evergreen Theater's general admissions policy, FOG does not distinguish between adult and child ticket holders, and it does not verify the age of attendees. Thus, a "handful of minors" are already known to attend its shows.[3] R. 81, PageID 1110.

And FOG's evidence demonstrated that its productions are arguably "harmful to minors, as that term is defined in § 39-17-901." Tenn. Code Ann. § 7-51-1401(3)(A). The district court considered the contents of multiple FOG sketches. *See Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 56 (1973) (explaining that the "materials" are "sufficient in themselves for the determination of" whether they lack artistic value (quotation omitted)). Those productions showed FOG performers portraying sexual acts, including sexual intercourse and masturbation. Additionally, Ms. Rodley testified to the content common in FOG's shows, including simulating oral sex. Such conduct fits the definition of "harmful to minors," particularly when younger minors are exposed to such conduct. As Ms. Rodley testified, four- or five-year-old minors were unlikely to "get any value" from such performances. R. 81, PageID 1114.

Confronted with the plain text of the AEA and the undisputed facts developed at trial, Mulroy invites this court to rewrite the Act. Although Tennessee law says that a minor is anyone under the age of 18, Tenn. Code Ann. § 1-3-105(16), Mulroy contends that a minor is a "reasonable 17-year-old." As support for his argument, Mulroy relies on an incorrect and anachronistic reading of *Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520 (Tenn. 1993).

---

[3]The district court also found that FOG had standing to challenge the AEA's public-property provision. *See* Tenn. Code Ann. § 7-51-1407(c)(1)(A). But the record does not support this finding. Ms. Rodley testified that FOG has never performed a pre-scripted drag show on public property. And while FOG does participate in the annual Memphis Pride Festival, it appears that the organization does not conduct "adult-oriented performances" at that event. *Id.* § 7-51-1401(3). Instead, Ms. Rodley explained that FOG merely rides a float and hands out flowers. Such activities plainly do not qualify as "adult cabaret entertainment" under the AEA. *Id.* § 7-51-1401(3).

Federal courts have an "independent obligation . . . to ensure a case or controversy exists as to each challenged provision" of a given ordinance. *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 350 (6th Cir. 2007) (quotation omitted). And we have rejected the "idea that an injury in fact under one provision creates standing to challenge" another. *Id.* For this reason, I agree with the majority that FOG lacks standing to challenge the AEA's public-property provision.

In *Davis-Kidd*, the Tennessee Supreme Court considered a First Amendment overbreadth challenge to Tennessee's display statute, which criminalizes the "display for sale or rental" of any "visual depiction" containing "material harmful to minors anywhere minors are lawfully admitted."  866 S.W.2d at 522 (emphasis omitted) (quoting Tenn. Code Ann. § 39-17-914(a) (1991)).  In the introductory paragraphs of the opinion, the *Davis-Kidd* court announced that "the *display statute* is readily susceptible to a narrowing construction which makes it only applicable to those materials which lack serious literary, artistic, political, or scientific value for a reasonable 17-year-old minor." *Id.* (emphasis added).  In its analysis, the court "h[e]ld that the *display statute* applies only to those materials which lack serious literary, artistic, political, or scientific value for a reasonable 17-year-old minor." *Id.* at 528 (emphasis added).  And in case a reader missed those two pronouncements, the court repeated it in the conclusion and even provided a citation to the statute it construed: "[W]e conclude that the *display statute*, Tenn. Code Ann. § 39-17-914, is not unconstitutionally overbroad with the limiting construction applied, because it proscribes only the knowing display of materials which, taken as a whole, lack serious literary, artistic, political, or scientific value for a reasonable seventeen year old minor." *Id.* at 532–33 (emphasis added).

Despite *Davis-Kidd* stating several times that it was construing the display statute, Mulroy argues that the court was in fact interpreting Tenn. Code Ann. § 39-17-901(6), the harmful-to-minors statute.  And he takes it a step further by arguing that *Davis-Kidd* applied a narrowing construction to the AEA, which was enacted 30 years after *Davis-Kidd*.

The fallacy of Mulroy's argument is obvious.  Other than *Davis-Kidd* citing the harmful-to-minors statute, Mulroy can point to nothing showing that the *Davis-Kidd* court construed anything other than what it said it was construing—the display statute.  To the extent there was any confusion about what statute *Davis-Kidd* interpreted, post-*Davis-Kidd* cases confirm that the Tennessee Supreme Court interpreted the display statute. *See Blackwell v. Haslam*, No. M2011-00588, 2012 WL 113655, at *5 (Tenn. Ct. App. Jan. 11, 2012); *State ex rel. Woodall v. D&L Co.*, No. W1999-00925, 2001 WL 524279, at *7–8 (Tenn. Ct. App. May 16, 2001).  And, of course, Mulroy cannot show that *Davis-Kidd* reached forward 30 years to construe the AEA.

When the Tennessee legislature wants to import a court's interpretation into a statute, it knows how to do so. *See* Tenn. Code Ann. §§ 71-5-126; 45-20-111.

Nevertheless, the majority accepts Mulroy's invitation to misread *Davis-Kidd*, claiming that *Davis-Kidd* interpreted the harmful-to-minors statute. *See* Maj. Op. at 3, 5–6. The majority neglects to mention the actual law that *Davis-Kidd* interpreted—the display statute. The consequences of this misreading are far-reaching. For example, in 2022, the Tennessee legislature required public K-12 schools to obtain technology for its computers that would prohibit users from accessing materials on the computers "that are deemed to be harmful to minors, as defined in § 39-17-901." Tenn. Code Ann. § 49-1-221(a)(1)(C)(ii). Both the legislature and grade schools will be shocked to learn that, although K-12 school-age children generally range from 5 to 18 years old, public schools must bar only those materials that are harmful to a reasonable 17-year-old minor.

To be sure, we have relied on a state court's narrowing construction of a state statute in determining whether a plaintiff has sustained an injury in fact. *See Fieger*, 553 F.3d at 965. But Tennessee courts have not adopted a narrowing construction of the AEA. And it is improper for this court to adopt a narrowing construction of the AEA when assessing standing. In *Virginia v. American Booksellers Association, Inc.*, for instance, the Supreme Court found that the plaintiffs had standing before certifying questions to the state supreme court to determine if the statutes at issue were "readily susceptible to a narrowing construction." 484 U.S. 383, 393, 397–98 (1988) (internal quotation marks omitted). In First Amendment challenges, federal courts apply their own narrowing constructions to statutes only after finding the statutes unconstitutional as written. *See, e.g.*, *Erznoznik v. Jacksonville*, 422 U.S. 205, 216 (1975) (assessing whether to apply narrowing construction after concluding challenging ordinance was unconstitutionally overbroad); *Anderson v. Spear*, 356 F.3d 651, 665–66 (6th Cir. 2004) (applying narrowing construction after determining statute was unconstitutionally overbroad).

Mulroy contends that FOG has not shown that its productions lacked serious artistic value as a whole, *see* Tenn. Code Ann. § 39-17-901(6)(C), because it presented evidence of only a few isolated scenes, rather than an entire show. Mulroy runs into a few problems with this argument. First, he argued differently before the district court. There, Mulroy acknowledged

that there was "one complete show in the record." R. 85, PageID 1332. Second, the district judge stated that he viewed FOG's "full videos" before deciding whether FOG's performances were harmful to minors, rather than limiting his review to video clips that FOG showed during the trial. And third, Rodley testified about the content of FOG's shows. Mulroy put forth no evidence to rebut Rodley's description of FOG's performances.

All in all, FOG's trial evidence demonstrated that its productions are "arguably . . . proscribed by" the AEA. *See Crawford*, 868 F.3d at 454.

### 3.

FOG needed to also show that it faced "a credible threat of enforcement" of the AEA against it. *See Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022) (per curiam) (citations omitted). To that end, there must be "an actual and well-founded fear that the law will be enforced against" the plaintiff. *Am. Booksellers*, 484 U.S. at 393. That is because "self-censorship" is "a harm that can be realized even without an actual prosecution." *Id.* But "mere allegations of a 'subjective chill' on protected speech are insufficient." *McKay v. Federspiel*, 823 F.3d 862, 868–69 (6th Cir. 2016) (quoting *Berry v. Schmitt*, 688 F.3d 290, 296 (6th Cir. 2012)). Subjective chill, combined with any of the following factors, establishes a credible threat of prosecution: (1) "a history of past enforcement against the plaintiffs or others"; (2) "enforcement warning letters sent to the plaintiffs regarding their specific conduct"; (3) "an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action"; and (4) "a defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff." *Id.* at 869. Those "factors are not exhaustive, nor must each be established." *Online Merchs. Guild*, 995 F.3d at 550.

And "when dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution" absent compelling evidence to the contrary. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020) (quoting *N.H. Right to Life PAC v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996)); *see also Picard v. Magliano*, 42 F.4th 89, 98

(2d Cir. 2022); *Cooksey v. Futrell*, 721 F.3d 226, 237 (4th Cir. 2013); St. *Paul Chamber of Com. v. Gaertner*, 439 F.3d 481, 486 (8th Cir. 2006); *Commodity Trend Serv. v. Commodity Futures Trading Comm'n*, 149 F.3d 679, 687 (7th Cir. 1998). "This is because a court presumes that a legislature enacts a statute with the intent that it be enforced." *Bryant v. Woodall*, 1 F.4th 280, 286 (4th Cir. 2021) (citations omitted).

To start, the newly enacted AEA has caused FOG to chill its speech. As the district court found, "[FOG] is concerned that the AEA could subject" it to criminal "charges." R. 91, PageID 1401. That has led FOG "to alter the content of their productions, and to spend more on security at the Evergreen Theater." *Id.*

Next, consider the application of the *McKay* factors. Of course, the first two factors do not apply because the district court enjoined the AEA in Shelby County before the Act could take effect. The third *McKay* factor favors FOG because the AEA has multiple attributes that make it "easier" to be enforced. *See McKay*, 823 F.3d at 869.

For one, the AEA is a strict-liability crime. Criminal offenses housed in Tennessee's Criminal Code require "[a] culpable mental state . . . unless the definition of an offense plainly dispenses with a mental element." Tenn. Code Ann. § 39-11-301(b). "[I]ntent, knowledge or recklessness suffices to establish the culpable mental state." *Id.* § 39-11-301(c). But the AEA lacks a scienter requirement because it is not in the Criminal Code. The Tennessee legislature placed the AEA in the part of the Tennessee Code that regulates adult-oriented businesses. "[P]ublic welfare or regulatory offenses which allow for a form of strict criminal liability through statutes . . . do not require the defendant to know the facts that make his conduct illegal." *State v. Terry*, No. E2021-00406, 2022 WL 1288587, at *11 (Tenn. Crim. App. Apr. 29, 2022) (quoting *Staples v. United States*, 511 U.S. 600, 606 (1994)). Thus, to establish a violation of the AEA, a prosecutor would not have to prove that a defendant acted with a culpable mental state.

Second, the AEA's broadness makes it easier to enforce. Mulroy can prosecute a violation of the law for conduct that occurs at any location that "could be viewed by a person who is not an adult." Tenn. Code Ann. § 7-51-1407(c)(1)(B). This includes the Evergreen Theater where FOG performs—the trial evidence showed that minors have been admitted to

FOG's shows.  And, as Mulroy conceded at oral argument, it also includes the home where minors live or have access.  Keep in mind, the AEA applies to, among others, male and female impersonators.  *Id.* § 7-51-1401(3), (7).  Males can impersonate females.  But males can also impersonate other males.  And females can impersonate males and females.

Third, the AEA's reliance on a variable-obscenity standard provides law enforcement with wide discretion in deciding what conduct is potentially "harmful to minors."  Indeed, obscenity—like beauty—is in the eyes of the beholder.  *See Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring) ("I know it when I see it.").  This likely explains why the Supreme Court abandoned their attempts at developing a unified, objective definition of the term and, instead, opted for a standard guided by the contemporary values of the relevant community.  *Compare Roth v. United States*, 354 U.S. 476, 487 (1957) ("Obscene material is material which deals with sex in a manner appealing to prurient interest."), *and A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Att'y Gen. of Mass.*, 383 U.S. 413, 418 (1966) (same), *with Miller v. California*, 413 U.S. 15, 30 (1973) ("To require a State to structure obscenity proceedings around evidence of a national 'community standard' would be an exercise in futility.").

The fourth *McKay* factor also favors FOG because Mulroy refuses to "disavow enforcement" of the AEA against FOG.  *McKay*, 823 F.3d at 869.  He has instead expressed his intention to enforce it.  And "as a district attorney general," Mulroy "has both a 'constitutional and statutory obligation to prosecute offenses committed in [Shelby] County.'"  *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1035 (6th Cir. 2022) (quoting *Ramsey v. Town of Oliver Springs*, 998 S.W.2d 207, 208 (Tenn. 1999)); *see also* Tenn. Code Ann. § 8-7-103(1) ("Each district attorney general . . . [s]hall prosecute in the courts of the district all violations of the state criminal statutes[.]").  This court has found the fourth *McKay* factor satisfied where, although government officials had not threatened to enforce a statute against a particular party, "they also have not explicitly disavowed enforcing it in the future."  *Green Party of Tenn. v. Hargett*, 791 F.3d 684, 696 (6th Cir. 2015); *see also Universal Life*, 35 F.4th at 1035 (holding that a district attorney had not disavowed enforcement of a criminal law because he never "provided clear assurances" that he would not prosecute the plaintiffs).

Because Mulroy refuses to take any affirmative step suggesting that he will not enforce the AEA against FOG, FOG has satisfied the disavow-enforcement factor. *See Am. Booksellers*, 484 U.S. at 387, 393 (finding standing to raise pre-enforcement challenge because the state had "not suggested that the newly enacted law will not be enforced").

The majority's arguments that FOG has not established a credible threat of prosecution are unavailing.

As it relates to the third *McKay* factor, the majority argues that enforcement of the AEA is not easier because a member of the public cannot initiate enforcement of the AEA. That is incorrect. Tennessee allows citizens' arrests. Thus, anyone in Tennessee can arrest another person "[f]or a public offense committed in the arresting person's presence." Tenn. Code Ann. § 40-7-109(a)(1). This encompasses all misdemeanors committed in public and in the presence of the person making the arrest. *State v. Smith*, 695 S.W.2d 954, 959 (Tenn. 1985). A violation of the AEA is a misdemeanor. And FOG conducts its performances in public at the Evergreen Theater. Thus, anyone can make an arrest for a violation of the AEA. Tennessee law also allows anyone to present evidence to a grand jury if the person has "knowledge or proof of the commission of a public offense." Tenn. Code Ann. § 40-12-104(a). As mentioned above, Mulroy is required to "prosecute . . . all violations of state criminal statutes." *Id.* § 8-7-103(1). In *Platt v. Board of Commissioners on Grievances & Discipline of the Ohio Supreme Court*, this court found that enforcing Ohio's Judicial Code was made easier because any person could file a grievance. 769 F.3d 447, 452 (6th Cir. 2014). Surely a person making an arrest or seeking an indictment has at least the same effect as filing a grievance.

But even if the majority was correct that members of the public cannot initiate enforcement of the AEA, that does not help Mulroy. In *Universal Life*, we found that the plaintiff had standing to bring a pre-enforcement challenge to a criminal statute against the Hamilton County district attorney after the Tennessee legislature banned ministers for solemnizing weddings if they received their ordinations online and increased the criminal penalty for making false statements. 35 F.4th at 1034. This court found that Universal Life Church ministers had standing to sue the district attorney, even though no one had been prosecuted under the criminal statute, because the amendment that increased the criminal penalty for making false

statements "emboldened prosecutors in a way that they were not before the amendment." *Id.* at 1035.  That same rationale applies here.  The majority suggests that *Universal Life* is inapposite because the harmful-to-minors statute has not changed.  But the majority fails to acknowledge that the AEA is a new statute with a criminal penalty that did not exist before the Act's enactment.  And because the AEA is a new statute that restricts expressive activity, we should "assume a credible threat of prosecution" and that Mulroy intends to enforce the law.  *Speech First*, 979 F.3d at 335.

The majority relies on *Davis-Kidd* to argue that a scienter requirement is automatically imputed into the AEA.  But that is yet another misreading of *Davis-Kidd*.  The Tennessee Supreme Court did not impose a scienter requirement to the display statute at issue in that case.  Rather, *Davis-Kidd* correctly noted that a scienter requirement applied already to the display statute because of its placement in the Criminal Code.  866 S.W.2d at 528 (citing Tenn. Code Ann. § 39-11-301(c)).  The AEA is different—it is not in the Criminal Code.

As to a disavowal factor, the majority contends that the focus should be on a particular plaintiff.  I agree.  The problem is that Mulroy has not disavowed enforcement of the AEA as to FOG.  The overwhelming weight of the authority from this court supports FOG on this point.  *See Kareem v. Cuyahoga Cnty. Bd. of Elections*, 95 F.4th 1019, 1027 (6th Cir. 2024); *Universal Life*, 95 F.4th at 1035; *Online Merchs. Guild*, 995 F.3d at 551 (finding the disavowal factor favored the plaintiff because the attorney general had not disavowed his enforcement activities); *Green Party*, 791 F.3d at 696; *Platt*, 769 F.3d at 452.

\*     \*     \*

In sum, I conclude that FOG showed that it suffered an injury in fact.  The evidence presented at trial demonstrated a "substantial probability" that FOG will engage in conduct that is "arguably affected" by the AEA, *Crawford*, 868 F.3d at 455, and that it will face a "certain threat of prosecution" if it continues to engage in that conduct, *id.*  FOG can easily establish the causation and redressability components of standing.  Because Mulroy is responsible for enforcing the AEA in Shelby County, the violation of FOG's First Amendment rights is traceable to him.  *See Kareem*, 95 F.4th at 1027.  And FOG's request for injunctive and

declaratory relief would redress its harm. *See id.* Therefore, FOG proved that it had standing to sue Mulroy.

**B. The AEA is a Content-Based Restriction that Cannot Survive Strict Scrutiny**

The majority reverses the district court because it finds that FOG lacks standing. So the majority does not address whether the AEA violates FOG's First Amendment rights. Because I find that FOG had standing to sue Mulroy, I must reach FOG's First Amendment challenge.

Applicable to the States through the Fourteenth Amendment, the First Amendment prohibits the government from "abridging the freedom of speech." U.S. Const. amend. I; *Grosjean v. Am. Press Co.*, 297 U.S. 233, 243 (1936). As the Supreme Court has explained, the Free Speech Clause protects "the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). This includes expressive conduct that is "sufficiently imbued with elements of communication." *Johnson*, 491 U.S. at 404 (quoting *Spence*, 418 U.S. at 409). Like many constitutional rights, the freedom of speech and expression is not unlimited. States may "constitutionally impose reasonable time, place, and manner regulations" on speech, but they may not "discriminate in the regulation of expression on the basis of the content of that expression." *Hudgens v. NLRB*, 424 U.S. 507, 520 (1976). But "above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of City of Chi. v. Mosley*, 408 U.S. 92, 95 (1972).

**1.**

The district court found that the AEA is a content-based regulation of speech and expression. In doing so, the district court did not err.

As the Supreme Court has told us, "[c]ontent-based laws . . . target speech based on its communicative content[.]" *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). More specifically, a law is content based if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* "Content-based prohibitions, enforced by

severe criminal penalties, have the constant potential to be a repressive force in the lives and thoughts of a free people." *Ashcroft v. ACLU*, 542 U.S. 656, 660 (2004).

The government may permissibly restrict "the content of speech in a few limited areas, which are 'of such slight social value . . . that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.'" *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382–83 (1992) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942)). This low-value speech includes obscenity, defamation, true threats, and fighting words. *See id.* Outside of low-value speech, content-based laws are subject to strict scrutiny and are presumed unconstitutional. *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 618 (2020) (plurality op.); *Reed*, 576 U.S. at 163. The government bears the burden of showing that a content-based law is constitutional. *Ashcroft*, 542 U.S. at 660.

In determining whether a law is content based, courts must "consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Reed*, 576 U.S. at 163 (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 563 (2011)). "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose." *Id.* Even laws that are facially content neutral can be "considered content-based regulations" if the laws "cannot be justified without reference to the content of the regulated speech," or the laws "were adopted by the government because of disagreement with the message [the speech] conveys." *Id.* at 164 (alteration in original; internal quotation marks omitted).

Determining whether a speech regulation is content based is a two-step inquiry. First, courts ask whether the regulation is facially content based. *Id.* at 165. Such regulations are subject to strict scrutiny "regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." *Id.* (internal quotation marks omitted). But if the regulation is facially content-neutral, the second step requires consideration of whether its adoption was guided by an impermissible purpose, *i.e.*, the suppression of free expression. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *United States v. Eichman*, 496 U.S. 310, 315 (1990) ("Although the [statute] contains no explicit content-based limitation on the scope of prohibited conduct, it is nevertheless clear that the

Government's asserted *interest* is related to the suppression of free expression[.]" (internal quotation marks omitted)). An impermissible purpose may be gleaned by looking to "the law's justification or purpose." *Reed*, 576 U.S. at 166; *see also Sorrell*, 564 U.S. at 564; *Hill v. Colorado*, 530 U.S. 703, 711–719 (2000).

One need look no further than step one. The AEA is a facially content-based regulation that, by its terms, targets a specific category of content—"adult-oriented performances that are harmful to minors." Tenn. Code Ann. § 7-51-1401(3). The AEA applies to particular expressive conduct—adult-oriented performances—because of the message that such conduct expresses. *See Reed*, 576 U.S. at 163. Mulroy, though not conceding that the AEA is content based, agrees that the law "references the content of certain performances." D. 26 at p.55.

The Supreme Court has found that laws were content based in similar contexts. In *Ashcroft*, the Court found that the Child Online Protection Act, which criminalized posting materials on the internet that were "harmful to minors," was a content-based speech regulation. 542 U.S. at 660–66. Similarly, in *United States v. Playboy Entertainment Group, Inc.*, the Court determined that a statute regulating "sexually explicit adult [television] programming or other programming that is indecent" was a "content-based speech restriction." 529 U.S. 803, 811–813 (2000) (quotation omitted).

Although the AEA is content based, Mulroy argues that the district court should have treated the law as content neutral.

First, Mulroy contends that the AEA is nothing more than a time, place, or manner restriction that limits adult-themed performances to "adult-only zones." D. 26 at p.56. True, "[e]xpression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). Courts uphold such restrictions "only if they are 'justified without reference to the content of the regulated speech.'" *R.A.V.*, 505 U.S. at 386 (quoting *Ward*, 491 U.S. at 791). But the AEA did not create an adult-only zone. Instead, it criminalizes the performance of adult cabaret entertainment any place where a minor could view the performance. Tenn. Code Ann. § 7-51-1401(c)(1)(B). Because Mulroy has not identified the location of these purported adult-

only zones and because he has failed to justify the restriction without referencing the content of the expression, the AEA is not a valid time, place, or manner restriction.

Second, Mulroy argues that the secondary-effects doctrine applies to the AEA. This doctrine allows the government to "accord differential treatment to a content-defined subclass of speech because that subclass was associated with specific 'secondary effects' of the speech, meaning that the differential treatment was '*justified* without reference to the content of the . . . speech.'" *Daunt v. Benson*, 956 F.3d 396, 420 (6th Cir. 2020) (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986)). According to Mulroy, the AEA has the secondary effect of preventing sexual-exploitation crimes and sexual assaults. To that end, one must consider whether: (1) "the 'predominate concerns' motivating the [AEA] 'were with the secondary effects of adult [speech], and not with the content of adult [speech]'"; and (2) that a "connection [exists] between the speech regulated by the [AEA] and the secondary effects that motivated" its adoption. *See City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 440–41 (2002) (plurality op.) (quoting *Renton*, 475 U.S. at 47).

Mulroy cannot satisfy either consideration. Contrary to Mulroy's assertions, the legislative record does not reflect that sexual-exploitation crimes against children were a "predominate concern" of the Tennessee legislature. The statutory text does not mention, or create an inference, that sexual-exploitation crimes were the main concern of the legislature in passing the AEA. The legislative history bolsters this conclusion. Only one person mentioned a concern related to sexual exploitation: Ms. Starbuck, who testified as a witness at a committee hearing. The legislators did not discuss sexual exploitation or sexual assaults at all. Supporters of the AEA bill instead focused on the expressive content. And neither the text of the AEA nor the legislative record makes a connection between the conduct the AEA seeks to regulate and the risk of sexual exploitation.

In sum, the AEA is a content-based restriction on speech. It is not a time, place, or manner restriction. And the secondary-effects doctrine does not apply. Therefore, the AEA is subject to strict scrutiny.

**2.**

Because the AEA imposes a content-based restriction on speech, it must survive strict scrutiny. This requires Mulroy "to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011) (quotation omitted). In other words, is the AEA the "least restrictive means [to regulate protected speech] among available, effective alternatives[?]" *United States v. Alvarez*, 567 U.S. 709, 729 (2012) (plurality op.) (quoting *Ashcroft*, 542 U.S. at 666). "Only a rare case . . . survives strict scrutiny." *Norton Outdoor Advert., Inc. v. Vill. of St. Bernard*, 99 F.4th 840, 851 (6th Cir. 2024) (internal quotation marks omitted).

Mulroy has identified a compelling interest—"safeguarding the physical and psychological well-being of a minor." *New York v. Ferber*, 458 U.S. 747, 756–57 (1982) (quotation omitted). No one disputes that the AEA furthers that interest.

But the AEA is not narrowly tailored to further the interest of safeguarding minors. As the Supreme Court has explained, if a less restrictive method is available, then "the legislature must use that alternative." *Playboy Entm't Grp.*, 529 U.S. at 813. "To do otherwise would be to restrict speech without an adequate justification, a course the First Amendment does not permit." *Id.* "A statute that 'effectively suppresses a large amount of speech that adults have a constitutional right to receive and to address to one another . . . is unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve.'" *Ashcroft*, 542 U.S. at 665 (alteration in original) (quoting *Reno v. ACLU*, 521 U.S. 844, 874 (1997)).

Some of the strongest evidence that the AEA is not narrowly tailored comes from Mulroy's attempts to rewrite the Act. The AEA says that adult cabaret entertainment "[m]eans adult-oriented performances that are harmful to minors." Tenn. Code Ann. § 7-51-1401(3)(A). And under Tennessee law, a minor is anyone under the age of 18. *Id.* §§ 1-3-105(16); 7-51-1401(1). But Mulroy argues that, through *Davis-Kidd*, the AEA limits the harmful-to-minors definition to content that lacks value to a reasonable 17-year-old minor. Also, the AEA prohibits adult cabaret entertainment "[i]n a location" that "could be viewed by a" minor. *Id.* § 7-51-

1407(c)(1)(B). Mulroy tries to narrow this rather broad language to mean that such entertainment can be performed only "in private, age-restricted venues." Additionally, Mulroy seeks to write a scienter requirement into the AEA that the plain text of the law does not support. *See Smith v. California*, 361 U.S. 147, 154–55 (1959) (finding an ordinance criminalizing the possession of obscene books unconstitutional because it did not require proof of a culpable mental state).

Another issue is that the AEA contains no affirmative defenses. Notably, it lacks a parental-consent defense, which are found commonly in statutes seeking to protect minors from indecent sexual materials. *See, e.g.*, Fla. Stat. § 847.013(3)(c); Ohio Rev. Code Ann. § 2907.31(B)(2). In fact, the Tennessee legislature codified a parental-consent exception in the display statute at issue in *Davis-Kidd*. *See* Tenn. Code Ann. § 39-17-914(b)(6). That further shows that the AEA is not narrowly tailored.

When there is "a plausible, less restrictive alternative . . . to a content-based speech restriction," the government must "prove that the alternative will be ineffective to achieve its goals." *Playboy Entm't Grp.*, 529 U.S. at 816. Mulroy cannot meet his burden. Because Mulroy proposed three alternatives—modifying the harmful-to-minors definition; limiting § 7-51-1407(c)(1)(B)'s reach to private, age-restricted venues; and reading a scienter requirement into the AEA—he has essentially conceded that those alternatives would be effective. Not only are those alternatives effective, but they were available to the Tennessee legislature. The legislature could have incorporated *Davis-Kidd*'s narrowing construction of the display statute into the AEA just as it has included court interpretations in other statutes. *See* Tenn. Code Ann. §§ 71-5-126; 45-20-111. It could have limited § 7-51-1407(c)(1)(B)'s reach to private, age-restricted venues. And the legislature could have placed the AEA in the Criminal Code to take advantage of the default scienter requirements contained there. *See id.* § 39-11-301(c). As to the parental-consent defense, the legislature could have copied from its display statute. *See id.* § 39-17-914(b)(6).

The Supreme Court has found content-based restrictions similar to the AEA unconstitutional even though those laws were more narrowly tailored. In *Ashcroft*, the Court considered the Child Online Protection Act, which prohibited individuals from knowingly

posting content on the internet that was "harmful to minors." 542 U.S. at 661. That law's harmful-to-minors definition resembles Tennessee's. *Id.* at 661–62 (citing 47 U.S.C. § 231(e)(6)). Even though the law contained a scienter requirement, the Court found that the government had failed to show that the law was the least restrictive alternative. *Id.* at 660–61. The Third Circuit ultimately held that the law could not withstand strict scrutiny. *ACLU v. Mukasey*, 534 F.3d 181, 207 (3d Cir. 2008). In *Reno*, the Court reviewed a challenge to the Communications Decency Act of 1996 which, in pertinent part, prohibited individuals from knowingly sending or displaying "patently offensive messages in a manner that is available to a person under 18 years of age." 521 U.S. at 859. The statute included two affirmative defenses. *Id.* at 860–61. Still, the Court held that the law could not withstand strict scrutiny. *Id.* at 878–79; *see also Playboy Entm't Grp.*, 529 U.S. at 813. The AEA should meet the same fate.

### 3.

I also consider whether the AEA is subject to a "narrowing construction that would make it constitutional." *Am. Booksellers*, 484 U.S. at 397. This is possible only if the law is "readily susceptible to the limitation; we will not rewrite a state law to conform it to constitutional requirements." *Id.* (internal quotation marks omitted). That said, this court "should not assume that state courts would broaden the reach of a statute by giving it an expansive construction." *Richland Bookmart, Inc. v. Nichols*, 137 F.3d 435, 441 (6th Cir. 1998) (internal quotation marks omitted). Here, no narrowing mechanism can save the AEA. At a minimum, rescuing the AEA would require: (1) writing in a scienter requirement, (2) creating affirmative defenses, and (3) limiting Tenn. Code Ann. § 7-51-1407(c)(1)(B)'s reach to private, age-restricted venues. In other words, it would require a rewrite of the AEA.

\*     \*     \*

The AEA is a content-based restriction on speech that cannot withstand strict scrutiny. It therefore violates the First Amendment. As a result, I do not need to also conduct substantial-overbreadth and vagueness analyses. *See R.A.V.*, 505 U.S. at 381 & n.3.

### C.    Scope of Relief

The district court declared the AEA an unconstitutional restriction on speech and enjoined Mulroy from enforcing the Act in Shelby County.  Mulroy does not challenge the district court's declaratory-judgment remedy, but he does contest the scope of the injunctive relief.

When a statute violates a person's free-speech rights, "[c]ourts invalidate such statutes in their entirety to prevent a chilling effect, whereby speakers self-censor protected speech to avoid the danger of possible prosecution."  *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1054 (6th Cir. 2015) (internal quotation marks omitted).  "[B]ecause it impairs a substantial amount of speech beyond what is required to achieve acceptable objectives, 'a statute which chills speech can and must be invalidated where its facial invalidity has been demonstrated.'"  *Id.* (quoting *Citizens United v. FEC*, 558 U.S. 310, 336 (2010)); *see also Reed*, 576 U.S. at 172.

The district court erred in enjoining Mulroy from enforcing the public-property provision of the AEA, Tenn. Code Ann. § 7-51-1407(c)(1)(A), because FOG lacked standing to challenge that provision.  But the district court did not err in enjoining Mulroy from enforcing Tenn. Code Ann. § 7-51-1407(c)(1)(B) because that provision is a content-based restriction on speech that fails strict scrutiny.  Thus, the district court did not abuse its discretion by prohibiting Mulroy from enforcing that unconstitutional law in Shelby County.

### V.

FOG had standing to bring this action against Mulroy.  And the AEA is an unconstitutional content-based restriction on speech.  Therefore, I would affirm the district court's decision to enjoin Mulroy from enforcing Tenn. Code Ann. § 7-51-1407(c)(1)(B) in Shelby County.

I respectfully dissent.